**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul Johnson Drywall Incorporated, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>Sterling Group LP,<br><br>    Defendant. | No. CV-21-01408-PHX-DWL<br><br>**ORDER** |

Pending before the Court is Defendant The Sterling Group, L.P.'s ("Sterling") motion to dismiss the second amended complaint ("SAC") for failure to state a claim. (Doc. 37.) The motion is fully briefed (Docs. 48, 50) and neither side requested oral argument. For the following reasons, the motion is granted in part and denied in part.

**BACKGROUND**

I.   The Parties

There are three plaintiffs in this action (collectively, "Plaintiffs"): (1) Paul Johnson Drywall, Inc. ("PJD"); (2) the Johnson 2013 Irrevocable Trust, dated December 28, 2013; and (3) the RCJ Irrevocable Trust, dated April 29, 2010. (Doc. 56 ¶¶ 1-2.) PJD is an Arizona-based "provider of drywall-related goods and services" and "market leader." (*Id.* ¶¶ 1, 15.) The two trusts (together, "the Johnson Trusts") own equity interests in PJD. (*Id.* ¶ 46.) The defendant, Sterling, is a Texas-based entity. (*Id.* ¶ 5.)

II.   PJD's Protected Information

PJD, which has been in the drywall business for more than 50 years, has "developed

confidential and proprietary business information and other trade secrets" during its course of operation. (*Id.* ¶¶ 16-17.) This information, which is referred to in the SAC as the "Protected Information," "is extraordinarily valuable" and PJD has taken reasonable and appropriate steps to protect it. (*Id.* ¶¶ 18-20.)

One component of the Protected Information, which PJD developed in the years leading up to 2020, consists of "a roll-up strategy to acquire other drywall companies in high-growth markets throughout the United States where existing customers were underserved and to implement and adapt [PJD's] Protected Information into a broad national platform." (*Id.* ¶ 21.) This roll-up strategy is referred to in the SAC as "PJD's Venture." (*Id.*)

III. **PJD Shares Protected Information With Sterling Following Execution Of A Non-Disclosure Agreement And A Letter Of Intent**

Beginning in early 2020, Sterling began exploring the possibility of acquiring PJD. (*Id.* ¶ 26.) As part of these discussions, PJD and Sterling entered into a non-disclosure agreement ("NDA"). (*Id.* ¶ 27.) Under the NDA, PJD agreed to share the Protected Information with Sterling. (*Id.* ¶ 28.) Sterling, in turn, "promised [1] that it would protect this Confidential Information, [2] that it would use the Confidential Information only to evaluate, negotiate and, if applicable, consummate the acquisition of PJD, and [3] that it would direct any person receiving such information in connection with the above activities to comply with the obligations of the NDA." (*Id.*, brackets added.) The parties also agreed, in § 2.8 of the NDA, that any "breach of this Agreement may cause irreparable harm to the non-breaching party, which harm cannot be adequately compensated by money damages." (*Id.* ¶ 36.)

Between 2020 and mid-2021, "in reliance upon the protections provided by the NDA," PJD provided various pieces of Protected Information to Sterling. (*Id.* ¶ 43.)[1]

---

[1] "The Protected Information PJD provided to Sterling included valuable financial, operational, market, resources, personnel and contact information relating to PJD and others in the drywalling industry; information concerning markets and regions . . . ; strategy and operations models for the PJD Venture; information concerning employee relations; risks and benefits of PJD's W-2 labor model versus the 1099 model being utilized by PJD's competitors and others; legal and regulatory compliance information; valuable vendor,

Much of this information-sharing occurred via a virtual data room that Sterling (and Sterling's outside consultants) used to access documents that had been uploaded by PJD. (*Id.* ¶¶ 67-68.)

Throughout 2020, at the same time it was sharing Protected Information with Sterling pursuant to the NDA, PJD continued pursuing the roll-up strategy it had previously devised. (*Id.* ¶ 25 ["During 2020, PJD planned, analyzed, and took substantial steps to execute PJD's Venture."]; *id.* ¶ 42 ["From March 2020 through December 2020, PJD actively continued to pursue PJD's Venture . . . ."].) However, "[i]n early 2021, Sterling asked PJD to 'take its foot off the gas' on PJD's Venture and to allow Sterling not only to acquire PJD but also to participate as the majority partner/private equity sponsor for PJD's roll-up in what would essentially be a joint venture." (*Id.* ¶ 45.) To that end, PJD and Sterling entered into a letter of intent ("LOI"), with an effective date of April 23, 2021, that "set forth the purchase price Sterling would pay for the acquisition of PJD, the manner in which PJD would be acquired through a newly-created entity, and material terms and structure by which the equity owners of PJD—the Johnson Trusts—would participate in the newly-created entity as investors (and as management)." (*Id.* ¶ 46.)

Following the execution of the LOI, "Sterling kept requesting more and more details about the strategic pricing advantages and customer alignment that [the PJD Venture] gives PJD." (*Id.* ¶ 56.) However, "[i]mmediately after getting this detailed confidential information, Sterling represented it had unexpectedly changed its mind about doing any portion of the transaction that involved PJD and was withdrawing from the process." (*Id.*) This notification occurred on June 11, 2021. (*Id.* ¶ 82.)

…

---

manufacturer, and distributor/supplier purchasing and integration models and information; customer and pricing models and information; spreadsheets, databases and other sources of financial information and analysis; valuable models and strategic and tactical advice and information; volume and related data for geographic market analysis . . . .; the identity of, and valuable information about, numerous identified target companies throughout the United States that are integrally involved in the drywall industry, including information concerning synergies and how to enhance those companies' profitability to establish which companies were likely to be the most 'actionable' participants in PJD's roll-up strategy." (Doc. 56 ¶ 44.)

IV.   The Alleged Breaches Of The Non-Disclosure Agreement

In the first paragraph under the heading "Sterling's Misuse of PJD's Protected Information," the SAC alleges that "[d]espite the explicit requirements of the NDA, Sterling disclosed PJD's Confidential Information to, among others: (1) a group of drywall companies known as Construction Applicators, Inc., which is PJD's largest potential national competitor for obtaining drywall work from customers; and to (2) Mike Callahan, who was originally presented to PJD as an 'industry expert' consulting with Sterling but who is also the recent CEO of . . . the largest drywall supply distributor in the United States and PJD's largest potential national competitor for providing drywall materials from manufacturers." (*Id.* ¶ 70.)  The SAC identifies three discrete sets of meetings in which the challenged disclosures occurred: (1) during a PowerPoint presentation by Sterling to Callahan in February 2021; (2) "on no fewer than six occasions in March and April 2021, [when] Sterling discussed Protected Information with Mike Callahan"; and (3) during a series of meetings on May 6-7, 2021 in Texas involving Sterling, Callahan, and representatives from Construction Applicators. (*Id.* ¶¶ 72-74.)  These disclosures resulted in "Sterling convey[ing] PJD's vital business information to third parties who are extremely well-positioned to collaborate and to compete with PJD on both the customer and supply sides of PJD's business model." (*Id.* ¶ 71.)

The SAC additionally alleges, "[u]pon [in]formation and belief," that Sterling disclosed unspecified "substantial additional Protected Information" to Construction Applicators, Callahan, and unspecified "other individuals and entities" on unspecified other dates. (*Id.* ¶ 76.)

Finally, the SAC alleges, again "[u]pon information and belief," that "despite the explicit requirements of the NDA," Sterling failed to instruct any of these recipients of Protected Information "that they had to comply with the restrictions of the NDA and could use the Confidential Information only in connection with 'evaluating, negotiating, and potentially consummating' the acquisition of PJD by Sterling." (*Id.* ¶ 77.)

…

V.  Subsequent Developments

On June 29, 2021—that is, a few weeks after Sterling gave notice that it would not be pursuing the acquisition of PJD—a Sterling representative wrote an email to a PJD representative stating, among other things, that "Sterling was 'still considering' proceeding to develop and implement the roll-up in the drywall industry without acquiring PJD or having any participation by the owners of PJD in the roll-up" and that "Sterling viewed itself as free to do so with PJD's targets and competitors, including but not limited to Construction Applicators, with whom Sterling had already shared large amounts of PJD's Protected Information." (*Id.* ¶ 84.)

After receiving this email, PJD has repeatedly asked Sterling for "information concerning the people to whom Sterling distributed PJD's Protected Information and the steps Sterling took to ensure compliance with the NDA and the protection of PJD's Protected Information" and sought "unambiguous assurances that Sterling has reversed its position that it is free to move forward with a national drywall roll-up platform, including doing so with people and entities to whom Sterling has distributed PJD's Protected Information." (*Id.* ¶ 86.)  However, Sterling has "never provided PJD with a comprehensive list of the identities of the people or entities with whom Sterling shared PJD's Confidential Information, or any evidence showing that such people or entities were provided with the directives required by the NDA" (*id.* ¶ 85) and has not provided any assurances related to its roll-up plans (*id.* ¶ 86).

The SAC alleges, "[u]pon information and belief," that "Sterling extracted valuable Protected Information from PJD for the benefit of Sterling, its existing portfolio companies and various targets, at PJD's expense . . . while excluding PJD from the anticipated transactions and continuing with the anticipated structures and transactions with other participants in the drywalling industry." (*Id.* ¶ 87.)  The anticipated transactions include using "PJD's business model" to "dramatically improve the profitability of" unspecified "potential drywall roll-up acquisition targets." (*Id.* ¶ 87(b).)  Additionally, the SAC alleges, "[u]pon information and belief," that Sterling "plans to continue to use and exploit

the Protected Information for its own benefit to the detriment of Johnson, to compete unfairly with PJD and others, and to destroy the value to PJD of its Protected Information." (*Id.* ¶ 89.)

VI. The Claims

Based on the factual allegations summarized above, the SAC asserts nine claims.

In Count One, entitled "Declaratory Judgment," Plaintiffs ask the Court to declare that "(1) the duties of the NDA and the Joint Venture that are material here; (2) that Sterling has materially breached the NDA and the Joint Venture; and (3) that the legal remedies available here are inadequate to make [PJD] whole." (*Id.* ¶¶ 93-98.)

In Count Two, entitled "Injunctive Relief," Plaintiffs request an order "enjoining Sterling: (a) from continuing to repudiate the NDA; (b) to perform its contractual obligations under the NDA; (c) from using or distributing the Confidential Information pursuant to the terms of the NDA; (d) from using or distributing the Protected Information under A.R.S. § 44-402; (e) requiring Sterling to return or destroy any and all Protected Information, including Protected Information provided to third parties; and (f) upon the completion of this return and destruction, to certify in writing to PJD the complete return and/or destruction of such information." (*Id.* ¶¶ 99-109.)

In Count Three, entitled "Breach of Contract—Specific Performance," Plaintiffs seek an order requiring "Sterling to specifically perform its obligations under the NDA." (*Id.* ¶¶ 110-16.)

In Count Four, entitled "Unjust Enrichment," Plaintiffs request an order requiring "Sterling to pay to [Plaintiffs] the amount of the enrichment that Sterling has realized by its unlawful acts." (*id.* ¶¶ 117-22.)

In Count Five, entitled "Breach of Contract—Damages," Plaintiffs argue that Sterling breached the NDA in two distinct ways—*first*, by disclosing Protected Information to third parties (including Callahan, Construction Applicators, and others) "for purposes other than evaluating the acquisition of PJD"; and *second*, by "failing to instruct [these] recipients . . . to comply with the terms of the NDA"—and seek an unspecified amount of

monetary damages. (*Id.* ¶¶ 123-27.)

In Count Six, entitled "Breach of Implied Covenant of Good Faith and Fair Dealing," Plaintiffs argue that the NDA and LOI each contained "an implied covenant that Sterling would act in good faith and fair dealing with PJD," that Sterling breached each of these covenants, and that Plaintiffs suffered unspecified monetary damages as a result of the breaches. (*Id.* ¶¶ 128-31.)

In Count Seven, entitled "Misappropriation of Trade Secrets—A.R.S. § 44-401 to -407," Plaintiffs assert that some or all of the Protected Information qualifies as a trade secret under Arizona Trade Secrets Act, that Sterling's conduct "constitute[d] actual and threatened misappropriation of PJD's Trade Secrets," and that Plaintiffs are entitled to injunctive relief and damages. (*Id.* ¶¶ 132-45.)

In Count Eight, entitled "Breach of Fiduciary Duty," Plaintiffs assert that PJD and Sterling "entered into a venture to create a successful national platform drywall company or consortium of companies," that "[b]y virtue of the relationship with PJD, Sterling owed and owes fiduciary duties to [the Johnson Trust] and PJD," that "Sterling breached these fiduciary duties owed to PJD through the use or disclosure of PJD's Protected Information for the direct and indirect benefit of Sterling," and that Plaintiffs are entitled to damages and a constructive trust. (*Id.* ¶¶ 146-53.)

In Count Nine, entitled "Unfair Competition," Plaintiffs assert that Sterling's conduct constituted unfair competition and that Plaintiffs are entitled to damages. (*Id.* ¶¶ 154-58.)

Finally, although the wording of the SAC makes it difficult to discern who is asserting each count, Plaintiffs clarify in their response to the motion to dismiss that PJD is asserting all nine counts, while the Johnson Trusts are only joining in Counts One, Two, Four, and Nine. (Doc. 48 at 6 ["The Trusts seek declaratory and injunctive relief, and request remedies under claims for unjust enrichment and unfair competition."].)

…

…

**DISCUSSION**

I. Standard Of Review

"[T]o survive a motion to dismiss under Rule 12(b)(6), a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1444-45 (citation omitted). However, the Court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-680. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 679. The Court also may dismiss due to "a lack of a cognizable theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II. Analysis

"Sterling moves to dismiss the Complaint on three grounds: (1) the Complaint fails to state any claims for relief as to the Trusts; (2) the Complaint fails to allege facts supporting a purported 'Joint Venture'; and (3) the Complaint fails to allege that PJD or the Trusts suffered any harm, an essential element of its claims." (Doc. 37 at 1.) The Court will begin by addressing Sterling's final dismissal argument—the purported lack of harm—because it is potentially dispositive of all of Plaintiffs' claims.

A. **Harm**

Sterling seeks dismissal of the SAC in its entirety because it "includes only hypothetical and conclusory allegations of harm." (Doc. 37 at 8-12.) According to Sterling, the overarching problem is that the SAC "does not allege that Sterling is or has used PJD's information to actually close a transaction in the drywall space." (*Id.* at 8.) Sterling argues that "[n]otably absent from" the SAC are any allegations "that Sterling

disclosed any information *after* it decided not to pursue the transaction with PJD," that Callahan and Construction Applicators "are using any information that Sterling allegedly provided with them," or that Sterling, Callahan, and Construction Applicators "are competing *at all* in the drywall space with PJD." (*Id.* at 9-10.) Thus, Sterling argues that "even if" it disclosed Protected Information to Callahan and Construction Applicators "in breach of the NDA," such conduct alone would not "cause[] PJD or the Trusts [to suffer] any harm or damage." (*Id.* at 10.)

These arguments lack merit. Although Sterling suggests that the wrongful disclosure of a trade secret (or similar piece of confidential information) alone can never give rise to cognizable harm, and that harm arises only if a recipient subsequently uses the protected information to compete against the original holder, Sterling fails to cite any cases in support of this *ipse dixit*. In fact, there are many cases, from Arizona and elsewhere, reaching a contrary conclusion. *See, e.g.*, *Ctr. for Auto Safety v. Goodyear Tire & Rubber Co.*, 454 P.3d 183, 189 (Ariz. Ct. App. 2019) ("The very purpose of trade secret law is to protect valuable confidential information from discovery. Therefore, the public disclosure of trade secrets necessarily implies that particularized harm exists because trade secrets derive their value from their secrecy.") (citations omitted); *Williams-Sonoma Direct, Inc. v. Arhaus, LLC*, 109 F. Supp. 3d 1009, 1018 (W.D. Tenn. 2015) ("[The Tennessee trade secrets statute] does not require proof that the trade secret has actually been used. Nor does [it] require proof of detriment outside the misappropriation or disclosure itself . . . [because] harm to the owner of a trade secret is inherent in its misappropriation or disclosure. When information that derives value from not being generally known becomes more widely known, its value is necessarily diminished.") (citations omitted); *Directory Concepts, Inc. v. Fox*, 2008 WL 5263386, *7 (N.D. Ind. 2008) (noting that "harm is inherent in the disclosure of a trade secret").[2] Sterling also ignores that, in the NDA itself, it agreed that

---

[2] *See generally Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984) ("Once the data that constitute a trade secret are disclosed to others, or others are allowed to use those data, the holder of the trade secret has lost his property interest in the data."); Restatement (First) of Torts § 757, cmt. c ("One who has a trade secret may be harmed merely by the disclosure of his secret to others as well as by the use of his secret in competition with him.

any "breach of this Agreement may cause irreparable harm to the non-breaching party." (Doc. 56 ¶ 36.)

Here, the SAC alleges that Sterling violated the NDA by disclosing Protected Information to at least two different recipients, Callahan and Construction Applicators, "for purposes other than evaluating the acquisition of PJD." (Doc. 56 ¶ 125.) The SAC also alleges that the wrongfully disclosed information qualified as a trade secret under Arizona law. (*Id.* ¶ 133.) Sterling, in turn, does not dispute that the adequacy of Plaintiffs' allegations on these issues[3] and only contests whether the wrongful disclosure of PJD's trade secrets resulted in any cognizable harm. For the reasons discussed above, it did, at least with respect to Plaintiffs' claim in Count Seven under the Arizona Trade Secrets Act. And because the Court interprets Sterling as raising an all-or-nothing challenge to *all* of the claims in the SAC based on a lack of harm (Doc. 37 at 12 ["[E]ach of Plaintiffs' claims requires a non-conclusory allegation that they have been or are being harmed by Sterling's purported misuse of its 'Protected Information.' Because the Complaint fails to make these allegations, the Court should dismiss Plaintiffs' claims."]), it follows that Sterling is not entitled to dismissal of the SAC on this ground.

B. **The Johnson Trusts**

Sterling also moves to dismiss the Johnson Trusts as plaintiffs. (Doc. 37 at 5-7.) In a nutshell, Sterling argues that (1) the Johnson Trusts lack standing to assert any of the contract-based claims in the SAC because they weren't parties to the NDA (which was only signed by PJD and Sterling), the LOI "does not impose any binding obligations on Sterling," and the SAC "limits its allegations of breach of contract to the NDA" (*id.* at 5); (2) the Johnson Trusts cannot assert any claim related to the misuse of confidential

---

A mere disclosure enhances the possibilities of adverse use.").

[3] Although Sterling notes the "limited" nature of Plaintiffs' allegations concerning the challenged acts of disclosure and emphasizes that all of the challenged disclosures occurred before it stopped pursuing the acquisition of PJD (Doc. 37 at 9-10), Sterling does not seek dismissal on the ground that the factual allegations in the SAC fail to establish that the challenged disclosures violated the NDA. To the contrary, and as discussed above, Sterling argues that "even if" the disclosures amounted to a "breach of the NDA," there was no "harm or damage." (*Id.* at 10.)

information because the SAC doesn't allege that any of the confidential information belonged to them (as opposed to PJD) or that Sterling owed them any duty of confidentiality (*id.* at 6); and (3) the Johnson Trusts have not suffered any harm (*id.* at 6-7).

Plaintiffs oppose Sterling's request to dismiss the Johnson Trusts. (Doc. 48 at 6-8.) As an initial matter, Plaintiffs clarify that the Johnson Trusts are not asserting any of the contract-based claims in the SAC and are only joining in Counts One, Two, Four, and Nine (*i.e.,* the claims for unjust enrichment and unfair competition, as well as requests for declaratory and injunctive relief arising from those claims). (*Id.* at 6.) As for the unjust enrichment and unfair competition claims, Plaintiffs seem to argue that the Johnson Trust are proper plaintiffs for three reasons: (1) in their capacity as "equity owners of PJD," the Johnson Trusts "took actions in furtherance of the acquisition of PJD by Sterling," including sharing confidential information with Sterling, and "Sterling has used this information in an unconsented to way to its own benefit—an enrichment"; (2) the LOI expressly contemplated that Sterling would "work[] with the *owners* of PJD to accomplish the proposed transaction and venture," and thus it is "disingenuous for Sterling to now say it had no interactions with the owners of PJD"; and (3) "[t]he misuse of the confidential information Sterling obtained as part of the potential acquisition of PJD has harmed and will continue to harm the Trusts in their capacity as holders of ownership interests in PJD because the profitability of PJD and its value are reduced." (*Id.* at 6-8.) Plaintiffs also argue that, precisely because the Johnson Trusts are not parties to the NDA and lack standing to raise any contract-based claims, this shows that they "lack a remedy at law," which in turns supports their standing to assert an unjust enrichment claim. (*Id.* at 8.)

In reply, Sterling argues that Plaintiffs' concession that the Johnson Trusts' alleged injuries flow from their status as "equity owners of PJD" is dispositive because, "[u]nder Arizona law, a shareholder does not have standing to bring a claim for injury to a corporation on the theory that a defendant's actions devalued the corporate stock." (Doc. 50 at 2.)

Sterling has the better side of these issues. At bottom, Plaintiffs' theory is that because Sterling's conduct caused PJD to suffer harm, it follows that the equity owners of PJD—the Johnson Trusts—also suffered harm. But Arizona courts have long held that individual equity holders may not, as a general rule, bring suit under this theory. *See, e.g.*, *Hidalgo v. McCauley*, 70 P.2d 443, 445 (Ariz. 1937) ("[T]he complaint doubtless state a cause of action against the alleged conspirators, with the gist of the conspiracy being the making of the stock of the company worthless. That such an action lies, cannot be questioned, but the all important question herein is, who may bring such an action, and for whose benefit must it be brought? . . . When there are numerous shareholders, it is apparent that each suffers relatively, depending upon the number of shares he owns, the same damage as all the others, and that each will be made whole if the corporation obtains restitution or compensation from the wrongdoer . . . [o]bviously it is sound policy to require a single action to be brought by the corporation, rather than to permit separate suits by each shareholder.") (citation and internal quotation marks omitted); *Funk v. Spalding*, 246 P.2d 184, 186 (Ariz. 1952) ("[I]t is the general rule of law that where . . . acts committed . . . ha[ve] the effect of depressing the market value of the stock of the corporation, that the damage flowing therefrom is to the corporation; that it alone has a right of action against the wrongdoer; that no right of action may be maintained by a stockholder until after refusal of the corporation upon request to institute such action (unless such a request would be futile)."); *Albers v. Edelson Tech. Partners L.P.*, 31 P.3d 821, 826 (Ariz. Ct. App. 2001) ("Generally, a stockholder may not bring an action individually for wrongs done to a corporation on the theory that the acts devalued the corporation's stock.").

Nor do the allegations in the SAC suggest that the Johnson Trusts' claims fall within any of the exceptions to this general rule. In Arizona, these exceptions include "when (1) the relationship between the shareholders and a wrongdoer is separate from the shareholders' status as shareholders or their ownership interest in the corporation, (2) the wrongdoer owes a duty to the shareholders for some reason other than their status as shareholders, or (3) the injuries or damages were sustained by individual shareholders

rather than by the corporation." *Albers*, 31 P.3d at 826.  Here, although the SAC alleges that, under the LOI, "the equity owners of PJD—the Johnson Trusts—would participate in the newly-created entity as investors (and as management)" (Doc. 56 ¶ 46), none of the claims in the SAC are premised on the harm that the Johnson Trusts suffered from the loss of this opportunity to serve in management capacities in the contemplated new entity.  (This is likely because, as Sterling repeatedly notes, the LOI did not create any binding obligations.)  Rather, all of the harm is ultimately tied to Sterling's alleged breaches of the NDA and alleged misuse of PJD's Protected Information.  Any such harm affected all of PJD's equity holders and did not cause any particularized injury to the Johnson Trusts outside their capacity as PJD equity holders.

> C.   **Fiduciary Duty/Joint Venture**

Sterling's final dismissal argument falls under the heading "The Complaint Fails to State a Claim Related to a Purported 'Joint Venture.'" (Doc. 37 at 7.)  Sterling argues that, because "[t]he terms of the LOI are absolutely clear that they create 'no binding obligations of any nature' on the part of Sterling," it would be improper to characterize "the unconsummated transaction proposed in the non-binding LOI as a 'Joint Venture.'" (*Id.*)  Sterling further argues that, because there was no joint venture, "Plaintiffs cannot plead any sort of 'special relationship' giving rise to fiduciary obligations." (*Id.*)  Thus, Sterling seeks dismissal of Count Eight of the SAC, which is PJD's claim for breach of fiduciary duty.  (*Id.*)

In response, Plaintiffs argue that Sterling "misses the point" by narrowly focusing on the LOI, which "do[es] not supplant the terms and obligations of the NDA and the parties' prior dealings." (Doc. 48 at 8-10.)  According to Plaintiffs, a fiduciary duty may arise whenever there is "a relationship of 'trust and confidence'" and such a relationship arose here when Sterling chose to receive confidential information from PJD.  (*Id.*)

In reply, Sterling argues that Plaintiffs' reliance on the NDA as the basis for the alleged fiduciary duty fails because the NDA includes a clause "making clear that no fiduciary relationship exists." (Doc. 50 at 3.)  Sterling contends that, because both the

NDA and LOI disclaimed the existence of any such duty, "the parties effectively agreed that no 'special relationship' giving rise to fiduciary obligations would exist between them." (*Id.*)

In Arizona, "[a] fiduciary relationship has been described as something approximating business agency, professional relationship, or family tie impelling or inducing the trusting party to relax the care and vigilance he would ordinarily exercise." *Cook v. Orkin Exterminating Co., Inc.*, 258 P.3d 149, 152 (Ariz. Ct. App. 2011) (citations and internal quotation marks omitted). "Generally, commercial transactions do not create a fiduciary relationship unless one party agrees to serve in a fiduciary capacity." *Id.* Moreover, if commercial parties "have expressly characterized their relationship" in a contract, "such characterization will be persuasive on the issue of the parties' capacities." *Urias v. PCS Health Sys., Inc.*, 118 P.3d 29, 35 (Ariz. Ct. App. 2005).

Here, the parties were involved in a potential commercial transaction and executed two agreements in an effort to facilitate their pursuit of that transaction. Although the first agreement, the NDA, called for the sharing of confidential information, it also included a clause in which the parties specifically agreed that "unless and until a final definitive agreement between Recipient [Sterling] and the Company [PJD] has been executed and delivered, neither Recipient . . . nor the Company will be under any legal obligation of any kind whatsoever . . . by virtue of this Agreement except for the matters specifically agreed to herein." (Doc. 56 at 36 [NDA ¶ 11].) Likewise, in the second agreement, the LOI, the parties agreed that, apart from exceptions that are inapplicable here, "this letter . . . is not meant to, nor does it, create binding obligations of any nature on the part of . . . Sterling." (Doc. 37 at 3.) Because the SAC alleges that the parties' relationship arose by virtue of their interactions pursuant to the NDA and the LOI, yet both agreements expressly disclaimed the existence of any fiduciary duties, it follows that Plaintiffs cannot assert a claim for breach of fiduciary duty against Sterling, even though the parties' interactions involved the sharing of confidential information. *Cf. Urias*, 118 P.3d at 35 ("The Agreement between PCS and Premier specified that the parties were independent

contractors and did not purport to create a fiduciary relationship. If Premier had intended to create a fiduciary relationship, it could have negotiated for specific language in the Agreement to that effect. The Agreement does not contain such language."). Thus, Count Eight must be dismissed.

### D. **Leave To Amend**

In the final section of their response to the motion to dismiss, Plaintiffs state that "[i]f the Court finds dismissal proper for any claim, Plaintiffs respectfully request that the Court do so without prejudice and grant Plaintiffs leave to amend their complaint." (Doc. 48 at 12.) Sterling does not address this request in its reply.

Plaintiffs' request is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). "This policy is 'to be applied with extreme liberality.'" *Id.* Thus, Plaintiffs' amendment request should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). Additionally, "[t]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989).

Here, although it is not clear that additional factual allegations could cure the deficiencies identified above, the Court will grant Plaintiffs' amendment request in light of the policies favoring liberal amendment and in light of Sterling's apparent non-opposition to the request.

…

…

…

…

…

Accordingly,

**IT IS ORDERED** that Sterling's motion to dismiss (Doc. 37) is **granted in part and denied in part**. The Johnson Trusts are dismissed as parties and Count Eight is dismissed.

**IT IS FURTHER ORDERED** that Plaintiffs' request for leave to amend is granted. Plaintiffs may file a Third Amended Complaint within 21 days of the issuance of this order. If Plaintiffs file a Third Amended Complaint, the changes shall be limited to attempting to cure the deficiencies raised in this order and Plaintiffs shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.

Dated this 13th day of December, 2021.

Dominic W. Lanza
United States District Judge