**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul Johnson Drywall Incorporated, et al., | No. CV-21-01408-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Sterling Group LP, | |
| Defendants. | |

Plaintiff Paul Johnson Drywall Inc. ("PJD") shared confidential information with Defendant Sterling Group LP ("Sterling"), a private equity fund, pursuant to a non-disclosure agreement so Sterling could evaluate whether to acquire PJD as part of a national drywall roll-up acquisition strategy that PJD had proposed. However, the anticipated acquisition of PJD never occurred. In this action, PJD contends that Sterling improperly shared its confidential information with third parties, including a competitor called Construction Applicators ("Con App") and a consultant named Michael Callahan, and that Sterling and/or the third parties misused that information in various ways. PJD further contends it suffered damages as a result of the alleged misuse, including as shown by the analysis of its expert, David Duffus.

Now pending before the Court are PJD's motion for partial summary judgment (Doc. 159), Sterling's motion for summary judgment (Doc. 162), and Sterling's motion to exclude Duffus (Doc. 163 [sealed]). For the reasons stated below, PJD's motion for partial summary judgment is denied, Sterling's motion for summary judgment is granted in part

1    and denied in part, and Sterling's motion to exclude is denied without prejudice.

2    I.    Relevant Factual Background

3            In 2019 or 2020, PJD created a plan for a national drywall roll-up through

4    acquisitions of various drywall contractors, including PJD.   (Doc. 166-1 at 170-76

5    [sealed].)  Through its representative SunTrust (now "Truist"), PJD marketed this plan to

6    various potential partners in private equity, including Sterling.  (*Id.* at 155-56 [sealed].)

7    Sterling expressed interest in the plan and agreed to sign a non-disclosure agreement so it

8    could learn more.  (*Id.* [sealed].)  The parties executed this non-disclosure agreement (the

9    "NDA") on March 30, 2020, designating certain protected information as "Confidential

10   Information."  (Doc. 56 at 32-38.)  The NDA's definition of "Confidential Information,"

11   which is critical to this case, is as follows:

12           For all purposes of this Agreement, the term "<u>Confidential Information</u>" shall
13           collectively refer to all non-public, confidential, or proprietary information
             or material disclosed or provided by or on behalf of the Company to
14           Recipient on or after the date hereof, either orally or in writing, concerning
             any aspect of the business or affairs of the Company or its "subsidiaries."
15           Confidential Information also includes any notes, analyses, compilations,
             studies or other material or documents prepared by Recipient which contain,
16           reflect or are primarily based on the Confidential Information.  Any of the
             Confidential Information disclosed by the Company that fits the definition of
17           a 'trade secret' under the Uniform Trade Secrets Act, it will be referred to
             herein as a "Trade Secret."

18           Notwithstanding the foregoing, Confidential Information shall not include
19           information or material that (i) is publicly available or becomes publicly
             available through no action of Recipient in violation of this Agreement, (ii)
20           was already in Recipient's or its Representatives' possession or known to
             Recipient or its Representatives prior to being disclosed or provided to
21           Recipient by or on behalf of the Company, <u>provided</u>, that, the source of such
             information or material was not, to Recipient's Knowledge, bound by a
22           contractual, legal or fiduciary obligation of confidentiality to the Company
             or any other party with respect thereto, (iii) was or is obtained by Recipient
23           or its Representatives from a third party, <u>provided</u>, that, such third party was
             not, to Recipient's Knowledge, bound by a contractual, legal or fiduciary
24           obligation of confidentiality to the Company or any other party with respect
             to such information or material, or (iv) is independently developed or derived
25           by the Recipient or its Representatives without reference to the Confidential
             Information in violation of this Agreement.  "Recipient's Knowledge" means
26           both actual knowledge and the knowledge that a reasonably prudent person
             would have obtained after a reasonable inquiry and investigation.
27

28   (*Id.* at 32.)  After the NDA was executed, PJD provided information and documents to

- 2 -

Sterling, including providing access to a virtual data room.  (*See, e.g.*, Doc. 159-1 at 357.)

Sterling worked with various consultants in evaluating its potential acquisition of PJD (the "Transaction").  (Doc. 181-1 at 192-208 [sealed].)  By February 2021, Sterling retained Michael Callahan as a consultant and began forwarding some PJD-related information to him.  (Doc. 159-1 at 361, 363.)  However, Sterling did not show him or have him sign PJD's NDA.  (*Id.* at 45, 282.)  Sterling eventually asked Callahan to sign a standalone non-disclosure agreement, but it was not executed until May 2021.  (Doc. 162-2 at 109-13.)

Sterling also became interested in a possible acquisition of Con App, another drywall company.  (Doc. 178-2 at 7.)  Callahan was the first to reach out to Con App.  (Doc. 161-2 at 13-14 [sealed].)  In an email dated March 19, 2021, Callahan informed Con App that Sterling was considering acquiring PJD and added that the potential acquisition was supposed to be "confidential" but he "didn't feel right" not telling Con App about it, so Con App's CEO Jeff Ratliff should "keep it under [his] hat."  (Doc. 159-2 at 23.)  Callahan subsequently expressed misgivings over this disclosure.  (Doc. 159-1 at 281 ["[F]rankly, that was a mistake on my part, but I really shouldn't have told them at that point."].)  Representatives from Sterling and Con App met in April 2021, during which meeting portions of a slide deck entitled "Drywall Installation Platform" were shown.  (Doc. 159-2 at 32, 37.)  It appears the deck contained some information about PJD.  (Doc. 159-1 at 42-44.)  However, Con App never signed PJD's NDA.  (*Id.* at 59.)[1]

In April 2021, Sterling and PJD executed a Letter of Intent ("LOI") under which Sterling would acquire a majority stake in PJD.  (Doc. 181-1 at 154-58 [sealed].)[2]  Under the LOI, Sterling would acquire PJD through a new platform company, Newco, that would also be used to acquire other drywall companies as part of the national roll-up.  (*Id.* at 154 [sealed].)  PJD and Sterling also worked together on compiling a list of potential acquisition

---

[1]    Sterling previously stated that Con App qualified as a "Representative" under the NDA but has since changed its mind and now views Con App only as an acquisition target.  (Doc. 161-1 at 69 [sealed].)

[2]    Sterling also executed a letter of intent with Con App.  (Doc. 181-1 at 146-52 [sealed].)

targets, which included the Florida drywall company Vatos Drywall ("Vatos").  (*Id.* at 12, 33 [sealed]; Doc. 159-1 at 60-61; Doc. 159-2 at 156.)

In May 2021, Sterling began having second thoughts about acquiring PJD.  (Doc. 159-1 at 46; Doc. 181-1 at 80-82 [sealed].)   Sterling contends it noticed red flags concerning PJD's employee benefits, which it believed PJD had attempted to conceal.  (Doc. 161-1 at 8, 46-47 [sealed]; Doc. 181-1 at 31-32 [sealed].)   PJD contends these benefits issues were "low risk" and a "pretext."  (Doc. 161 at 7 [sealed].)  However, Sterling remained interested in acquiring Con App—one partner wrote in a June 11, 2021 email that he "was wrapping up drywall stuff (killing PJD, trying to pivot to Con App)."  (Doc. 159-2 at 151.)

On June 11, 2021, Sterling told PJD (via Truist) that it would not go forward with the Transaction.  (Doc. 181-2 at 61, 96-100 [sealed].)  Afterward, Cole Johnson (PJD's CEO) asked Sterling to reconsider and offered to step away from the company as part of the Transaction.  (Doc. 181-1 at 110-12 [sealed].)  Sterling, in turn, convened a partner's meeting, which occurred at some point between June 18 and 28, 2021, where it decided to reject Johnson's offer.  (*Id.*)  On June 28, 2021, Sterling told PJD, again through Truist, that it would not proceed with the Transaction.  (Doc. 181-3 at 2-3 [sealed].)

That same day, PJD told Sterling that any effort by Sterling to "clos[e] on [Con App] or any of the other targets prior to resolving the issues surrounding [Sterling and PJD's] partnership, and the utilization of PJD's proprietary information, would be untenable."  (*Id.* at 3 [sealed].)  Sterling responded: "[W]e disagree with any assertion or implication that a roll-up strategy in the drywall industry is proprietary information of PJD or anyone else. . . .  As a result, while we are not moving forward with you or PJD, we are still considering executing on a platform investment in the drywall space.  Such a platform may also include a transaction involving Construction Applicators, a business that Sterling independently identified and sourced through its established expert and executive networks."  (*Id.* at 2-3 [sealed].)  Sterling also noted: "As to information received by Sterling from PJD . . . , we understand, and intend to honor, our obligations under the Non-

disclosure Agreement." (*Id.* at 3 [sealed].)

Meanwhile, Con App, Callahan, and Sterling worked together on a possible national drywall roll-up. (Doc. 159-1 at 67.) On June 20, 2021, Sterling shared with Con App a target list it had developed in consultation with PJD (Doc. 159-2 at 156), but on July 1, 2021, Sterling provided a new "scrubbed" list that "only include[d] non-contaminated information" and asked the group to "please delete all prior versions of M&A lists/trackers." (Doc. 159-3 at 2, emphasis omitted.)

Sterling ultimately decided not to pursue a national drywall roll-up. (Doc. 159-1 at 67-68.) Sterling principal Johann Friese then told Callahan either "that he would be free to use information he already had to go and pursue whatever he wanted" or that "he can of course use information and knowledge that he independently developed throughout his career to go and do whatever he wants with it." (Doc. 161-1 at 77 [sealed].)

In September 2021, Callahan began discussions with AEA Investors ("AEA") as a possible replacement for Sterling. (Doc. 161-3 at 107 [sealed].) Callahan stated at his deposition that he believed he was free to use information from Sterling's presentations "as a central thesis as [he] moved forward with Con App without Sterling." (Doc. 159-1 at 301-02.) As part of his work with AEA, Callahan attempted to set up a meeting with Vatos to pitch it on a possible acquisition by AEA. (Doc. 161-1 at 291, 320 [sealed].)[3] Vatos did not take the meeting. (Doc. 161-4 at 22, 25-26 [sealed].)

Meanwhile, on December 21, 2021, Vatos and PJD entered into a letter of intent under which PJD would acquire Vatos for $35 million. (Doc. 175-1 at 86 [sealed].) However, Vatos later demanded a price increase and the deal ultimately closed on March 30, 2022 for $40 million. (*Id.* at 97 [sealed].)

…

---

[3]      During oral argument, both sides seemed to agree that this inquiry occurred during the early part of 2022, not in December 2021 as stated in the tentative ruling. The Court notes that although some documents in the record suggest the inquiry occurred in March 2022 (Doc 161-4 at 22-23 [sealed]), Callahan's deposition testimony seems to indicate it occurred in December 2021 (Doc. 161-1 at 291 [sealed]). At any rate, any dispute over the specific date is not material to the summary judgment analysis.

1  II.  Procedural History

2      On July 13, 2021, PJD, the Johnson 2013 Irrevocable Trust, and the RCJ Irrevocable

3  Trust sued Sterling in Maricopa County Superior Court.  (Doc. 1-11.)

4      On August 13, 2021, Sterling removed the action to this Court.  (Doc. 1)

5      On September 8, 2021, PJD lodged a version of its Second Amended Complaint

6  ("SAC").  (Doc. 31.)  The SAC was ultimately filed on October 26, 2021.  (Doc. 56.)

7      On September 22, 2021, Sterling moved to dismiss the SAC under Rule 12(b)(6).

8  (Doc. 37.)

9      On December 13, 2021, the Court granted in part and denied in part Sterling's

10 motion to dismiss.  (Doc. 66.)  Among other things, the Court dismissed the Johnson 2013

11 Irrevocable Trust and the RCJ Irrevocable Trust as plaintiffs.  (*Id.*)

12     On July 21, 2023, PJD moved for partial summary judgment (Doc. 159) and Sterling

13 moved for summary judgment (Doc. 162) and to exclude Duffus (Doc. 163 [sealed]).  After

14 substantial sealing-related litigation, all of the motions became fully briefed.  (Doc. 192.)

15     On March 19, 2024, the Court circulated a tentative ruling to the parties via email.[4]

16     On March 20, 2024, the Court heard oral argument.[5]

17                         **DISCUSSION**

18 I.  Legal Standard

19     "The court shall grant summary judgment if [a] movant shows that there is no

20 genuine dispute as to any material fact and the movant is entitled to judgment as a matter

21 of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of

22 the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

23

24 [4]  Although the Court's usual practice is to place tentative rulings on the docket, the Court utilized email in this case in light of the (over)abundance of sealed docket entries
25 and the corresponding risk that the tentative ruling might contain references to sensitive, sealed information.

26 [5]  After oral argument, the Court issued an order noting that "the tentative ruling contains references to certain matters that were filed under seal," but "nothing in the
27 tentative ruling strikes the Court as unfit for public consumption," and "any redaction request must be filed by March 22, 2024."  (Doc. 203.)  The parties did not file any
28 redaction requests.  Accordingly, the Court has not redacted from this order the references to materials that were filed under seal.

in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  *See also Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).  At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255.  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254.  Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotation marks omitted).  For "the party with the burden of persuasion at trial" to succeed in obtaining summary judgment, it "must establish beyond controversy

every essential element" of each claim on which summary judgment is sought.  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (internal quotation marks omitted).  The party without the burden of persuasion at trial is entitled to summary judgment where it establishes that the party with the burden of persuasion will be unable to prove at least one element of its claim in light of the undisputed facts.  *Celotex Corp.*, 477 U.S. at 322-23.  This distinction reflects that the burden is ultimately on the proponent of each claim to prove it.  *Id.* ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Where the Court "does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."  Fed. R. Civ. P. 56(g).  However, where "it is readily apparent that the court cannot grant all the relief requested by the motion, it may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial.  Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established."  Fed. R. Civ. P. 56(g), advisory committee's note to 2010 amendment.  *See also Kreg Therapeutics, Inc. v. VitalGo, Inc.,* 919 F.3d 405, 415 (7th Cir. 2019) ("Because Rule 56(g) speaks of what a court 'may' do, we review for an abuse of discretion."); *NCWC Inc. v. CarGuard Admin. Inc.*, 2022 WL 17620550, *2 (D. Ariz. 2022) ("The decision whether to grant relief under Rule 56(g) is discretionary."); 2 Steven S. Gensler & Lumen N. Mulligan, Federal Rules of Civil Procedure, Rules and Commentary, Rule 56 (2023) ("[T]he decision whether to enter an order establishing facts is left to the trial court's

1    discretion.  No party has a procedural entitlement to have facts established by order.")

2    (footnote omitted).

3    II.    PJD's Motion for Partial Summary Judgment

4         PJD asks the Court to find that the NDA is a valid contract and that Sterling breached

5    it.  (Doc. 159 at 12-13.)  PJD would leave the issue of damages and any other remedies for

6    trial.  (*Id.*)  Sterling does not dispute that the NDA is a valid contract (Doc. 162 at 19

7    ["While the parties may disagree as to the correct application or interpretation of the NDA

8    and LOI, the overall validity of these agreements is not in dispute."]), so the Court turns to

9    the issue of breach.

10        A.    **Section 2.1**

11        Section 2.1 of the NDA provides as follows:

12        2.1. Non-disclosure.  Recipient shall keep confidential and shall not disclose to any
13        person or entity, any information about the Transaction or the fact that Recipient
         has received the Confidential Information and is considering the Transaction and all
14        discussions between the Company and Recipient related thereto, except that (subject
         to section 2.2 below) Recipient may make such disclosure if such disclosure must
15        be made in order that Recipient not commit a violation of law.  Recipient shall keep
         confidential and shall not disclose, to any person or entity, the Confidential
16        Information, except to its directors, officers, managers, equityholders, members,
         partners, employees, agents, advisors, affiliates, representatives, consultants,
17        operating partners, insurance providers and potential financing sources (such
         persons or entities who actually receive Confidential Information will collectively
18        be referred to herein as Recipient's "Representatives") for the purpose of evaluating
         the Transaction and who shall be directed to comply with the terms of this
19        Agreement expressly applicable to them, and except as otherwise consented to in
         writing by the Company.  Recipient agrees not to initiate contact with any person
20        who, to Recipient's Knowledge, is an employee, customer, or supplier of the
         Company or its subsidiaries, specifically with respect to the Transaction, without
21        the Company's prior written consent, provided, that, the foregoing restriction does
         not prohibit initiating, contacting or engaging in discussions with such persons in
22        the ordinary course of business and does not restrict any of Recipient's affiliates
         that have not received Confidential Information.  Recipient further agrees that all
23        inquiries, requests for information and other communications concerning the
         Transaction shall be made only through RBC Capital Markets, LLC ("RBCCM").

24    (Doc. 56 at 32-33.)
25

26        1.    The Parties' Arguments

27        PJD argues that "Sterling violated . . . § 2.1 . . . when: (1) Sterling gave PJD's

28    Confidential Information to its Representatives without directing them to comply with the

NDA's terms, and (2) its Representatives divulged the information to third parties." (Doc. 159 at 14.) As for the first theory, PJD elaborates that Sterling breached § 2.1 by "fail[ing] to instruct Callahan according to the terms of the NDA, then sen[ding] him non-public information regarding PJD's roll-up thesis, a breakdown of PJD's margin profiles, and a discussion of PJD's procurement advantage over its competitors." (*Id.*) As for the latter theory, PJD elaborates that Sterling breached § 2.1 by "shar[ing] Confidential Information with Con App—one of PJD's largest potential national competitors—without the required protections under the NDA." (*Id.* at 15.)

Sterling responds that "[a]ll of [its] [R]epresentatives either signed written joinders or acknowledgments (although such written direction was not required by the NDA) or had their own confidentiality obligations with respect to PJD's Confidential Information, governed by separate agreements." (Doc. 178 at 11.) Further, Sterling contends that § 2.1 "does not contain . . . a requirement" to "direct Callahan to comply with the NDA's terms." (*Id.*, internal quotation marks omitted.) According to Sterling, "Representatives need only be directed to comply with the terms 'expressly applicable to them,'" "Sterling did direct Callahan to comply with the NDA," and "Callahan expressly understood that the information he received about PJD was confidential." (*Id.*) Meanwhile, Sterling contends that Con App "was not a Representative under the NDA," but rather "a target company that Sterling evaluated alongside PJD," and Con App "did not actually receive Confidential Information." (*Id.* at 12-13, emphasis and internal quotation marks omitted.) Finally, Sterling asserts that "PJD's motion is precluded because PJD waived its rights under the NDA" by "treat[ing] the information it now claims as confidential with cavalier disregard" and that "PJD's motion runs afoul of Arizona law and would chill fair competition." (*Id.* at 16-17.)

In reply, PJD argues that the record clearly shows that "Sterling breached Section[] 2.1 . . . of the NDA by sharing the target compilation that PJD developed with Sterling using PJD's Confidential Information with Callahan and Con App," "by disseminating PJD Confidential Information to a third-party private equity firm and using such information

with the third-party firm 'as a central thesis' to pursue a national drywall roll-up in competition with PJD," and "by sharing with the third-party private equity firm the target compilation that PJD developed with Sterling using PJD's Confidential Information and targeting many of the same entities for which PJD provided Confidential Information." (Doc. 183 at 2-4.)  PJD further asserts that "Sterling attempts to . . . manufacture a factual dispute to . . . avoid summary judgment by submitting a sham declaration and rewriting the discovery record."  (*Id.* at 4-8.)  PJD also argues that it "did not waive the protections of the NDA" and that "Arizona public policy supports enforcing the NDA."  (*Id.* at 9-10.)

### 2.   Analysis

PJD's first theory of breach is that because Sterling did not specifically advise Callahan of the NDA's non-disclosure requirements and of his responsibility to comply with them, Sterling was not permitted under the NDA to disclose any Confidential Information to Callahan (and violated § 2.1 by doing so).  The problem with this theory is that it overlooks the existence of unresolved questions of contractual interpretation concerning how, exactly, § 2.1's non-disclosure obligations apply to consultants such as Callahan.  Although § 2.1 begins by creating a default rule that "Recipient"—which is defined elsewhere in the contract as Sterling (Doc. 56 at 32)—is not allowed to disclose various categories of information "to any person or entity," § 2.1 then creates several exceptions to that prohibition.  One of those exceptions, relevant here, is that Sterling may disclose "Confidential Information" to its "Representatives"—and both sides agree that Callahan qualifies as a Representative—"for the purpose of evaluating the Transaction *and who shall be directed to comply with the terms of this Agreement expressly applicable to them*."  (*Id.* at 32-33, emphasis added.)  PJD focuses on the first half of the italicized language, "and who shall be directed to comply with the terms of this Agreement," and argues that it required Sterling to direct Callahan and its other Representatives to comply with § 2.1's non-disclosure requirements.  But PJD ignores the second half of the italicized language, "expressly applicable to them."  As Sterling correctly notes in its response brief, that language must mean something under Arizona contract law.  *See, e.g., Terrell v.*

1    *Torres*, 456 P.3d 13, 16 (Ariz. 2020) ("[W]e attempt to reconcile and give effect to all

2    terms of the contract to avoid any term being rendered superfluous.").

3           In its reply, PJD does not meaningfully grapple with the surplusage issue.  Although

4    PJD argues that Sterling's proffered interpretation of § 2.1 is "nonsensical" and attempts

5    to show that its proffered interpretation of § 2.1 is consistent with "Callahan's testimony

6    and actions" (Doc. 183 at 5-7), PJD never attempts to explain what the phrase "expressly

7    applicable to them" means or how its inclusion in § 2.1 should factor into the contractual-

8    interpretation analysis.[6]    Moreover, in the Court's view, at least one reasonable

9    interpretation of the "expressly applicable to them" modifier in § 2.1 is that Sterling was

10   not required to direct its Representatives to comply with all of the NDA's terms—instead,

11   Sterling was only contractually obligated to direct its Representatives to comply with the

12   subset of the NDA's terms that expressly apply to Representatives.  In the Court's view, it

13   is also reasonable to construe § 2.1 as a term of the NDA that is not "expressly applicable"

14   to Representatives.  After all, § 2.1 defines the obligations of "Recipient"—which, again,

15   is a defined term that only means Sterling.

16          Although the parties don't characterize the issue this way in their moving papers,

17   the problem posed by the existence of these competing, reasonable interpretations of § 2.1

18   is that they raise an unresolved question of contractual interpretation,[7] at least insofar as

19   § 2.1 governs Sterling's obligation to advise Representatives like Callahan of their non-

20   disclosure obligations.  PJD, however, did not seem to appreciate the unresolved nature of

21   that issue when it moved for summary judgment—instead, it took as a given that its

22   interpretation of § 2.1 was correct and then attempted to show, factually, why § 2.1 (as so

23   understood) was breached.  But because the interpretation issue remains unresolved, PJD's

---

24   [6]       The Court acknowledges that PJD's counsel offered additional arguments regarding
25   the meaning of this phrase during oral argument and that some of Sterling's
     counterarguments during oral argument—such as that none of the provisions of the NDA
26   are expressly applicable to Representatives—are not terribly compelling.  Nevertheless,
     even after oral argument, the Court continues to view the contractual-interpretation
27   question as one properly resolved after further development at trial.

28   [7]       The tentative ruling referred to this problem as an unresolved question of contractual
     ambiguity.  Upon reflection, that description is imprecise.  *Taylor v. State Farm Mut. Auto.
     Ins. Co.*, 854 P.2d 1134, 1140-41 (Ariz. 1993).

request for summary judgment is premature—the meaning of the contractual language at issue must be decided before the analysis turns to breach.  *See, e.g., Hamada v. Valley Nat. Bank*, 555 P.2d 1121, 1124 (Ariz. Ct. App. 1976) ("The intent of the parties to an ambiguous contract is a question of fact which cannot properly be resolved on motion for summary judgment."); *Vathana v. EverBank*, 770 F.3d 1272, 1277 (9th Cir. 2014) ("If the wording is ambiguous, interpreting the contract involves a factual question and summary judgment is inappropriate"); *Petro Star, Inc. v. BP Oil Supply Co.*, 584 F. App'x 709, 710 (9th Cir. 2014) ("Because the term 'tariff,' as used in the disputed oil contracts, is ambiguous, and a genuine dispute as to the term's proper interpretation exists on this record, the district court erred in granting BP's motion for summary judgment on Petro Star's breach of contract claim.").  *See generally Taylor*, 854 P.2d at 1144-45 ("Whether contract language is reasonably susceptible to more than one interpretation so that extrinsic evidence is admissible is a question of law for the court.  We have concluded in the preceding section that the language of the agreement, illuminated by the surrounding circumstances, indicates that either of the interpretations offered was reasonable.  Because interpretation was needed and because the extrinsic evidence established controversy over what occurred and what inferences to draw from the events, the matter was properly submitted to the jury.") (citation omitted); *State v. Mabery Ranch, Co.*, 165 P.3d 211, 219 (Ariz. Ct. App. 2007) ("Where contract language is susceptible to more than one interpretation, the matter should be submitted to the jury.").

For similar reasons, even assuming that Sterling had a contractual obligation under § 2.1 to provide *some* form of direction to Callahan concerning confidentiality, the contract is susceptible to competing reasonable interpretations as to how, exactly, Sterling was required to comply with that obligation.  Although PJD contends the only way to do so was to bring the actual NDA to Callahan's attention, Sterling's competing interpretation of § 2.1—that it could comply by entering into a separate non-disclosure agreement with Callahan (Doc. 178 at 3, 11-12)—is a reasonable one, at least in the Court's view on this record.  This serves as another reason why summary judgment is unwarranted as to PJD's

first theory of breach concerning § 2.1.[8]

PJD's other theory of breach is that Callahan's communications with Con App breached § 2.1.  PJD focuses on an email chain in which Callahan set up a call with Ratliff from Con App to bring him "up to speed on what the thesis is all about."  (Doc. 159-2 at 23.)  On March 19, 2021, Callahan told Ratliff "[t]hey are obviously trying to keep PJD confidential but I didn't feel right not sharing with you so keep it under your hat."  (*Id.*)  Callahan stated during his deposition that he "really shouldn't have told [Con App] at that point."  (Doc. 159-1 at 281-82.)

PJD is not entitled to summary judgment on this breach theory.  As an initial matter, PJD is wrong to suggest that § 2.1 could, alone, provide the basis for holding Sterling liable for any disclosure violations committed by Callahan.  As discussed, § 2.1 requires "Recipient" (*i.e.*, Sterling) to maintain the confidentiality of certain information with the exception that "Recipient" may disclose "Confidential Information" to "Representatives" for the purpose of evaluating the Transaction, so long as those Representatives are "directed to comply with the terms of this Agreement expressly applicable to them."  (Doc. 56 at 32-33.)  At most, then, § 2.1 imposes two explicit obligations on Sterling: (1) to refrain from disclosing Confidential Information, or other information regarding the Transaction, except as authorized in § 2.1; and (2) to provide certain forms of "direct[ion]" to Representatives as part of any authorized disclosure to them.  In contrast, § 2.1 does not say that Sterling is responsible for any subsequent disclosure violations committed by Representatives.

The clause of the NDA that might potentially give rise to such responsibility is § 2.6, which provides:

---

[8]     During oral argument, PJD also emphasized the three-month gap between when Sterling began providing PJD-related material to Callahan (Doc. 159-1 at 363 [February 2021]) and when Callahan signed his non-disclosure agreement with Sterling (Doc. 162-2 at 109-11 [May 2021]).  PJD is not entitled to summary judgment on this breach theory because there is evidence—in the form of Callahan's written avowal—that Callahan understood his confidentiality obligations as arising from the start of his work for Sterling. (Doc. 162-2 at 113.)

1

2.6. <u>Other Parties Bound</u>.  Recipient shall be responsible for any breaches by its Representatives of the terms of this Agreement expressly applicable to them.

2

3

4

(*Id.* at 33.)

5

Although this clause might, at first blush, seem to provide a pathway for imposing

6

liability against Sterling based on disclosure violations committed by Representatives, the

7

analysis is once again complicated by the presence of the modifier "expressly applicable

8

to them," which must be given effect and not disregarded as surplusage.  *Terrell*, 456 P.3d

9

at 16.  Given the presence of that clause, it is reasonable (as Sterling argues) to construe

10

§ 2.6 as only authorizing liability against Sterling for the conduct of Representatives *if* that

11

conduct violates a clause of the NDA that expressly applies to Representatives.  (Doc. 178

12

at 11, 16.)  But as noted, § 2.1 does not expressly require Representatives to maintain the

13

confidentiality of any Confidential Information they may receive from Sterling.  The Court

14

does not foreclose the possibility that the parties' intent may have been to impose such a

15

confidentiality requirement on Representatives—it would be surprising not to include

16

one—but the text of § 2.1 says nothing to that effect.  At a minimum, because there is an

17

unresolved question of contract interpretation as to whether § 2.6, in conjunction with

18

§ 2.1, renders Sterling responsible for any disclosure violations committed by

19

Representatives, PJD's request for summary judgment on the issue of breach is premature.

20

*Hamada*, 555 P.2d at 1124; *Vathana*, 770 F.3d at 1277; *Petro Star,* 584 F. App'x at 710;

21

*Taylor*, 854 P.2d at 1144-45; *Mabery Ranch,* 165 P.3d at 219.

22

Alternatively, even assuming that Sterling could be held responsible for any

23

improper disclosures of Confidential Information by Callahan, a reasonable factfinder

24

could conclude—when all inferences are resolved in Sterling's favor as the non-movant—

25

that no such improper disclosures occurred.  Notwithstanding Callahan's subjective belief

26

that the information he disclosed to Con App in his March 19, 2021 email (*i.e.*, that Sterling

27

might acquire PJD as part of the roll-up strategy) was confidential and that his disclosure

28

was therefore inappropriate, the definition of "Confidential Information" in the NDA is

very specific and excludes any information that was known to Sterling before the execution of the NDA: "[T]he term '<u>Confidential Information</u>' shall collectively refer to all non-public, confidential, or proprietary information or material *disclosed or provided by or on behalf of the Company to Recipient on or after the date hereof*." (Doc. 56 at 32, emphasis added.)[9]   Unfortunately, PJD does not acknowledge the italicized language in its moving papers—its breach arguments are premised on the mistaken contention that "[t]he clear and unambiguous terms of the NDA broadly defined Confidential Information as 'all non-public, confidential or proprietary information.'"  (Doc. 183 at 2.)  But as noted with respect to PJD's first theory of breach concerning § 2.1, Arizona law requires courts to "attempt to reconcile and give effect to all terms of the contract to avoid any term being rendered superfluous."  *Terrell*, 456 P.3d at 16.

Given this backdrop, PJD's involvement in the roll-up strategy would not constitute Confidential Information if that information was known to Sterling before Sterling entered into the NDA.  And there is evidence in the record that Sterling became generally aware of PJD's roll-up strategy on February 27, 2020.  (Doc. 166-1 at 156 [sealed] [Truist's email to Sterling: "Paul Johnson Drywall is a leading drywall services provider with attractive growth opportunities (nice roll-up similar to what IBP and TopBuild did in insulation installation).  This one is straight down the fairway for you given huge roll-up opportunity."].)  However, the NDA was not executed until March 30, 2020.  (Doc. 56 at 32-38.)  Accordingly, there is evidence in the record that supports Sterling's position that "[t]he roll-up thesis is not PJD's Confidential Information."  (Doc. 178 at 12.)

It is, of course, possible that Callahan disclosed more to Con App about the roll-up strategy than the limited details he disclosed in his March 19, 2021 email.  As PJD notes,

---

[9]     Other portions of the definition of Confidential Information underscore that it does not apply to information previously known by Sterling: "Confidential Information shall not include information or material that . . . was already in Recipient's or its Representatives' possession or known to Recipient or its Representatives prior to being disclosed or provided to Recipient by or on behalf of the Company, provided, that, the source of such information or material was not, to Recipient's Knowledge, bound by a contractual, legal or fiduciary obligation of confidentiality to the Company or any other party with respect thereto."  (Doc. 56 at 32, underlining omitted.)

"Con App, through Jeff Ratliff and Tom Healy . . . corresponded regularly with Callahan" after the email.  (Doc. 159 at 5.)   But specifics matter, and without more detail and evidentiary development, PJD has not established that a disclosure of Confidential Information occurred during Callahan's course of correspondence with Con App.

PJD also contends an in-person meeting in April 2021 between Sterling and Con App breached § 2.1 because Friese used a slide deck that relied on PJD's "Cost Stack" and "Optimized Procurement" information.  But although the parties agree this slide deck was used during the April 2021 meeting, Friese testified that not every slide was used ("Not page by page, but we went through several slides") and that he could not remember whether the "cost stack" slide was "actually discussed" at the meeting.  (Doc. 181-2 at 34-35 [sealed].)  Likewise, Con App's representative at the April 2021 meeting, Ratliff, could not recall specifics of what was (and was not) discussed during the meeting and could not specify whether the "handout" he was provided during the meeting (which he did not retain) was the entire slide deck.  (Doc. 166-1 at 69-71 [sealed].)  Because a reasonable factfinder, when construing all inferences in Sterling's favor, could conclude that Sterling did not disclose the challenged slides during the April 2021 meeting, PJD is not entitled to summary judgment.[10]

## B.   Section 2.5

Section 2.5 of the NDA provides: "Recipient shall use the Confidential Information only to evaluate, negotiate and, if applicable, consummate the Transaction in a manner consistent with the terms and conditions of this Agreement."  (Doc. 56 at 33.)

### 1.   The Parties' Arguments

PJD argues that "Sterling violated the use restriction provision in Section 2.5 when: (1) Sterling and its Representatives used PJD's Confidential Information to evaluate and pursue acquiring Con App and a national drywall roll-up strategy without PJD; and (2)

---

[10]   This conclusion makes it unnecessary to resolve Sterling's other arguments regarding the April 2021 meeting, some of which are premised on the Friese declaration, or to resolve PJD's corresponding contention that the Friese declaration should be stricken pursuant to the sham affidavit rule.

Sterling's Representatives continued independently to use PJD's Confidential Information to reach out to potential targets in pursuit of a national roll-up in competition with PJD and with Sterling's authorization." (Doc. 159 at 15.) PJD also asserts that Sterling "continued to request Confidential Information from PJD and send it to its Representatives" after it "internally made the decision to abandon its pursuit of PJD and pivot to Con App in mid-May" 2021—at which point it "was obligated to cease using PJD's Confidential Information entirely, because the NDA clearly provides that Confidential Information may only be used for the purpose of evaluating and consummating an acquisition of PJD." (*Id.*)

Sterling responds that it complied with § 2.5 because "it used the alleged 'Confidential Information' only to evaluate, negotiate, or consummate a transaction with PJD." (Doc. 178 at 13.) Sterling further contends that PJD cannot show "as a matter of law, that Sterling was no longer evaluating or negotiating a deal with PJD" and thus had to cease using the information in mid-May 2021 because "Sterling and PJD continued to negotiate through the end of June." (*Id.*) Sterling also questions whether much of the information at issue qualifies as Confidential Information under the NDA. (*Id.* at 14-15.) Finally, Sterling contends that it cannot be held responsible for any alleged breaches of § 2.5 by Callahan or Con App because "Section 2.6 provides that Sterling is responsible for its Representatives['] breaches of only the terms 'expressly applicable to them'" and "Section 2.5 does not mention or impose an obligation on Sterling's Representatives." (*Id.* at 16.)

In reply, PJD argues that "[a]fter informing PJD that it was no longer going forward with an acquisition, Sterling breached Section 2.5 of the NDA by using PJD's Confidential Information including PJD's procurement advantages and unique estimating and pricing methods in pursuit of a national roll-up with Con App and Callahan, acknowledging that they would be competing directly with PJD." (Doc. 183 at 3.) PJD also argues that the undisputed evidence shows that "Sterling breached Section[] . . . 2.5 . . . of the NDA by sharing the target compilation that PJD developed with Sterling using PJD's Confidential Information with Callahan and Con App," "by disseminating PJD Confidential Information

- 18 -

to a third-party private equity firm and using such information with the third-party firm 'as a central thesis' to pursue a national drywall roll-up in competition with PJD," and "by sharing with the third-party private equity firm the target compilation that PJD developed with Sterling using PJD's Confidential Information and targeting many of the same entities for which PJD provided Confidential Information." (*Id.* at 2-4.) Finally, as for Sterling's "purported justifications" of losing interest in the Transaction and independently researching a roll-up strategy that would include targeting Vatos, PJD contends these contentions are "self-serving" and a "red herring" contradicted by the record. (*Id.* at 8.)

### 2. Analysis

Many of PJD's arguments regarding § 2.5 are premised on the contention that "Sterling internally made the decision to abandon its pursuit of PJD and pivot to Con App in mid-May" 2021, which precluded Sterling from making any subsequent "use" of Confidential Information. (Doc. 159 at 15.) PJD is not entitled to summary judgment on this theory because the question of when Sterling stopped "evaluat[ing]," "negotiat[ing]," and attempting to "consummate" the Transaction is the subject of a genuine factual dispute—although the pieces of evidence that PJD proffers on this issue may be persuasive at trial, the Court cannot overlook, under Rule 56, the contrary evidence that Sterling has proffered. Sterling contends that although it became concerned about red flags that appeared in due diligence in late May 2021, it did not make its initial decision to decline to proceed with the Transaction until June 11, 2021. (Doc. 178 at 9.) Sterling further contends that, even after communicating that initial decision to PJD, it continued evaluating and negotiating the Transaction during the latter part of June 2021, when considering PJD's request to reconsider the initial decision. (*Id.* at 14 ["PJD ignores evidence that negotiations continued through the end of June."].) Even putting aside the Friese declaration, there is evidence in the record to support Sterling's version of the timeline. For example, in an internal email written on June 2, 2011, a Sterling representative wrote: "At this time we are still planning on engaging PJD. We have entered a bit of a holding pattern on some 3rd party diligence streams, but are still pushing forward

the diligence streams that we are able to while our critical diligence items are being worked through." (Doc. 181-2 at 77 [sealed].)  Additionally, a Sterling representative testified that the Sterling partnership group participated in "a general meeting" that occurred "sometime between . . . June 18th . . . and June 28th" to discuss PJD's proposal to salvage the Transaction.  (Doc. 181-1 at 111-12 [sealed].)  Thus, PJD is not entitled to summary judgment on its theory that any "use" of Confidential Information by Sterling after mid-May 2021 was necessarily forbidden under § 2.5.

In a related vein, PJD is not entitled to summary judgment on its claim that "A&M's analysis and dissemination of" Confidential Information constituted a breach of § 2.5. (Doc. 159 at 15-16.)  The communication at issue is a June 14, 2021 email from Sterling's advisor Alvarez & Marshall ("A&M") to Callahan attaching a slide deck dated June 14, 2021 that contained some PJD information.  (Doc. 181-2 at 112-46 [sealed].)  Even assuming the information at issue might qualify as Confidential Information, a reasonable factfinder could conclude that one purpose of the communication was to facilitate Sterling's evaluation of the Transaction (which, again, was a permissible use under § 2.5). The A&M slide deck refers to PJD as one of two "[t]arget[s]" and states "the purpose of such inquiries is solely to assist . . . Sterling . . . in gaining an understanding of the Targets." (*Id.* at 119 [sealed].)  And as discussed above, a reasonable factfinder could conclude that, from Sterling's perspective, the Transaction remained under evaluation after June 11, 2021 and into the latter part of June 2021.

Sterling's June 18, 2021 internal partner meeting, which involved discussion of a slide deck that contained references to PJD (Doc. 161-1 at 7-28 [sealed]), presents a closer call.  During oral argument, PJD characterized this slide deck as its best example of misuse in violation of § 2.5, and upon reflection the Court agrees that PJD's arguments regarding this slide deck are perhaps its strongest breach arguments.  As PJD correctly notes, certain slides within this deck suggest that Sterling was no longer evaluating an acquisition of PJD and had instead pivoted to pursuing a roll-up of different drywall contractors so as to compete with PJD.  (*See, e.g., id.* at 13 [page 7 of sealed deck]; *id.* at 26 [page 20 of sealed

deck, explaining that "[w]hile the analysis below was performed for ConApp and PJD combined, we would expect the procurement opportunity for a combination of ConApp and one or several players which in total generate [an EBITDA threshold] to be within a similar range"].)  However, a reasonable factfinder could construe other slides within this presentation as evidence that the PJD acquisition was still under consideration—for example, the "Situation Update" noted the presence of red flags related to PJD but clarified that "this could be structured or negotiated around."  (*Id.* at 8 [page 2 of deck].)  Thus, even though PJD has a strong argument that certain individual slides are difficult to characterize, in isolation, as attempts to evaluate, negotiate, or consummate the Transaction, a reasonable factfinder could conclude that one overall purpose of the slide deck was to engage in this form of permissible "use" under § 2.5.[11]

PJD also identifies Sterling's June 20, 2021 email to Con App as an example of misuse under § 2.5.  On the one hand, the Court agrees with PJD that no reasonable factfinder could view that email as an attempt to evaluate, negotiate, or consummate the Transaction.  Although that email was sent before Sterling definitively renounced its interest in the Transaction, and thus theoretically could have qualified as a permissible use under § 2.5, the contents of the email reveal that it had nothing to do with attempting to acquire PJD.  On the contrary, the email explained that Sterling "wanted to share the current M&A list with" Con App and that Sterling had "prioritized targets through to row 89." (Doc. 159-2 at 156.)   PJD was not one of the acquisition targets identified in the corresponding spreadsheet.  (Doc. 161-3 at 37-41 [sealed].)  Nevertheless, PJD is not entitled to summary judgment on its claim that the June 20, 2021 email to Con App violated § 2.5 because a reasonable factfinder could conclude, when all disputed facts and inferences are resolved in Sterling's favor, that the target list did not contain Confidential Information as that term is defined in the NDA.  During his deposition in this case,

---

[11]      The Court also notes that, even assuming an individual slide within the June 18, 2021 presentation could not be viewed as an attempt by Sterling to evaluate, negotiate, or consummate the Transaction, PJD would also need to show—in order to establish breach under § 2.5—that the slide involved the use of "Confidential Information."  PJD has not established, on this record, the absence of a genuine dispute of fact on that issue.

Sterling's Friese provided the following description of the genesis of the target list:

> Any of these targets on this list you can find by doing a Google search. We're working with Mike Callahan who was a distributor to all these drywall installers and he could pick up the phone, call one of his guys and get any of these names. And the existence of—the pure existence of these names and these targets and, you know, who owns them is public information and we can easily replicate every single one. And for—for a fact, a majority of the names on this list are from us. The other number of targets on this list, I believe Cole [Johnson] came up with because we changed his M&A strategy and he would constantly make this gesture of turning a glass of water upside down in the sense that we changed his strategy, which then I would consider joint work product. And then lastly, the phasing of these targets, Phase 1, Phase 3, prioritization, is something that we, at Sterling, determined all on our own. So I believe this list to be our work product.

(Doc. 166-1 at 50 [sealed].) Friese also testified, with respect to a "company tracker" in a different document, that he personally created the company tracker "in conjunction with a[n] associate of [his]" via "expert interviews," "some Google searches," "some trade publications . . . [that] list essentially all these players by geography," and a contact in the drywall industry. (*Id.* at 39-40 [sealed].) Given this testimony, a reasonable factfinder could conclude that the target list Sterling sent to Con App on June 20, 2021 fell within one or more of the NDA's exclusions to the definition of Confidential Information. (Doc. 56 at 32 [noting that Confidential Information does not include, *inter alia*, information that "is publicly available," "was already in Recipient's or its Representatives' possession or known to Recipient or its Representatives prior to being disclosed," or "is independently developed or derived by the Recipient or its Representatives"].)[12]

Finally, to the extent PJD's breach theories regarding § 2.5 turn on communications by Callahan and Con App (as opposed to communications by Sterling),[13] summary

---

[12] PJD places heavy emphasis on Sterling's subsequent decision to circulate a "scrubbed" version of the target list (Doc. 159-3 at 2), which PJD views as an implicit admission that the original target list must have included *some* Confidential Information. But how to reconcile the "scrubbed" statement with Friese's explanation of the genesis of the target list is a question to be resolved by the factfinder at trial, not a question that must be resolved in PJD's favor at summary judgment.

[13] *See, e.g.,* Doc. 159 at 16 ("Sterling violated the use restriction provision in Section 2.5 when . . . Sterling's Representatives continued independently to use PJD's Confidential

judgment is unwarranted for the additional reason that, as discussed in relation to § 2.1, the text of § 2.5 doesn't expressly prohibit impermissible uses by Representatives (it only prohibits such uses by Sterling) and § 2.6 is reasonably susceptible to competing interpretations as to whether Sterling is deemed responsible for alleged NDA violations committed by Representatives.

III.     Sterling's Motion for Summary Judgment

   A.   **Damages**

      1.   The Parties' Arguments

Sterling's primary summary judgment arguments relate to damages (or the lack thereof). Accordingly, it is helpful to begin by providing an overview of PJD's damages theories. It appears that PJD has disclosed two such theories. The first broadly relates to "the value of PJD's Proprietary Information that Sterling and its Representatives wrongfully misappropriated from PJD and disseminated and misused." (Doc. 199-1 at 14 [Duffus report].) According to PJD's expert Duffus, the value of that information is $45.7 million. (Doc. 163-2 at 15 [sealed].) Duffus also opines that the value of "a stream of cash flows that could be generated from royalties paid to license the information" is $45.7 million. (*Id.* [sealed].) PJD's second theory relates to the Vatos transaction. PJD contends it sustained $5 million in damages in relation to that transaction because it should have been able to purchase Vatos for $35 million but, due to the misconduct of Sterling and its Representatives, the ultimate purchase price ballooned to $40 million. (Doc. 175 at 7 [sealed].)

With that backdrop in mind, Sterling argues that "summary judgment is proper because . . . PJD cannot establish any injury or damage" and "[d]amages are an element for each of PJD's affirmative claims." (Doc. 162 at 4-5.) As an initial matter, Sterling argues that Duffus's opinions should be excluded and therefore his testimony is "not competent evidence of PJD's damages." (*Id.* at 5.) Sterling asserts that PJD's only other

_____

Information to reach out to potential targets in pursuit of a national roll-up in competition with PJD and with Sterling's authorization.").

"remaining damages calculation is based on its assertion that it paid $5 million more to acquire Vatos . . . because Callahan and ConApp interfered with the acquisition by misusing PJD's Confidential Information or unfairly competing," then contends that "[t]his theory fails because: a) Vatos' identity is not 'Confidential Information' under the NDA; b) the NDA specifically allowed for competition with PJD in the drywall space; and c) PJD has no evidence to support its assertion that Callahan or ConApp (or Sterling) had any effect on PJD's efforts to purchase Vatos." (*Id.* at 5-6.) Sterling further asserts that "PJD has disclosed no other computation of damages aside from Mr. Duffus's opinions and the Vatos calculation" and "Rule 37 bars PJD from presenting undisclosed calculations of damages." (*Id.* at 8.)

PJD responds that "every breach of contract gives the injured party a right to damages," so "remedies and the calculation of damages are issues that should be reserved for trial." (Doc. 172 at 5, cleaned up.) PJD contends that Sterling's argument also "ignores PJD's entitlement to equitable remedies." (*Id.*) PJD also argues that Duffus's opinion satisfies Rule 702 and establishes substantial damages and that the increased purchase price of Vatos is evidence of damages. (*Id.* at 6-7.) Also, PJD contends that "it is well settled that PJD is entitled to unjust enrichment as a contract remedy requiring Sterling to disgorge the benefits it and its Representatives received as a result of the breaches." (*Id.* at 6.) Finally, PJD asserts that "Sterling's request for Rule 37 relief is not ripe since PJD has not offered any undisclosed damages calculation that it is seeking to present at trial" and "is a premature, advisory motion *in limine*." (*Id.* at 8.)

In reply, Sterling argues that PJD has failed to establish proximate causation, including because Duffus's "opinion does not address damages resulting from any alleged breach of the NDA," and that there is no competent evidence of damages proximately caused by Sterling regarding the Vatos acquisition. (Doc. 188 at 3-6.) Sterling further asserts that "PJD cannot articulate what, if any, equitable remedies it would be entitled to against Sterling" because "Sterling is not using any of PJD's Confidential Information" and PJD cannot "obtain a judgment against non-parties Callahan and ConApp." (*Id.* at 5,

emphasis omitted.)

## 2.    Analysis

Some of Sterling's damages-related arguments are premised on the notion that Duffus's opinions should be excluded under Rule 702.  But as discussed in Part IV *infra*, the Court has denied, without prejudice, Sterling's motion to exclude Duffus in light of this being a case that will culminate in a bench trial.  *B.K. by next friend Tinsley v. Faust*, 2020 WL 2616033, *3 (D. Ariz. 2020) ("[T]he motions to exclude the experts will be denied without prejudice. . . .  Genuine disputes of material fact preclude a grant of summary judgment in favor of either party.").

Sterling also contends that, even if Duffus's opinions are not excluded, PJD has failed to establish proximate causation.  (Doc. 188 at 3 ["The testimony of PJD's damages expert, even if not excluded, is not competent evidence that PJD suffered damages resulting from any act or omission of Sterling."].)  This argument is unavailing.  Although Sterling is correct that damages and proximate causation are essential elements of PJD's contract and tort claims,[14] PJD is not required, at least in relation to its trade secrets claim, to show that Sterling's alleged misconduct caused it to suffer an actual loss (as it has nevertheless attempted to do in relation to Vatos).  Under Arizona's trade secrets statute, "[d]amages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.  In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret."  A.R.S. § 44-403(A).  Here, it appears PJD is attempting to use Duffus's report to calculate damages based on a reasonable-

---

[14]       *See, e.g., Home Indem. Co. v. Bush*, 513 P.2d 145, 150 (Ariz. Ct. App. 1973) ("Generally, damages for breach of contract are those proximately caused by the breach, or which are within the contemplation of the parties at the time they entered into the contract."); *W.L. Gore & Assocs., Inc. v. GI Dynamics, Inc.*, 872 F. Supp. 2d 883, 888 (D. Ariz. 2012) ("Damages are an essential element of [an Arizona] misappropriation of trade secret claim, and a claim fails as a matter of law without a cognizable theory of proximately caused damages.") (cleaned up); *Firetrace USA, LLC v. Jesclard*, 800 F. Supp. 2d 1042, 1054 (D. Ariz. 2010) ("To recover on a tort or a breach of contract claim, a plaintiff must show proximately caused damages.").

royalty model.  That is a permissible method of attempting to prove causation and damages in a trade secrets case.  As the Fifth Circuit has explained:

> In an action for trade secret misappropriation, the plaintiff can recover actual damages based on the value of what has been lost by the plaintiff or the value of what has been gained by the defendant. . . .  The value of what the defendant has gained as a result of the misappropriation can be measured by a number of methods.  First, the plaintiff can seek damages measured by the defendant's actual profits resulting from the use or disclosure of the trade secret (unjust enrichment).  Second, the plaintiff can seek damages measured by the value that a reasonably prudent investor would have paid for the trade secret.  Third, the plaintiff can seek damages measured by the costs saved by the defendant. . . .  Finally, the plaintiff can seek damages measured by a reasonable royalty.  The royalty is calculated based on what a willing buyer and seller would settle on as the value of the trade secret.

*Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 722-23 (5th Cir. 2006) (cleaned up).[15]  *See also W.L. Gore & Assocs.*, 872 F. Supp. 2d at 888 ("The reasonable royalty theory is derived from patent law, and is based not on the infringer's profit, but on the royalty to which a willing licensor and a willing licensee would have agreed at the time of the misappropriation.") (cleaned up).

The Ninth Circuit's decision in *Joshua David Mellberg LLC v. Will*, 2021 WL 4480840 (9th Cir. 2021), on which Sterling relies, is not to the contrary.  There, the plaintiffs in a trade secrets case sought $27 million in damages under a restitution/unjust enrichment theory but did not disclose their expert's "damage calculation" until one year after the close of discovery, which in turn led the district court to exclude the report under Rule 37.  *Id.* at *1.  This case is obviously distinguishable, as Duffus's royalty-calculation opinions have not been excluded.  *Cf. W.L. Gore & Assocs.*, 872 F. Supp. 2d at 891 ("While a reasonable jury could reject Dr. Ugone's [reasonable royalty] report, and Gore offers many reasons to view it with skepticism, a reasonable jury could also find that Dr. Ugone's methods present a reasonable method for calculating damages.  Cases cited by Gore in

---

[15]     Although *Carbo Ceramics* is an unpublished decision that was decided before 2007, the Fifth Circuit (unlike the Ninth Circuit) does not prohibit its citation under these circumstances.  *Compare* 5th Cir. R. 47.5.4 *with* 9th Cir. R. 36-3.

which no expert testimony was presented, or in which testimonies or reports of a damages expert were excluded based on *Daubert*, are simply not applicable here.") (citation omitted).

Although the parties have not briefed the issue in much detail, PJD has adequately demonstrated, at least at this stage of the case, that it should also be allowed to pursue the same theory of damages in relation to its contract claims. (Doc. 172 at 6 ["[I]t is well settled that PJD is entitled to unjust enrichment as a contract remedy requiring Sterling to disgorge the benefits it and its Representatives received as a result of the breaches."].)[16] Although the NDA does not specify how damages are to be calculated in the event of a breach, the general rule is that a plaintiff may seek restitution as an alternative measure of damages in a contract action. *See* Restatement (Second) of Contracts § 373, comment a ("An injured party usually seeks, through protection of either his expectation or his reliance interest, to enforce the other party's broken promise. However, he may, as an alternative, seek, through protection of his restitution interest, to prevent the unjust enrichment of the other party.") (citation omitted). Such an award "may as justice requires be measured by . . . the reasonable value to the other party of what he received in terms of what it would have cost him to obtain it from a person in the claimant's position." *Id.* § 371(a). Sterling has not argued, nor can the Court ascertain why, the reasonable-royalty method of measuring damages in the trade secrets context would not be equally available in a contract action where the alleged breach was the misuse of confidential information.

The tentative ruling stated that, in light of these conclusions, Sterling's request for an across-the-board grant of summary judgment should be denied. In an attempt to avoid this outcome, Sterling raised a new damages/causation theory during oral argument that was not distinctly raised (at least in the Court's view) in its motion papers—that because Duffus made no effort to individually value the various pieces of Confidential Information that he has collectively valued at $45.7 million, PJD will not be able to prove an entitlement

---

[16]    This clarification is important because, as discussed in later portions of this order, Sterling is entitled to summary judgment on PJD's trade secrets claim for unrelated reasons.

to damages for any disclosure or misuse violation that only involved a subset of PJD's Confidential Information.[17]  Even assuming this argument is not forfeited for summary judgment purposes, it does not change the outcome.  Sterling may very well be correct that PJD will be unable to prevail at trial on its all-or-nothing $45.7 million damage theory if any of the assumptions underlying Duffus's calculation are disproved, but none of those assumptions have been disproved yet.

Sterling also seeks a more targeted grant of summary judgment as to PJD's claim for $5 million in damages related to the Vatos transaction.  Sterling's first argument as to why this claim fails is that "Vatos' identity is not 'Confidential Information' under the NDA." (Doc. 162 at 5-6.)  This is correct but misses the point.  Although the undisputed evidence shows that Callahan had independent awareness of Vatos's identity and existence, it was only after Callahan was exposed to PJD's Confidential Information that he chose to approach Vatos to attempt to acquire it.  The record is undeveloped as to why, exactly, Callahan made the challenged inquiry on behalf of AEA, but a reasonable factfinder could conclude, in light of its timing and when all reasonable inferences are resolved in PJD's favor, that it was based at least in part on knowledge Callahan had gathered from being exposed to PJD's Confidential Information.  Indeed, Callahan stated during his deposition that he considered himself free to use information from Sterling's presentations "as a central thesis as [he] moved forward with Con App without Sterling" (Doc. 159-1 at 301-02), which is difficult to reconcile with the provision in Callahan's non-disclosure

---

[17]     The Court acknowledges that Sterling developed this theory in more depth in its motion to exclude Duffus (Doc. 163 at 3-7 [sealed]), but Sterling did not distinctly raise this theory in its summary judgment motion.  The motion simply asserts that if Duffus's opinions are excluded, summary judgment should be granted as to the claim for $45.7 million in damages (Doc. 162 at 5), before delving into a more developed challenge to PJD's claim for $5 million in Vatos-related damages (*id.* at 5-7).  Additionally, although a later section of the motion notes that "[a] factual claim underpinning all of PJD's claims is that Sterling misappropriated, misused, and/or improperly disclosed all of the information that PJD provided Sterling as part of the contemplated transaction" (*id.* at 13), that argument is not raised in relation to damages or causation, but in relation to Sterling's request for partial summary judgment as to some of PJD's breach theories.  Finally, although Sterling's summary judgment reply brief contains passages (Doc. 188 at 3) that might be construed as raising the damages/causation theory that counsel emphasized during oral argument, "[t]he district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

- 28 -

agreement with Sterling that forbade him from "us[ing] the Confidential Information for any purpose other than to evaluate a possible consulting relationship with Sterling and to the extent applicable, in furtherance of such consulting relationship" (Doc. 162-2 at 109). And if PJD's Confidential Information informed Callahan's decision to reach out to Vatos, that inquiry itself—even if it did not, as both Callahan[18] and Louis Rodriguez (Vatos's co-owner)[19] testified, involve the disclosure of any Confidential Information to Vatos—could reasonably be construed as an impermissible "use" of Confidential Information under § 2.5 of the NDA, given that it was not for the purpose of evaluating, negotiating, or consummating a transaction with PJD.  Even though, as Sterling emphasized during oral argument, there is no *direct* evidence that Callahan used or otherwise relied on PJD's Confidential Information when deciding to make the inquiry, there is just enough circumstantial and inferential evidence for PJD's claim to survive summary judgment.

For related reasons, there is no merit to Sterling's second challenge to the Vatos claim, which is that "the NDA specifically allowed for competition with PJD in the drywall space."  (Doc. 162 at 6.)  True, § 9 of the NDA allowed for competition, but only "so long as Confidential Information is not used by such person in violation of this Agreement." (Doc. 56 at 35.)  Additionally, § 2.5 clarified that Sterling could not "use" Confidential Information for purposes other than evaluating, negotiating, or consummating a transaction with PJD.  (*Id.* at 33.)  One reasonable way to harmonize those provisions (assuming that § 2.6 deems Sterling responsible for misuse by Callahan) is that § 9's allowance for competition did not include authorizing Sterling and its Representatives to misuse

---

[18]      Doc. 161-1 at 291, 320 (Callahan's sealed deposition testimony, explaining that the initial inquiry consisted of saying "I'm working with private equity in order to facilitate a possible transaction and I would just want to see if [Vatos] had any interest in it" and that "no meeting ever took place"); Doc. 162-2 at 36 (Callahan's unsealed deposition testimony, explaining that "the initial response was [Vatos] would take a meeting, and then subsequent to that [Vatos] came back and said that [it] had decided against . . . having a meeting, at which point I sent [Vatos] a thank you letter for considering it and hopefully we could get a chance to meet some time down the road" and confirming that he "[n]ever talk[ed] dollars within anyone from Vatos").

[19]      Doc. 162-2 at 49 (Rodriguez, testifying that Callahan "[n]ever presented an offer" and "[n]ever actually progressed to a . . . stage where [Vatos is] discussing price").

Confidential Information for the purpose of competing against PJD.

Sterling's final argument is that "PJD has no evidence to support its assertion that Callahan or ConApp (or Sterling) had any effect on PJD's efforts to purchase Vatos." (Doc. at 6, emphasis omitted.)  This argument presents a close call.  On the one hand, Rodriguez provided the following explanation for Vatos's decision to seek the $5 million price increase:

> Q.    [H]ow did the $5 million [increase] get decided upon?
>
> A.    We [Vatos founders] talked about it one day. . . .  We just looked at real numbers.  This is what we pay out every month.  This is what we pay out, this, this, this, that, and this is the—the bulk of the money that's ours.

(Doc. 162-2 at 46.)  That explanation suggests that Callahan's inquiry had nothing to do with the price increase, which was instead the product of the Vatos owners' independent decision to reevaluate the "real numbers" underlying the deal.

However, Rodriguez's statements on this topic were not fully consistent.  During a later portion of his deposition, when discussing whether the Vatos owners brought up the possibility of "other interested buyers" in an attempt to exert leverage over PJD and persuade PJD to agree to the $5 million price increase, Rodriguez testified that "it's probably been stated that there's other parties interested and hurry up before you fall off the wagon."  (*Id.* at 47.)  Rodriguez also generally acknowledged that sellers benefit from having two or more potential bidders during an auction.  (*Id.* ["Have you ever been to an auction? . . .  The more the merrier. . . .  Would we feel better having more people on the back side of it?  Of course.  Who wouldn't?"].)  Finally, Rodriguez identified "Callahan" as the other "company interested in purchasing Vatos."  (*Id.* at 47-48.)

Under Arizona law, proximately caused harm is "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred."  *Saucedo ex rel. Sinaloa v. Salvation Army*, 24 P.3d 1274, 1278 (Ariz. Ct. App. 2001) (quoting *Robertson v. Sixpence Inns of*

*Am., Inc.*, 789 P.2d 1040, 1047 (Ariz. 1990)).  The conduct that proximately caused the harm "must be a substantial factor in bringing about the harm."  *Standard Chartered PLC v. Price Waterhouse*, 945 P.2d 317, 343 (Ariz. Ct. App. 1997) (cleaned up).  Here, when all factual disputes and reasonable inferences are resolved in PJD's favor, a reasonable factfinder could construe Rodriguez's testimony as evidence that Callahan's inquiry was a substantial factor in causing the $5 million price increase.  *Cf. Sunds Defibrator AB v. Beloit Corp.*, 930 F.2d 564, 565-67 (7th Cir. 1991) (affirming damage award where the defendant improperly used the plaintiff's intellectual property, in violation of licensing agreement between the parties that imposed use restrictions on the defendant, in an unsuccessful effort to bid for a third-party contract that "touch[ed] off a bidding war" which the plaintiff ultimately won by lowering its price, and noting that "[t]he proof of a counterfactual (what would have happened had [the defendant] not broken the contract) is often difficult, and, within reason, doubts are resolved against the wrongdoer").[20]

### B.    Confidential Information

#### 1.    The Parties' Arguments

Sterling next seeks summary judgment because "PJD cannot show all or even a substantial portion of its information is 'Confidential Information' as defined by the NDA." (Doc. 162 at 8.)  As discussed in more detail below, Sterling then identifies various specific categories of information that should be deemed to fall outside the definition of Confidential Information.  (*Id.* at 8-13.)

PJD responds that it "is not required to show that 'all or a substantial portion' of the information it provided to Sterling was Confidential Information and was misused" because "it is a clear breach of the NDA if Sterling or one of its Representatives disseminated or used any Confidential Information for any purpose other than the acquisition of PJD." (Doc. 172 at 10, emphasis omitted.)  Regarding the specific categories of information that Sterling asserts were not Confidential Information, PJD contends it

---

[20]    This conclusion makes it unnecessary to resolve Sterling's evidentiary objections (Doc. 188 at 11) to Cole Johnson's deposition testimony regarding the impact of Callahan's inquiry on the price increase.

1   provided much more detailed information than Sterling suggests, and much of it was non-

2   public.  (*Id.* at 11-13.)

3          In reply, Sterling argues that "[a] core issue with PJD's case is that it stops reading

4   the NDA after the first paragraph of Section 1" because "the very next paragraph excludes

5   broad swaths of information from the definition of Confidential Information—e.g.,

6   previously known or independently derived information."  (Doc. 188 at 6.)

7                    2.   Analysis

8          As an initial matter, although PJD is correct that any misuse of Confidential

9   Information by Sterling would breach the NDA, it does not follow that Sterling is precluded

10  from seeking summary judgment as to whether specific categories of information qualify

11  as Confidential Information.  Under Rule 56(a), Sterling is entitled to seek partial summary

12  judgment, including to narrow the grounds on which PJD may argue it breached the

13  contract, even if such a motion does not eliminate PJD's contract claims.  Fed. R. Civ. P.

14  56(a); 2 Steven S. Gensler & Lumen N. Mulligan, Federal Rules of Civil Procedure, Rules

15  and Commentary, Rule 56 (2023) ("The 2010 version of Rule 56 . . . mak[es] it clear that

16  a party may seek summary judgment on a claim, a defense, or a *part* of a claim or defense

17  . . . [a]lthough this type of partial summary judgment will not, by itself, resolve any of the

18  claims in the case.") (emphasis in original).  And even if such a ruling were too narrow

19  under Rule 56(a), the Court would have the discretion to issue it under Rule 56(g).  Fed.

20  R. Civ. P. 56(g) ("[T]he court . . . may enter an order stating any material fact—including

21  an item of damages or other relief—that is not genuinely in dispute and treating the fact as

22  established in the case.").

23                    a.   **Roll-Up**

24         PJD does not dispute that the ideas of a drywall roll-up or expansion through growth

25  are not Confidential Information.  (Doc. 172 at 11.)  Rather, PJD contends that it shared

26  detailed information about its roll-up plans with Sterling and that Sterling developed its

27  specific drywall roll-up plan using that information.  (*Id.*)

28         This appears to be an instance of the parties talking past each other.  Given the lack

of disagreement as to the narrow ruling Sterling actually seeks, the Court has no trouble granting Sterling's motion on this issue. The idea of "expansion through growth or M&A" is well known. (*See, e.g.*, Doc. 166-1 at 276 [sealed].) Additionally, the idea of creating a national drywall roll-up—or even the fact that PJD was considering doing so—are not Confidential Information as that term is defined in the NDA because Sterling became aware of those matters before entering into the NDA.

b. **Identities Of Drywall Companies**

Sterling next asserts that "identities of other drywall installers, including Vatos" are not Confidential Information. (Doc. 162 at 10.) Sterling advances two theories for this proposition. First, Sterling correctly asserts that the identity of a drywall installer would not qualify as Confidential Information if it were publicly available. (*Id.* at 10-11; *see* Doc. 56 at 32 ["Confidential Information shall not include information or material that (i) is publicly available . . . ."].) Second, Sterling correctly asserts that the identity of a drywall installer that Sterling or its Representatives identified *before* entering into the NDA, or identified without reference to any information provided by PJD pursuant to the NDA, would not be Confidential Information. (Doc. 162 at 11; *see* Doc. 56 at 32 ["Confidential Information shall not include information or material that . . . was already in Recipient's or its Representatives' possession or known to Recipient or its Representatives . . . . or . . . is independently developed or derived by the Recipient or its Representatives without reference to the Confidential Information."].) However, beyond asserting that "many"— note Sterling does not say "all"—drywall companies were independently known to or identified by Sterling, Sterling does not identify which ones (beyond Vatos) fall into these categories. (Doc. 162 at 11.)

Sterling does direct the Court to a list of drywall companies taken from a slide deck prepared by Friese. (*Id.* at 10-11.) Many of these companies have hyperlinks to websites identifying them publicly, but it is unclear when those websites became available. And some of the hyperlinks do not seem to work. (Doc. 166-1 at 236-38 [sealed].) Also, this slide deck was prepared after Sterling began receiving information from PJD under the

1    NDA, so it does not establish that the list was compiled without reference to that

2    information.  (*Id.* at 90, 155, 223, 263 [sealed].)

3          The Court concludes that the identity of Vatos was not Confidential Information,

4    but the record is undeveloped as to whether any other companies' identities qualify as

5    Confidential Information.  To be clear, this narrow ruling does not mean that other

6    information PJD may have provided concerning Vatos necessarily falls outside the

7    definition of Confidential Information.

8                        c.    **PJD Customer Information**

9          Sterling next asks the Court to rule that "[g]eneral information, regarding PJD's

10   customers, such as the slide shared at the joint meeting, is not Confidential Information

11   under the NDA."  (Doc. 162 at 11.)  PJD disagrees, asserting that "Sterling's argument

12   conveniently ignores the massive amount of detailed customer information, including

13   customer concentration, contact information, sales data, contracting terms, and turnkey

14   arrangements, that Sterling received from PJD."  (Doc. 172 at 12.)

15         Sterling's request is far too vague.  The Court cannot rule that "general information"

16   is not Confidential Information when it is unclear what such a ruling would mean or how

17   it would affect the trial.  *Cf. Phillips v. First Horizon Home Loan Corp.*, 2012 WL 3206555,

18   *4 (D. Nev. 2012) ("[T]he motion for partial summary judgment is too vague for the Court

19   to rule upon at this time.").

20         Nor has Sterling adequately explained why the information shared at the May 7,

21   2021 joint meeting could not be considered Confidential Information.  That information

22   apparently included "revenue for Paul Johnson Drywall['s] . . . top ten customers."  (Doc.

23   166-1 at 48 [sealed]; Doc. 166-2 at 129 [sealed].)  Even if the identify of those customers

24   and their association with PJD was public (Doc. 162-2 at 79-87 [PJD's website]), PJD's

25   internal revenue figures associated with those customers is an entirely different matter.

26   Further, although Sterling argues that PJD was present at the meeting where the slide was

27   shown and did not object (Doc. 162 at 11, 14), nothing in the NDA suggests that PJD

28   somehow forfeits its contractual rights by failing to make contemporaneous objections to

1  improper disclosures.

2               **d.**      **Labor and Turnkey Information**

3        Sterling contends that PJD's use of W-2 labor and turnkey models is not

4  Confidential Information because the fact that it uses these models is publicly available.

5  (Doc. 162 at 11-12; Doc. 162-2 at 100 [citing John Wyatt, *Arizona Contractors Paul*

6  *Johnson Drywall Bring the Heat to the Ever-Developing Southwest Market*, Walls &

7  Ceilings (Jan. 13, 2021), https://www.wconline.com/articles/93519-among-the-

8  mountains-and-deserts].)  PJD responds that it "provided Sterling with detailed information

9  about how it uniquely leveraged these concepts in combination with other facets of its

10  business model and systems to achieve superior financial performance to other industry

11  participants."  (Doc. 172 at 12-13.)

12        This appears to be another instance of the parties talking past each other.  On the

13  one hand, the Court agrees with Sterling that PJD's use of W-2 labor and turnkey models

14  is not, alone, Confidential Information.  On the other hand, the Court does not foreclose

15  the possibility that PJD's *specific* W-2 labor and turnkey models might qualify as

16  Confidential Information.

17               **e.**      **Procurement**

18        Sterling argues that PJD's "procurement and supply-chain" methods do not qualify

19  as Confidential Information because the basic ideas that PJD was "large, could enter into

20  longer-term contracts with suppliers for more volume to get better pricing, and negotiate

21  directly with manufacturers" are "generally known concepts."  (Doc. 166 at 12 [sealed].)

22        Although these concepts at their most basic level may be generally known, it does

23  not follow that more detailed information regarding PJD's specific procurement and

24  supply-chain methods falls outside the definition of Confidential Information.  The parties

25  appear to disagree as to whether Sterling sought to "copy PJD's procurement methods"

26  (Doc. 162 at 13), but that issue goes to whether Sterling misused that information, not

27  whether it could qualify as Confidential Information.

28        …

1      C.     **Disclosure and Use**

2             1.    The Parties' Arguments

3      According to Sterling, "PJD asserts that Sterling has misappropriated, misused,

4      and/or disseminated all of PJD's 'Confidential Information' in two general ways: (1)

5      disclosing that information to ConApp and Callahan; and (2) using that information for

6      purposes other than evaluating a transaction with PJD and in competition with PJD." (Doc.

7      162 at 13.)   Sterling seeks summary judgment as to both of these assertions because

8      "ConApp and Callahan received little to no information regarding PJD from Sterling or

9      any other source" and "Sterling, ConApp, and Callahan have not used all or even any of

10     PJD's 'Confidential Information' for purposes other than evaluating a transaction with PJD

11     or certainly not to compete against PJD." (*Id.* at 13, 16.)

12     PJD again responds that it "is not required to show that 'all or a substantial portion'

13     of the information it provided to Sterling was Confidential Information and was misused"

14     because "it is a clear breach of the NDA if Sterling or one of its Representatives

15     disseminated or used any Confidential Information for any purpose other than the

16     acquisition of PJD." (Doc. 172 at 10, emphasis omitted.)   PJD contends that "[t]here is no

17     genuine issue of material fact that Sterling and its Representatives repeatedly used

18     Confidential Information provided under the NDA for purposes other than an acquisition

19     of PJD, thus entitling PJD to judgment on the issue of liability." (*Id.*, citation omitted.)

20     In reply, Sterling asserts that "PJD's pleadings hinge on [the] claim . . . [that] all of

21     PJD's information was misused" and that Sterling "is permitted to seek partial summary

22     judgment to narrow and focus the issues for trial, if necessary." (Doc. 188 at 5-7.)  Sterling

23     also argues that certain evidence cited by PJD is inadmissible.  (*Id.* at 11.)

24             2.    Analysis

25             a.    **Disclosure**

26     As an initial matter, to the extent Sterling seeks a ruling that Con App and/or

27     Callahan did not receive "a significant amount" of PJD's Confidential Information, this

28     request is too vague, *Phillips*, 2012 WL 3206555 at *4, and the Court will not issue such a

ruling because it is unclear what it would even mean.

However, not all of Sterling's requests on this topic are overbroad or vague. Regarding Con App, Sterling more specifically argues that the only circumstances in which Con App may have received Confidential Information were "the customer slide and the target list" and participation in "two meetings . . . one on April 13, 2021, in Virginia and the other [being] the May 7 joint meeting in Houston." (Doc. 166 at 14 [sealed].) Sterling then directs the Court to Con App's 30(b)(6) deposition where its corporate representative (Ratliff) testified that "the handout in Houston and this Excel list that shows all the—just names of drywall companies and sometimes addresses and things like that" were the "only two things [he] could even think" of that "may have contained some information derived from PJD" after he "searched the depths of [his] soul" for any possible "connection." (Doc. 166-1 at 89 [sealed].) Sterling met its initial burden of "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," *Celotex Corp.*, 477 U.S. at 323, so PJD was required to come forward with evidence of other potential bases for liability to the extent it contends there are any, *cf. Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016) (assuming movant "carried its initial burden of production in its motion for partial summary judgment" and assessing whether nonmovant "produce[d] evidence supporting his claim"). Because PJD did not respond with evidence of other specific instances of Con App receiving Confidential Information (Doc. 172 at 10), the Court agrees with Sterling that PJD's bases at trial for establishing liability on sharing Confidential Information with Con App will be limited to the instances outlined above.

However, the Court does not agree with Sterling that no reasonable factfinder could conclude those instances were improper disclosures under the NDA. The "customer slide" discussed at the May 7, 2021 joint meeting could qualify as Confidential Information for the reasons discussed in Part III.B.2.c above. So could the target list for the reasons discussed in Part II.B.2 above. And although PJD is not entitled to summary judgment with respect to the April 2021 meeting, *see* Part II.A.2, Sterling is not either, because key

1  disputed factual issues could be resolved in either side's favor.  Finally, Sterling's argument

2  that Con App did not actually use much of this information (Doc. 162 at 13-15) does not

3  speak to whether there was an improper *disclosure* to Con App in violation of § 2.1,

4  particularly given Sterling's contention that Con App was not its Representative (Doc. 178

5  at 12.)

6  As for Callahan, Sterling's request for a ruling that it did not "provide[] Callahan

7  with 'all' of its Confidential Information . . . or even a significant amount of it[]" (Doc.

8  162 at 15-16) is too imprecise for the reasons discussed above.  Sterling also contends that

9  "PJD has not pointed to a single piece of procurement information that Callahan learned of

10  from PJD that he did not already know" (Doc. 188 at 7), but Sterling concedes that Callahan

11  joined a due diligence call with A&M in which procurement was discussed.  (Doc. 166 at

12  15 [sealed]; Doc. 166-2 at 140-42 [sealed].  *See also* Doc. 161-1 at 299-300 [sealed,

13  Callahan referring to "procurement" information from PJD during his deposition.].)

b.  **Use**

14

15  Sterling next contends that no reasonable factfinder could conclude that Sterling,

16  Callahan, and Con App misused "any, of PJD's Confidential Information."  (Doc. 162 at

17  16-17.)  As discussed, whether a "use" occurred in breach of § 2.5 of the NDA depends in

18  part on whether any Confidential Information was used for any purpose other than "to

19  evaluate, negotiate and, if applicable, consummate the Transaction."

20  Sterling notes that it has not worked with Con App and Callahan on a drywall roll-

21  up since September 2021.  (Doc. 166 at 16 [sealed].)  Sterling also argues that Con App

22  has not integrated PJD's information into its business and questions whether any harm

23  came from Callahan's communications with AEA regarding the Transaction.  (*Id.* at 16-17

24  [sealed].)  But these observations and arguments, even if true, do not negate the possibility

25  that one or more of these parties may have, at some point, "used" Confidential Information

26  for a purpose other than to evaluate, negotiate, or consummate Sterling's potential

27  acquisition of PJD.

28  As discussed in Part II.B.2 above, there is also a genuine dispute of fact about when

Sterling abandoned any interest in the Transaction.  Thus, a reasonable factfinder could conclude that Sterling's internal slide deck presentation on June 18, 2021, which in part addressed the feasibility of combinations not involving PJD (Doc. 161-1 at 26 [sealed] ["While the analysis below was performed for ConApp and PJD combined, we would expect the procurement opportunity for a combination of ConApp and one or several players which in total generate at least [a specified threshold] in EBITDA, to be within a similar range"]) was not a permissible use.  Likewise, although PJD is not affirmatively entitled to summary judgment with respect to the target-list email that Sterling later took pains to "scrub[]" of PJD information, Sterling is also not entitled to summary judgment with respect to that communication—disputed issues of fact and competing inferences abound.

Finally, a reasonable factfinder could infer that Callahan and AEA at least on some level considered information received through due diligence from PJD in subsequent evaluations of whether to and how to reach out to other potential targets.  After learning of PJD's acquisition of Vatos and C&S Drywall, one of AEA's investors encouraged Callahan "to reach out to the other material regional players," noting that "from how [Callahan] described PJD, [he] will be a welcome contrast."  (Doc. 161-4 at 25 [sealed].)  Thus, to the extent the unresolved dispute over contractual interpretation (*i.e.*, whether Sterling may be held liable for misuse by Callahan pursuant to §§ 2.5 and 2.6) is resolved in PJD's favor, this episode might provide a reasonable factfinder with another reason to rule against Sterling on the "use" issue.

     D.    **Trade Secrets**

        1.   <u>The Parties' Arguments</u>

In Count Seven of the SAC, PJD asserts a claim entitled "Misappropriation of Trade Secrets—A.R.S. § 44-401 to -407."  (Doc. 56 ¶¶ 132-45.)  Sterling seeks summary judgment on that claim "because (1) PJD does not have trade secrets and (2) PJD has not taken necessary steps to maintain its alleged trade secrets."  (Doc. 162 at 17.)

PJD responds that "[i]n arguing that PJD does not have any trade secrets, Sterling

simply ignores [*Enter. Leasing Co. of Phoenix v. Ehmke*, 3 P.3d 1064 (Ariz. Ct. App. 1999)], the leading Arizona case on compilations as trade secrets." (Doc. 172 at 14.)  PJD also argues that "Sterling's contention that PJD has not identified its trade secrets with sufficient particularity and is required to prove that each individual component of its business model and systems is a trade secret" is "without merit" because "the analysis depends on whether the compilation as a whole qualifies as a trade secret." (*Id.* at 15.) PJD next argues that "[i]t is plainly unreasonable to construe a diligence request directed to the identification of 'material unregistered intellectual property' as barring PJD from receiving trade secret protection." (*Id.* at 16.)  As for the failure-to-protect argument, PJD argues that it "has demonstrated that it took significant steps to protect the confidential business information from which it derived its competitive advantages" and "Sterling has not come close to making the showing required for the Court to grant judgment as a matter of law on this issue." (*Id.*)  Finally, PJD argues that "[l]imited disclosure for economic benefit or as part of a potentially profitable business transaction does not destroy secrecy." (*Id.* at 17.)

In reply, Sterling argues that "PJD cites no evidence that contradicts the evidence cited in Sterling's Motion that PJD admitted in real-time during diligence that the drywall business has no trade secrets.  Instead, PJD merely argues, without evidence, that the request did not require PJD to identify its trade secrets, which is just not true." (Doc. 188 at 9, citation omitted.)  Sterling rejects the argument that some Confidential Information may be a compilation trade secret because "[o]nly a small subset of PJD's alleged compilation trade secret was even arguably provided by Sterling to Callahan or ConApp" and "[t]hat subset of information was not . . . trade secret information." (*Id.*, emphasis omitted.)  Sterling also argues "PJD has not provided sufficient evidence to support the existence of a compilation trade secret" or "efforts taken to preserve secrecy." (*Id.* at 10.)

2.  Analysis

PJD is correct that Arizona's Uniform Trade Secrets Act provides an "expansive" definition of trade secrets.  *Ehmke*, 3 P.3d at 1069.  PJD is also correct that "a trade secret

may include a grouping in which the components are in the public domain but there has been accomplished an effective, successful and valuable integration of those public elements such that the owner derives a competitive advantage from it," and thus "a compilation of general concepts may amount to a trade secret" if "the end-product qualifies as a trade secret." *Id.* However, these principles do not displace PJD's duty to specifically identify, as part of the litigation process in this case, what it contends is a trade secret. "When a party fails to identify its trade secrets with particularity, summary judgment is appropriate." *W.L. Gore & Assocs.,* 872 F. Supp. 2d at 889. *See also Smartcomm License Servs., LLC v. Palmieri*, 2018 WL 326510, *8 (Ariz. Ct. App. 2018) (affirming grant of summary judgment where "Smartcomm refused to identify with sufficient particularity which documents, among the thousands in the repository, it considered trade secrets"); *Tucson Embedded Sys. Inc. v. Turbine Powered Tech. LLC*, 2016 WL 1408347, *8 (D. Ariz. 2016) ("Based upon the evidence put forth by Turbine, it would appear that it has invested significant time and resources to develop the T-53 for oil and gas industry applications; however, Turbine has failed to provide enough detail about the alleged trade secrets for TES or this Court to adequately discern what might be legally protectable. Because the Court finds that Turbine has not met its burden to prove a legally protectable trade secret exists, partial summary judgment in favor of TES is appropriate.") (footnote omitted); *cf. Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1166-67 (9th Cir. 1998) (affirming summary judgment ruling that "Imax failed to carry its burden of identifying for the court exactly what dimensions and tolerances it claimed as trade secrets").

PJD contends Count Seven should survive summary judgment because it has defined the allegedly misappropriated trade secrets with sufficient particularity in "Doc. 161-1, Ex. 9 at 5:22–11:15." (Doc. 172 at 15.) The cross-referenced document is PJD's response to an interrogatory that required it to "[i]dentify with reasonable particularity any and all trade secrets and/or 'Protected Information' that You claim were or are being misappropriated or misused by Sterling, Mike Callahan, Construction Applicators, and/or any other third party that forms the basis of your claims against Sterling." (Doc. 161-1 at

328 [sealed].)   In response, PJD began by providing a lengthy identification of the information it believes qualifies as "Confidential Information" under the NDA:

> PJD claims that Sterling misappropriated and/or misused the Confidential Information that PJD provided to Sterling under the NDA, including but not limited to PJD's Virtual Data Room ("VDR"), Sterling's written and oral diligence and related requests, and Sterling's consultants' and related third parties' written and oral diligence and related requests.  The Confidential Information that PJD provided to Sterling included but was not limited to non-public business, financial, technical, economic, and engineering information in the form of historic and projected profits and profitability, pricing, estimating factors and procedures, standardization factors and requirements; drywall service and installation techniques and requirements; lists and information about actionable target companies and target markets, business plans, company and industry forecasts; marketing plans; maps; blueprints and designs; negative know-how; formulas; computer data and algorithms; databases, spreadsheets, compilations and computer programs; methods, techniques and processes that derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(*Id.* at 330 [sealed].)  However, when it came time for PJD to specify which (if any) of that Confidential Information also qualifies as a trade secret, PJD declined to do so:

> While all of PJD's procurement and supply-chain, labor, operations, customer, financial, roll-up thesis, and acquisition target information is Confidential Information under the NDA, some of this information is also protected under the Arizona Uniform Trade Secrets Act, A.R.S. §44-401 to -407 ("AUTSA"). . . .  But to the extent that Interrogatory No. 8 seeks to have PJD distinguish between information that may be protected under AUTSA and information that may not be protected under the statute, PJD asserts that it need not do so, and, in any event, such a request is premature at best.  In addition, Arizona common law separately provides protections for the misappropriation and/or misuse of proprietary or otherwise confidential information that does not fall within the statutory definition of a trade secret, and PJD has asserted those common law claims under Counts 4 and 9 of its Second Amended Complaint as well.

(*Id.* at 334-35, citations omitted [sealed].)

Regardless of whether it was "premature" for Sterling to ask PJD to identify the

1    trade secrets underlying Count Seven in response to an interrogatory served before the
2    close of discovery, it was PJD's burden to provide that information in response to Sterling's
3    summary judgment motion.  *Celotex Corp.*, 477 U.S. at 322-23.  PJD's cross-reference to
4    a document in which it refused to do so is insufficient to meet that burden.  Summary
5    judgment is therefore proper on Count Seven.  *See, e.g., W.L. Gore & Assocs.*, 872 F. Supp.
6    2d at 889; *Smartcomm License Servs.*, 2018 WL 326510 at *8; *Tucson Embedded Sys.*,
7    2016 WL 1408347 at *8; *Imax Corp.*, 152 F.3d at 1166-67.

8         E.    **Unjust Enrichment**

9              1.    The Parties' Arguments

10         In Count Four of the SAC, PJD asserts a claim for unjust enrichment.  (Doc. 56
11   ¶¶ 117-22.)  Sterling seeks summary judgment on that claim "because valid contracts (the
12   NDA and LOI) apply" and thus "the doctrine of unjust enrichment has no application."
13   (Doc. 162 at 19.)

14         PJD responds that "[a]t this stage, PJD may recover damages on its breach of
15   contract claim based upon the unjust enrichment to Sterling and its Representatives in
16   addition to pursuing an independent unjust enrichment claim against Sterling."  (Doc. 172
17   at 13.)  PJD contends it "has not received the benefit of the protections of the NDA, so
18   unjust enrichment remains an alternative, stand-alone cause of action."  (*Id.*, citation
19   omitted.)

20         In reply, Sterling reiterates that "the core of PJD's suit is an alleged breach of the
21   parties' NDA" and "an unjust enrichment claim fails when there is a specific contract which
22   governs the relationship of the parties."  (Doc. 188 at 9, internal quotation marks omitted.)
23   Sterling further argues that "PJD's authorities from the motion-to-dismiss stage are
24   distinguishable."  (*Id.*)

25              2.    Analysis

26         Under Arizona law, an unjust enrichment claim has "five elements: (1) an
27   enrichment, (2) an impoverishment, (3) a connection between the enrichment and
28   impoverishment, (4) the absence of justification for the enrichment and impoverishment,

and (5) the absence of a remedy provided by law." *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011). "[I]f there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application." *Trustmark Ins. Co. v. Bank One, Ariz.*, 48 P.3d 485, 491-93 (Ariz. Ct. App. 2002) (cleaned up). However, where the validity of a relevant contract is disputed and the plaintiff has not yet received the benefit of the bargain, a plaintiff may plead an unjust enrichment claim in the alternative pending a ruling on the contract's validity. Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

*Physics, Materials & Applied Mathematics Rsch. LLC v. Yeak*, 2021 WL 2557398 (D. Ariz. 2021), is instructive. There, the defendant was a researcher employed by the plaintiff, a company that developed high-tech laser-based tools. *Id.* at *1. After the defendant secretly started a new competing company, the plaintiff brought several claims, including a claim for breach of the non-complete clause in the defendant's employment contract and a claim for unjust enrichment. *Id.* at *2. The court dismissed the latter claim because there was a contractual relationship between the parties, the plaintiff showed that it had an adequate remedy provided by law (by bringing breach of contract claims), and although the defendant disputed the applicability of "a single clause of the contract," he did not dispute the overall validity of the contract. *Id.* at *9.

So, too, here. PJD and Sterling have a contractual relationship, PJD has an adequate remedy provided by law (because it is asserting contract claims and may seek restitutionary/unjust enrichment damages as an alternative measure of contract damages), and Sterling agrees the NDA is a valid contract. (Doc. 162 at 19.)

In an attempt to avoid this outcome, PJD cites an order in which this Court allowed an unjust enrichment claim to survive a motion to dismiss. (Doc. 172 at 13.) There, the Court noted that an unjust enrichment claim may, under certain circumstances, survive a motion to dismiss as an alternative to a contract claim covering the same subject matter. *D Stadtler Tr. 2015 Tr. v. Gorrie*, 2023 WL 2503642, *47 (D. Ariz. 2023). However, the Court also cited cases recognizing that such an alternative theory would not survive if the

1  contract at issue were later deemed valid, as the contract claim would then displace the

2  unjust enrichment claim that covered the same subject matter.  *See, e.g.*, *Isofoton, S.A. v.*

3  *Giremberk*, 2006 WL 1516026, *5 (D. Ariz. 2006) ("It is clear that if Isofoton is found on

4  summary judgment or at trial to have acted under a valid Commission Agreement, Plaintiff

5  could not recover under an unjust enrichment theory.  However, Isofoton is merely seeking

6  one recovery through two alternate claims. . . .  The breach of contract and unjust

7  enrichment claims are separate and inconsistent, as contemplated by [Rule 8].   [I]t

8  withstands a motion to dismiss.").   That is the situation here, so Sterling is entitled to

9  summary judgment on Count Four.

10     F.     **Punitive and Exemplary Damages**

11            1.     The Parties' Arguments

12  Sterling seeks summary judgment on "PJD's claims for exemplary damages on its

13  trade secrets claim and punitive damages on its unfair competition claim" because PJD

14  cannot establish the necessary mental-state elements.  (Doc. 162 at 19-20.)

15  PJD responds that "to succeed on its Motion, Sterling has the burden to show that

16  there is a complete failure of proof such that no reasonable jury could find the requisite evil

17  mind by clear and convincing evidence."  (Doc. 172 at 8, cleaned up.)  PJD asserts that

18  "evidence at trial will show that Sterling knowingly, selfishly, repeatedly, and brazenly

19  disregarded and breached its obligations under the NDA." (*Id.* at 9.)  Finally, PJD contends

20  that "Sterling continues to ignore the clear use restrictions contained in the NDA and the

21  fact that any misuse of any of PJD's Confidential Information by Sterling or its

22  Representatives constituted a breach of the NDA for which Sterling is fully responsible."

23  (*Id.*)

24  In reply, Sterling argues that "PJD fails to point to anything in the record supporting

25  its bald assertion that Sterling behaved with the requisite 'evil mind' or 'malice' warranting

26  exemplary damages" and fails to contradict Sterling's evidence that it did not act with

27  malice or evil intent.  (Doc. 188 at 7-8.)

28     …

2.   Analysis

Because the Court has now granted summary judgment to Sterling on PJD's trade secrets claim in Count Seven of the SAC, the only remaining claim that might give rise to an award of punitive damages is PJD's unfair competition claim in Count Nine of the SAC. (Doc. 56 ¶¶ 154-58.)

Sterling's request for summary judgment as to that punitive damage claim is denied. "The question of whether punitive damages are justified should be left to the jury if there is any reasonable evidence which will support them.  The evidence, however, must be more than slight and inconclusive such as to border on conjecture." *Farr v. Transamerica Occidental Life Ins. Co. of California*, 699 P.2d 376, 384 (Ariz. Ct. App. 1984). *See also Rawlings v. Apodaca*, 726 P.2d 565, 578 (Ariz. 1986) ("We restrict [the availability of punitive damages] to those cases in which the defendant's wrongful conduct was guided by evil motives.  Thus, to obtain punitive damages, plaintiff must prove that defendant's evil hand was guided by an evil mind.  The evil mind which will justify the imposition of punitive damages may be manifested in either of two ways.  It may be found where defendant intended to injure the plaintiff.  It may also be found where, although not intending to cause injury, defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.").  Even where a "single piece of evidence, taken alone, might not be clear and convincing evidence of an 'evil mind,' several such pieces of evidence, taken together, might clear the evidentiary hurdle." *Thompson v. Better-Bilt Aluminum Prod. Co., Inc.*, 832 P.2d 203, 211 (Ariz. 1992).

Here, PJD's theory is that Sterling decided in May 2021 not to pursue the Transaction but continued requesting Confidential Information from PJD afterward in an attempt to facilitate a drywall roll-up involving PJD's competitors.  Drawing all inferences and viewing all evidence in the light most favorable to PJD, that is one reasonable conclusion a factfinder might reach.  If a factfinder reached such a conclusion, the factfinder might then reasonably conclude that Sterling, in misusing PJD's information to potentially acquire PJD's potential competitors, "acted to serve [its] own interests, having

1   reason to know and consciously disregarding a substantial risk that [its] conduct might

2   significantly injure the rights of others." *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 758

3   P.2d 1313, 1324 (Ariz. 1988).[21]

4   IV.   <u>Duffus</u>

5        A.   **Legal Standard**

6        "The party offering expert testimony has the burden of establishing its

7   admissibility." *Bldg. Indus. Ass'n of Washington v. Washington State Bldg. Code Council*,

8   683 F.3d 1144, 1154 (9th Cir. 2012).  Rule 702 of the Federal Rules of Evidence governs

9   the admissibility of expert testimony.  It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if . . .
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods
> to the facts of the case.

        As for the threshold requirement that an expert witness be qualified "by knowledge,

skill, experience, training, or education," "Rule 702 'contemplates a broad conception of

expert qualifications.'"  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015

(9th Cir. 2004) (citation and emphasis omitted).  Years of relevant experience can establish

the necessary "minimal foundation."  *Id.* at 1015-16 (finding that twenty-five years of

working as an independent consultant and an expert witness in the insurance industry

satisfied the "minimal foundation" necessary to provide expert testimony) (emphasis

omitted).  "Disputes as to the strength of an expert's credentials . . . go to the weight, not

---

[21]   During oral argument, Sterling argued that it is also entitled to summary judgment on punitive damages because PJD cannot establish the predicate actual damages.  Because the Court has declined to enter summary judgment on actual damages, this argument fails. In any case, the Court views this argument as forfeited for summary judgment purposes because Sterling did not raise it in its motion.

1  the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th
2  Cir. 1998) (cleaned up).

3          A district court's decision to admit or exclude expert testimony is guided by a two-
4  part test that focuses on the opinion's relevance and reliability.  *Daubert v. Merrell Dow*
5  *Pharms., Inc.*, 509 U.S. 579, 589 (1993).  "The inquiry envisioned by Rule 702 is . . . a
6  flexible one."  *Id.* at 594.  "The focus, of course, must be solely on principles and
7  methodology, not on the conclusions that they generate."  *Id.* at 595.

8          Evidence is relevant if it "has 'any tendency to make the existence of any fact that
9  is of consequence to the determination of the action more probable or less probable than it
10 would be without the evidence.'"  *Id.* at 587 (quoting Fed. R. Evid. 401).  "The Rule's basic
11 standard of relevance thus is a liberal one."  *Id.*

12         The basic standard of reliability is similarly broad.  "Shaky but admissible evidence
13 is to be attacked by cross examination, contrary evidence, and attention to the burden of
14 proof, not exclusion."  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).  "Basically,
15 the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude
16 opinions merely because they are impeachable."  *Alaska Rent-A-Car, Inc. v. Avis Budget*
17 *Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).  *See also* Fed. R. Evid. 702, advisory
18 committee note to 2000 amendments ("[P]roponents do not have to demonstrate to the
19 judge by a preponderance of the evidence that the assessments of their experts are correct,
20 they only have to demonstrate by a preponderance of evidence that their opinions are
21 reliable. . . .  The evidentiary requirement of reliability is lower than the merits standard of
22 correctness.") (citation and internal quotation marks omitted).  Further, the Court has
23 "broad discretion," both in deciding whether the evidence is reliable and in deciding how
24 to test for reliability.  *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).

25         Although courts serve an important "gatekeeper" role when it comes to screening
26 expert testimony, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997), this "gatekeeper"
27 role is "designed to protect juries" and is therefore "largely irrelevant in the context of a
28 bench trial."  *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004) (quoted

with approval in *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018)).  "[W]here the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702."  *Flores*, 901 F.3d at 1165 (citation omitted).  Further, where an expert's credentials make him or her appear "at least minimally qualified" and the question of admissibility is at all debatable, it is often logical to admit the evidence subject to allowing the opposing party to renew its motion to exclude at trial, rather than "risk trying th[e] case twice by considering the testimony of experts at a pretrial hearing with the likelihood of hearing it again at trial."  *B.K.*, 2020 WL 2616033 at \*3.  This is so even if denying a motion to exclude without prejudice results in denying a motion for summary judgment that depends in part on the success of the motion to exclude.  *Id.*

## B.   **The Parties' Arguments**

Sterling argues that "Mr. Duffus relies on unsupported and erroneous assumptions" in that he "assumes that all of the information alleged in the SAC in six broad categories qualifies as Confidential Information as defined in the NDA" and that "all of the information alleged in the SAC was in fact misappropriated, disseminated, or misused." (Doc. 163 at 3-4, internal quotation marks omitted [sealed].)  Sterling further contends that Duffus's "inability to simply describe the information, its purported use or how the information might provide a competitive advantage or otherwise provide value reveals that Mr. Duffus did not actually . . . engag[e] in an expert analysis of valuing an intangible asset such as confidential or proprietary information."  (*Id.* at 7-8, emphasis omitted [sealed].) Further, Sterling argues that "Mr. Duffus's claimed 'with and without methodology' is unreliable" and his "royalty rate and franchise fee methodology is unreliable and improper to assess damages in this case."  (*Id.* at 8, 14 [sealed].)  Finally, Sterling argues that Duffus's opinion regarding the Vatos acquisition is predicated on the assumption that "Callahan or ConApp caused a $5 million increase in the purchase price" in violation of the NDA, which is both wrong and not helpful to the factfinder.  (*Id.* at 16-17 [sealed].)

In response, PJD argues that because "*Daubert* is meant to protect juries from being

1    swayed by dubious scientific testimony" and "is largely irrelevant in the context of a bench

2    trial," "Sterling's challenges to Mr. Duffus's opinions are more appropriately addressed at

3    the bench trial."  (Doc. 174 at 5, cleaned up.)  PJD also argues that Duffus's opinions are

4    admissible under Rule 702.  (*Id.* at 6-7, 10.)

5        In reply, Sterling argues that "expert testimony may be excluded in bench trial

6    cases" and should be "where the opinion has no relevance to the case and presentation at

7    trial would be inefficient and a waste of time . . . [a]s is the case here."  (Doc. 196 at 1-2.)

8    Sterling reiterates that "Duffus's opinion cannot help the Court" because it rests on the

9    "false factual premise[s] that Sterling and its Representatives 'misappropriated and

10   misused PJD's entire proprietary business model.'"  (*Id.* at 2-4.)

11       C.    **Analysis**

12       Although Sterling correctly notes that the Court *may* grant its motion if Duffus's

13   testimony is so obviously unreliable that allowing him to testify would waste the Court's

14   time, Sterling does not appear to dispute that the Court has discretion to deny the motion

15   without prejudice, thereby reserving the question for trial.  *Flores*, 901 F.3d at 1165.

16   Having reviewed the briefing and record, the Court concludes that reserving this question

17   for trial is the most efficient way to proceed.  The Court will be best positioned to make

18   the necessary determinations under Rule 702 after it hears Duffus's testimony.  Sterling's

19   motion to exclude is therefore denied without prejudice.

20       …

21       …

22       …

23       …

24       …

25       …

26       …

27       …

28       …

1   Accordingly,

2   **IT IS ORDERED** that:

3       1.      PJD's motion for partial summary judgment (Doc. 159) is **denied**.

4       2.      Sterling's motion for summary judgment (Doc. 162) is **granted in part and**

5   **denied in part**.

6       3.      Sterling's motion to exclude Duffus (Doc. 163 [sealed]) is **denied**.

7       4.      PJD is reminded of its obligation under the scheduling order to file and serve

8   a Notice of Readiness for Final Pretrial Conference "within seven days after the resolution

9   of the dispositive motions." (Doc. 76 at 8.)

10      Dated this 26th day of March, 2024.

11

12

13      _____

14      Dominic W. Lanza
        United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28