**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul Johnson Drywall Incorporated, | No. CV-21-01408-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Sterling Group LP, et al., | |
| Defendants. | |

The bench trial in this matter took place over the course of seven trial days in October 2024. The Court's findings of fact and conclusions of law are set forth below.

## LEGAL STANDARD

Rule 52(a)(1) of the Federal Rules of Civil Procedure provides that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."

The Ninth Circuit has explained that a district court's findings under Rule 52(a) "should be explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision." *Alpha Distrib. Co. of Cal., Inc. v. Jack Daniel Distillery*, 454 F.2d 442, 453 (9th Cir. 1972). With that said, such findings must also "strike an appropriate balance between detail, simplicity, and efficiency. . . . [E]xcessively long and detailed

findings are not necessary . . . and can even be unhelpful. . . .  Ultimately, the trial court's findings should be sufficient to reveal the court's concept of the facts and applicable legal standards without being needlessly elaborate or too wordy." 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 52, (2024).  Put another way, "the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts." Fed. R. Civ. P. 52, advisory committee's note to 1946 amendment.[1]

**FINDINGS OF FACT**

I.    The Parties, The Roll-Up Thesis, And The NDA

1.    Plaintiff Paul Johnson Drywall, Inc. ("PJD") is an Arizona corporation organized under Arizona law and headquartered in Maricopa County, Arizona.  PJD has been in the business of providing drywall-related goods and services for more than 50 years.  (Doc. 225 at 3.)  At all relevant times, Robert "Cole" Johnson ("Johnson") was PJD's CEO.  (Tr. 66.)[2]

2.    Defendant The Sterling Group, L.P. ("Sterling") is a limited partnership with its principal place of business in Houston, Texas.  Sterling is an operationally focused middle market private equity firm and has been in the business of partnering with management teams to grow and build businesses in the industrial sector for over 40 years. (Doc. 225 at 3.)

3.    In or around 2018, PJD began pursuing a plan for a national drywall contractor roll-up (hereinafter, "roll-up thesis"), under which PJD would use its business model and certain systems it had developed as a platform for national expansion through the acquisition of other local and regional drywall contractors.  (Tr. 66-69.)

4.    PJD retained various outside advisors to assist it in pursuing the roll-up

---

[1]    Given the directive to "make brief, definite, pertinent findings and conclusions upon the contested matters" and avoid "over-elaboration of detail or particularization of facts," this order does not address all 174 of PJD's proposed findings of fact (Doc. 268) or all 241 of Sterling's proposed findings of fact (Doc. 273).  Instead, relevant findings have been included where appropriate.

[2]    The abbreviation "Tr." refers to the trial transcript.  For example, "Tr. 66" refers to page 66 of the trial transcript, which in turn appears at page 66 of Doc. 237.

thesis, including Royal Bank of Canada ("RBC") as its investment banker and FTI Consulting, Inc. ("FTI") as its financial advisor. (Tr. 67-70.)

5.    Through its representative at RBC, Michael Phipps ("Phipps"), who later joined the investment banks SunTrust and Truist (Tr. 213; Ex. 39 [email from Phipps at Truist]),[3] PJD approached a few potential partners in private equity to gauge if they were interested in partnering with PJD to pursue the roll-up thesis. (Tr. 69-70.)

6.    One of those private equity firms was Sterling. In June 2019, Truist[4] informed Sterling's Jim Apple ("Apple") of an intent to bring PJD to market for sale. (Ex. 400.) Truist, with PJD's authorization, informed Apple that PJD had $15 million in annual earnings before interest, taxes, depreciation, and amortization ("EBITDA"), worked for Lennar Homes, and did approximately 63% single family, 28% multi-family, and 9% commercial work. (Ex. 400; Tr. 212-13.)

7.    Later, on February 27, 2020, Phipps reached out to Apple regarding PJD and provided additional details about the roll-up thesis and PJD's business, including PJD's EBITDA and profit margins. (Ex. 2 at 2-3. *See also* Tr. 216 ["It says the EBITDA is $13 million with an 18 percent margin profile."].) In the same email, Phipps sent Apple a "teaser" about PJD's business and a proposed Non-Disclosure Agreement (the "Proposed NDA"). (Ex. 2.)

8.    Sterling did not agree to the Proposed NDA. Instead, the parties negotiated its terms, with PJD represented by sophisticated legal counsel and Sterling by its general counsel. (Tr. 214-15, 422.)

9.    Following those discussions, on March 30, 2020, the parties executed the Non-Disclosure Agreement (the "NDA"). (Ex. 4; Doc. 225 at 3 ¶ 1(c).) Both sides agree the NDA is a valid contract. (Doc. 225 at 4 ¶ 3(a).)

---

[3]    The abbreviation "Ex." refers to an exhibit that was admitted at trial. For example, "Ex. 39" is trial exhibit 39.

[4]    For ease of reference, PJD's investment banking partners will be referred to collectively as "Truist."

## II. The Relevant Provisions Of The NDA

10. In the NDA, the parties acknowledged that Sterling had requested certain information concerning PJD "which is non-public, confidential, or proprietary in nature" and that PJD wished "to protect and preserve the confidentiality of such information." (Ex. 4.)

11. In § 1 of the NDA, the term "Confidential Information" was defined as follows:

> For all purposes of this Agreement, the term "Confidential Information" shall collectively refer to all non-public, confidential, or proprietary information or material disclosed or provided by or on behalf of [PJD] to [Sterling] on or after the date hereof, either orally or in writing, concerning any aspect of the business or affairs of [PJD] or its "subsidiaries." Confidential Information also includes any notes, analyses, compilations, studies or other material or documents prepared by [Sterling] which contain, reflect or are primarily based on the Confidential Information. Any of the Confidential Information disclosed by [PJD] that fits the definition of a "trade secret" under the Uniform Trade Secrets Act, it will be referred to herein as a "Trade Secret."
>
> Notwithstanding the foregoing, Confidential Information shall not include information or material that (i) is publicly available or becomes publicly available through no action of [Sterling] in violation of this Agreement, (ii) was already in [Sterling's] or its Representatives' possession or known to [Sterling] or its Representatives prior to being disclosed or provided to [Sterling] by or on behalf of [PJD], provided, that, the source of such information or material was not, to [Sterling's] Knowledge, bound by a contractual, legal or fiduciary obligation of confidentiality to [PJD] or any other party with respect thereto, (iii) was or is obtained by [Sterling] or its Representatives from a third party, provided, that, such third party was not, to [Sterling's] Knowledge, bound by a contractual, legal or fiduciary obligation of confidentiality to [PJD] or any other party with respect to such information or material, or (iv) is independently developed or derived by [Sterling] or its Representatives without reference to the Confidential Information in violation of this Agreement. "[Sterling's] Knowledge" means both actual knowledge and the knowledge that a reasonably prudent person would have obtained after a reasonable inquiry and investigation.

(Ex. 4.)

12. One of the defined terms referenced in the definition of the term

- 4 -

"Confidential Information" was "Representative." In § 2.1 of the NDA, the term "Representative" was defined as Sterling's "directors, officers, managers, equityholders, members, partners, employees, agents, advisors, affiliates, representatives, consultants, operating partners, insurance providers and potential financing sources." (Ex. 4.)

13.     In § 2.1 of the NDA, entitled "Non-disclosure," Sterling agreed that it "shall keep confidential and shall not disclose to any person or entity, any information about the Transaction or the fact that [Sterling] has received the Confidential Information and is considering the Transaction and all discussions between [PJD] and [Sterling] related thereto," with exceptions not applicable here. (Ex. 4.) In § 2.1, Sterling further agreed that it "shall keep confidential and shall not disclose, to any person or entity, the Confidential Information, except to its [Representatives] for the purpose of evaluating the Transaction and who shall be directed to comply with the terms of this Agreement expressly applicable to them, and except as otherwise consented to in writing by [PJD]." (*Id.*)

14.     In § 2.5 of the NDA, entitled "Use," Sterling agreed that it "shall use the Confidential Information only to evaluate, negotiate and, if applicable, consummate the Transaction in a manner consistent with the terms and conditions of this Agreement." (Ex 4.)

15.     In § 2.6 of the NDA, entitled "Other Parties Bound," Sterling agreed that it "shall be responsible for any breaches by its Representatives of the terms of this Agreement expressly applicable to them." (Ex. 4.)

16.     In § 8 of the NDA, entitled "Equitable Remedies," the parties agreed "that a breach of this Agreement may cause irreparable harm to the non-breaching party, which harm cannot be adequately compensated for by money damages. It is further agreed that the seeking of an order of specific performance or for injunctive relief in the event of a breach or default under the terms of this Agreement would be equitable and would not work a hardship on either party." (Ex. 4.)

17.     In § 9 of the NDA, entitled "Dual-Hat Persons," PJD acknowledged, among

other things, that "[Sterling] and its affiliates . . . may from time to time invest in entities that develop and utilize technologies, products or services that are similar or competitive with those of [PJD]" and that "this Agreement shall not prevent [Sterling], its affiliates or [Sterling's] portfolio companies from (a) engaging in or operating any business, (b) entering into any agreement or business relationship with any third party or (c) evaluating or engaging in investment discussions with, or investing in, any third party, whether or not competitive with [PJD] or its affiliates, in each case, so long as Confidential Information is not used by such person in violation of this Agreement."  (Ex. 4.)

18.     In § 12 of the NDA, entitled "Miscellaneous," the parties agreed, among other things, that the NDA "may not be modified or amended and no provision hereof may be waived, in whole or in part, except by a written agreement signed by the parties hereto. No waiver of any breach or default hereunder shall be considered valid unless in writing, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature."  (Ex. 4.)

19.     In § 13 of the NDA, entitled "Term," the parties agreed that, with the exception of "provisions of this Agreement which are expressly given longer terms, all obligations hereunder shall expire two (2) years from the date hereof."  (Ex. 4.)[5]  One such exception appeared in § 4 of the NDA, where the parties agreed that "[a]ny Confidential Information that [Sterling] retains in accordance with this paragraph shall continue to be subject to the terms of this Agreement for five (5) years from the date hereof."  (*Id.*)

III.     PJD's Initial Information Sharing After Execution Of The NDA

20.     In March 2020, after execution of the NDA, Truist sent Sterling a "Confidential Information Presentation" ("CIP").[6]  (Ex. 1; Tr. 230.)  However, PJD did not have any direct communications with Sterling at that time, largely due to the onset of the

[5]     In § 13, the parties agreed to a longer five-year term for the protection of Trade Secrets (Ex. 4), but that provision is no longer implicated in light of the rejection of PJD's trade secrets claim at summary judgment.  (Doc. 206 at 39-43.)

[6]     Witnesses sometimes referred to this document as the "Confidential Information Memorandum" or "CIM."  (Tr. 231, 431.)  For consistency, the Court will use "CIP."

COVD-19 pandemic.  (Tr. 72-73.)

21.    In December 2020, Truist's Phipps and Sterling's Apple connected again regarding PJD.  (Ex. 401.)  Phipps and Apple held a call to discuss PJD and set up an introductory meeting between PJD, Truist, and Sterling for January 20, 2021, at PJD's offices in Phoenix.  (Tr. 74, 641-42.)  In advance of that meeting, Apple sent a copy of the CIP to Sterling Vice President Johann Friese ("Friese").  (Tr. 639-40; Ex. 402.)

IV.    <u>Sterling's Activities In Anticipation of The January 2021 Meeting</u>

22.    Throughout December 2020 and January 2021, leading up to the in-person meeting, Friese researched the drywall industry extensively, including research concerning business practices in the industry and potential targets.

23.    Friese's efforts included connecting with other industry contacts, including the COO of Artisan Design Group ("ADG"), a Sterling portfolio company specializing in interior finishings and installation of cabinets, countertops, and flooring.  (Tr. 638, 644-45.)  In a December 10, 2020, email, Friese summarized this call and stated that ADG had provided him with "the top 5 businesses by size operating in the mid-Atlantic, with roughly $300M in revenue in total."  (Ex. 405.)  Friese also explained that ADG provided him with five "targets" in the drywall installation market, which, as reflected in a separate email (Ex. 13), included Construction Applicators ("ConApp" or "Con App").  (Tr. 645.  *See also* Ex. 10 at TSG032117 ["Theme Discussion Materials December 2020," reflecting ConApp on company tracker list)].)

24.    In early January 2021, Sterling reached out to Michael Callahan ("Callahan"), the former CEO of Gypsum Management Supply ("GMS"), a large drywall distributor, to discuss the drywall industry and value chain economics.  (Tr. 650-51; Ex. 18; Ex. 19; Ex. 20.)  At that time, Callahan had close to 30 years of experience in the drywall distribution industry.  (Doc. 267-3 at 68 [Callahan deposition excerpts at 235-36].)[7]

---

[7]    After trial, the parties filed the deposition transcript designations for the videos played at trial.  (Doc. 267.)

Through that experience, Callahan obtained substantial knowledge of procurement, distributors, manufacturers, pricing structures, and the drywall industry in general. (Tr. 178 [describing Callahan as "the most knowledgeable person in this country about drywall distribution"]; Doc. 267-3 at 68-71, 86 [Callahan deposition excerpts at 236-38, 242, 297-98].) Sterling subsequently informed PJD that it had retained Callahan as an industry consultant. (Tr. 95.) Sterling also told Johnson that he should provide Callahan with any PJD-related information that Callahan requested, other than the ultimate financial terms of the PJD acquisition: "[A]ny economic discussion should happen just between us." (Ex. 86.)

25. On January 15, 2021, Apple and Friese held a call with Callahan for the first time. (Tr. 651.) Apple described the objectives of the call as "to get [Callahan's] views on whether or not production builders are getting deals with sheetrock mfg or distributors in terms of price or rebates, and if there is risk of / potential for an installer to get large enough to go direct (assuming they can also justify the capx in fleet, etc. to self-provide the services they currently get from distribution)." (Ex. 20.)

26. Friese compiled his research and notes into a slide deck entitled "Drywall Installation Theme Working Materials," which Sterling used internally to show its working materials on the drywall space, assess the viability of Sterling's drywall roll-up thesis, and track other companies in the industry. (*See, e.g.*, Ex. 23 [January 2021 version].)

V. PJD's Information Sharing During And After The January 2021 Meeting

27. On January 20, 2021, three Sterling representatives—Apple, Friese, and Brian Henry ("Henry")[8]—traveled to PJD's offices in Phoenix to have an in-person meeting with PJD to learn more about PJD's business model and systems. (Tr. 84-85; Ex. 17 at TSG014904.)

---

[8] After the January 20, 2021 meeting, Greg Elliott ("Elliott") replaced Henry as the lead partner of the Sterling deal team. (Tr. 348; Ex. 26 [January 26 email cc'ing Elliott].)

28.     During the January 20, 2021 meeting, PJD provided information concerning its procurement model and how its better pricing was a primary driver of its ability to achieve superior EBITDA margins.  (Tr. 86-87.)  PJD's procurement model took the form of "3-way agreements between the distributor, the manufacturer, and the installer," such that PJD was receiving a "back-end rebate" from the manufacturer.  (Tr. 756.)  PJD's procurement model eventually came to be depicted in a schematic that will be referred to here as the "Procurement Slide."  (Ex. 413-035.)

29.     During the January 20, 2021 meeting, PJD also provided information concerning its standardized estimating system, which allowed it to provide customers with a common result independent of the estimator who was doing the work.  (Tr. 90-91.)  PJD's estimators gave a demonstration of PJD's model for estimating.  (Tr. 761.)

30.     During the January 20, 2021 meeting, PJD also provided information concerning its labor model (*i.e.*, using W-2 employees rather than subcontractors).  (Ex. 413-033.)

31.     During the January 20, 2021 meeting, PJD also asserted that the margins of acquired targets could be doubled by applying its systems and processes.  (Tr. 759.)

32.     During the January 20, 2021 meeting, PJD also provided the "Company Overview."  (Tr. 656-57.)  This 25-page document included much of the information and slides that PJD had previously provided to Sterling in the teaser and CIP.  (Ex. 540.) The presentation also included two "near-term targets" for PJD, but those targets were anonymized or "blinded" as Target A in Phoenix and Target B in Denver.  (Ex. 540-021.) The parties did not discuss specific targets at the in-person meeting and PJD did not identify any targets by name.  (Tr. 260-62, 658-59.)

33.     Some time after the January 20, 2021 meeting, PJD created a virtual data room ("VDR") populated with over 2,000 documents.  (Tr. 83; Ex. 270 [VDR Index].) Sterling downloaded the entire contents of the VDR and saved it onto Sterling's internal drive.  (Doc. 267-2 at 3 [Cueter deposition excerpts at 69-70].)  Callahan subsequently

received access to the contents of the VDR.  (Ex. 75.)  In contrast, "[n]either [ConApp] nor any of its employees or representatives were given direct access to PJD's virtual data room."  (Doc. 225 at 4 ¶ 2(a).)

VI.    Sterling's Activities Following The January 2021 Meeting

    A.    **Sterling's Identification Of Vatos As A Potential Target**

34.    Following the January 20, 2021 meeting, Friese and Sterling continued to do industry work, including connecting with experts, identifying additional M&A targets, and prioritizing potentially attractive markets.  (Tr. 666-67.)  The Court specifically finds that, within a month of the January 20, 2021 meeting, Sterling identified Vatos Drywall ("Vatos") as a potential acquisition target.

35.    As noted above, by December 2020, PJD had only sent Sterling the teaser and the CIP.  Neither document identified Florida as an attractive market or Vatos as a potential target or included any other identities or information about targets.  (Tr. 655; Ex. 1; Ex. 2.)

36.    By January 19, 2021, the day before Sterling met with PJD for the first time, Sterling's internal "Theme Working Materials" included a list of "Installation Players" and a "Company Tracker," which would go on to serve as the basis for a "target list" reflecting potential acquisition targets in the drywall installation industry.  (Ex. 23 at TSG002564-66.)  The first tracker listed 25 companies, including ConApp.  (*Id.*)

37.    As noted above, although PJD's written materials from the January 20, 2021 meeting included two "near-term targets" for PJD, those targets were anonymized or "blinded" as Target A in Phoenix and Target B in Denver.  (Ex. 540 at TSG000140.)

38.    On January 26, 2021, Friese created a "Drywall Targets" document ("Drywall Target List"), which included a list of "drywall players / targets that [he] had generated from [his] industry research," and sent it to Apple.  (Tr. 726-27; Ex. 415 [version 1].)  At this time, PJD had not provided Sterling with any specifically named targets as part of PJD's own M&A strategy.  (Tr. 727.)

39.     On January 27, 2021, Truist sent Sterling supplemental information from PJD that included a thank-you letter from Johnson, PJD's "M&A Strategy Overview January 2021," and an income statement from PJD's distribution company.  (Ex. 16.)  The "M&A Strategy Overview" identified the two "near-term targets" for PJD as Stratis Construction and TriStar Drywall.  (Ex. 16 at TSG000172.)  This document did not reveal any other targets but identified PJD's market statistical areas ("MSAs") of interest, which included Albuquerque, Atlanta, Boise, Denver, Phoenix, Reno, Salt Lake City, and the Twin Cities.  (Ex. 16 at TSG000179-80.)  This document did not identify Florida or Vatos. (Tr. 267.)

40.     During this time period, Sterling identified a few top priority markets for its strategy, which included Florida, Texas, and Virginia/D.C., and sent those priority markets to Callahan on February 8, 2021, seeking "[a]ny ideas or connections [he] might have to guide [Sterling] to larger installers in these markets."  (Ex. 420.)

41.     On February 9, 2021, Friese updated and consolidated the "Drywall Target List" into an Excel spreadsheet (version 2).  (Tr. 729.)  Friese sent this version of the Drywall Target List to Apple in an email explaining that Friese had consolidated the targets into one document that included (1) targets from expert calls, (2) a list from a public source, Walls & Ceilings, and (3) targets from the Association of Walls and Ceilings Publication. (Ex. 421.)  This version of the "Drywall Target List" did not identify a target named Vatos. (*Id.*)

42.     On or around February 12, 2021, Sterling updated its "Drywall Target List" (version 3) and included, for the first time, a target named "Vatos Drywall" on the list. (Tr. 731; Ex. 424.)  Sterling learned the identity of Vatos during a February 10, 2021 call with Callahan, whose prior company, GMS, had a nearly 25-year relationship with Vatos.  (Doc. 267-3 at 12-13, 25, 74-75 [Callahan deposition at 44-46, 100, 253-54.)  The internal notes in the document state that Vatos came "[f]rom call with Mike Callahan on 2/10/2021" and include the following comments: "[c]ould be a very attractive target," "[c]ontrols a lot of

labor in FL and therefore builders have to use him," references "Lennar, Minto Homes, Dr Horton, Mattamy Homes, Richmond, Ashton Woods, Key People: Rolando Rodriguez (President), Fransico Delgado (Vice President), Luis Rodriguez (Director of Ops)," and "[l]argest drywall installer in all Central Florida." (Ex. 424.)

43.    Similarly, on February 12, 2021, Sterling internally circulated a draft of the "Drywall Working Session" deck that it planned to present during an upcoming virtual meeting with PJD. (Ex. 425.) This draft listed Vatos second among the "high priority targets." (Ex. 425-020.)

44.    On February 14, 2021, Sterling sent the "Drywall Working Session" deck to Truist, which forwarded it to PJD. (Ex. 36; Ex. 39.) It contained an "M&A Target List" with 31 targets categorized into high, medium, and low priority targets. (Ex. 36 at PJD002453-56.) Vatos was listed first and ConApp was listed second in the high-priority category. (Ex. 36 at PJD002453.) The only two targets that PJD had identified by this point, Stratis and TriStar, were not on the list. (Ex. 36 at PJD002453-56.)[9]

**B.    Sterling's Refinement Of The Roll-Up Thesis**

45.    As noted, on February 14, 2021, Sterling circulated the "Drywall Working Session" deck to PJD via Truist. That same day, Sterling also circulated this document to Callahan. (Ex. 38.) This document was intended to present Sterling's findings and strategy with PJD to "get on the same page" if the parties decided to continue to work together going forward. (Tr. 672-74.) It included a regional prioritization slide that represented an amalgamation of Sterling's strategy based on its MSA and industry research. (*Id.*; Ex. 36 at TSG000212.) Compared to PJD's strategy as reflected in its CIP and M&A Strategy,

---

[9]    During trial, Johnson testified that he believed PJD would present a document showing that PJD identified Vatos as a potential target before Sterling did. (Tr. 281.) This belief turned out to be unfounded—as discussed above, the documentary evidence clearly establishes that Sterling was responsible for identifying Vatos as a potential target. This conclusion is not affected by version 10 of the "Drywall Target List," which might appear in isolation to attribute the source of Vatos as "Mike Callahan, PJD." (Ex. 475.) Sterling added this attribution at some point between the last modified date of version 9 (March 29, 2021) and the last modified date of version 10 (April 29, 2021). (Tr. 736-37.) This was long after Sterling had independently identified Vatos as a potential target.

Sterling's strategy differed in several ways, including by focusing on the East Coast, Southeast, and Texas regions. (Tr. 674.) Sterling's strategy also came to differ from PJD's strategy in that Sterling believed another major drywall installer contractor must be added. (Ex. 59 [Sterling email: "[W]e've clearly communicated [to PJD] that we need to get another sizeable installer in play to be comfortable that we could start with adequate scale."].)

46.     The "Drywall Working Session" deck also contained a slide reflecting a "cost stack" and common sources of economies of scale (the "Cost Stack Slide"). (Ex. 36 at TSG000222.)

47.     On the one hand, although Johnson testified that the Cost Stack Slide "had been copied from one of the presentations [he] had provided to" Sterling (Tr. 96-97), PJD did not establish at trial that specific diagram appearing in the Cost Stack Slide had previously appeared in a PJD presentation (*e.g.*, the CIP, the M&A Strategy, the teaser). The Court thus finds that Friese created the diagram, as Friese testified. (Tr. 786-87.) On the other hand, and as Friese acknowledged, PJD provided at least some of the specific percentile numbers relating to PJD (*e.g.*, PJD's EBITDA) that appear in that diagram. (Tr. 787.)

VII.    The February 2021 Virtual Meeting

48.     On February 26, 2021, Sterling, Truist, and PJD participated in a virtual meeting. Callahan also attended this meeting. (Tr. 94, 674.)

49.     During the virtual meeting, PJD provided some thoughts on potential acquisition targets, including Vatos, that were identified in Sterling's list in the Drywall Working Session slide deck. (Tr. 124-25.)

50.     During the virtual meeting, Johnson discussed the buying advantage that PJD had over its competitors, as depicted in the Cost Stack Slide, and asserted that it could be replicated with targets. (Tr. 769-70.)

51.     The written materials discussed during the virtual meeting also included

1   written questions for PJD to answer concerning its price and cost dynamics, and PJD

2   provided written responses after the meeting.  (Tr. 98-99; Ex. 48 at Callahan 353.)

3        52.    In the weeks following the February 26, 2021 virtual meeting, PJD provided

4   additional information to Sterling.  More specifically, on March 7, 2021, Truist sent

5   Sterling a slide deck titled "Financial Update."  (Ex. 434; Tr. 677-78.)  On March 9, 2021,

6   Truist sent Sterling a slide deck titled "Management Presentation."  (Ex. 436.)

7   VIII.   Sterling's Discussions With Callahan Regarding Use And Disclosure Restrictions

8        53.    Sterling personnel subjectively believed that, under the NDA, Sterling was

9   obligated to direct Callahan to comply with the terms of the NDA.  (Tr. 354 [Elliott, not

10  disputing that "it was a typical process of Sterling . . . that under the NDA Sterling was

11  required to direct any representative with whom it shared confidential information that they

12  were required to comply with the terms of the NDA"]; Tr. 747 [Friese, agreeing that he

13  "understood that if Sterling engaged a representative to assist it, that Sterling was required,

14  under this NDA to direct that representative that received PJD confidential information—

15  that the information was confidential and was subject to the PJD NDA"]; Doc. 267-1 at 3

16  [Henry deposition at 51, agreeing that it would "surprise" him if "Callahan wasn't asked

17  . . . to sign an NDA until May of 2021"]; Ex. 17 at TSG014909, emphasis added ["Schedule

18  working session with subset of theme materials with Mike Callahan (potentially come to

19  an advisor agreement / *NDA beforehand*)"].)  Nevertheless, Sterling did not provide

20  Callahan a copy of the NDA or specifically direct him to comply with its terms until

21  October 2021, after the initiation of this lawsuit.  (Tr. 752, 764-65, 799-800; Doc. 267-3 at

22  11-12, 19-20, 35-36 [Callahan deposition at 42, 83, 85-86, 143-49].)[10]

23       54.    With that said, Sterling did make some earlier efforts to discuss the concept

24  of use and disclosure restrictions with Callahan.  On May 11, 2021, Sterling presented

25  Callahan with a standalone non-disclosure agreement.  (Ex. 123.)  However, that document

26  

27  _____

28  [10]      In contrast, Sterling required other third-party consultants to sign explicit joinders
    identifying PJD and provided direction to maintain the confidentiality of PJD's
    information.  (Ex. 126.)

differed in various respects from the NDA between Sterling and PJD.  Among other things, that document placed restrictions on Callahan's "use" of PJD's Confidential Information that appear more permissive than those contained in § 2.5 of the NDA.  (*Id.*)  On May 18, 2021, Callahan returned a signed copy of that document.  (Ex. 137.)

55.    At the time his deposition was taken, Callahan did not appear to understand that the NDA placed restrictions on the use of PJD's Confidential Information:

> Q.    Did you have an understanding that any nonpublic confidential or proprietary information that PJD provided to Sterling was restricted to only being used in connection with Sterling evaluating, negotiating or consummating an acquisition of PJD?
>
> A.    No.  I don't—I can't say specifically to that, no.

(Doc. 267-3 at 36 [Callahan deposition at 148].)  Callahan also testified that, in his view, any confidential information that was interspersed in the presentations was all "open work product," such that only information PJD directly sent to Callahan was protected.  (Doc. 267-3 at 34, 83-84 [Callahan deposition at 138, 291].)

56.    On October 19, 2021, after this action was initiated, Sterling asked Callahan to sign an acknowledgement relating to the NDA.  (Ex. 243; Doc. 267-3 at 35-36 [Callahan deposition at 147-48].)  On October 20, 2021, Callahan signed the acknowledgement.  (Ex. 246.)  Among other things, Callahan avowed that "I have complied with my Nondisclosure Agreement, will continue to do so and have not and will not share any PJD confidential information with others."  (*Id.*)[11]

---

[11]    In its proposed findings, PJD asserts that "the acknowledgment only stated that Callahan would not share PJD's Confidential Information, and made no mention of the restriction in the NDA prohibiting the use of such information for any purpose other than an acquisition of PJD."  (Doc. 268 at 20 ¶ 72.)  This observation is partly true but misleading.  First, Sterling's May 2021 agreement with Callahan provided that he would "not use the Confidential Information for any purpose other than to evaluate a possible consulting relationship with Sterling and to the extent applicable, in furtherance of such consulting relationship." (Ex. 137.)  Second, in the email correspondence leading up to the execution of the acknowledgement in October 2021, Sterling's counsel provided a copy of the PJD NDA and specifically emphasized that "Paragraphs 2.1 and 2.5 deal with disclosing *or using* Confidential Information."  (Ex. 244, emphasis added.)

IX.    <u>Discussions With And Concerning ConApp In March/April 2021</u>

57.    On March 19, 2021, Callahan connected Sterling with Jeff Ratliff ("Ratliff"), the CEO of ConApp, for an introductory call.  (Ex. 59; Doc. 267-4 at 3 [Ratliff deposition at 21-22].)  The purpose of this introduction was to see if ConApp would consider being acquired by Sterling.  (Doc. 267-3 at 9 [Callahan deposition at 32].)  Around the time of the call, Callahan sent an email to Ratliff which stated: "They are obviously trying to keep PJD confidential but I didn't feel right not sharing with you so keep it under your hat. Thanks."  (Ex. 63.)  Callahan subsequently expressed misgivings over this statement: "[F]rankly, that was a mistake on my part, but I really shouldn't have told them at that point."  (Doc. 267-3 at 11 [Callahan deposition at 41].)

58.    Also on March 19, 2021, Sterling, Callahan, and PJD had another call regarding M&A and target companies.  (Ex. 61; Ex. 62.)  During that call, the parties discussed reaching out to potential acquisition targets and identified who would take "ownership" of outreach to specific targets.  Callahan was given ownership of ConApp and PJD was given ownership of Vatos.  (Ex. 62; Doc. 267-3 at 12-13 [Callahan deposition at 45-47].)

59.    On March 25, 2021, PJD, Sterling, and Callahan had their first weekly M&A call.  (Ex. 67.)  These calls were focused on updating everyone on the progress of reaching out to potential acquisition targets.  (Doc. 267-3 at 12 [Callahan deposition at 44-45].)  During the March 25, 2021 call, PJD informed Sterling that Vatos was "interested," that there would be a follow up call the next week, and that the parties should plan a trip to Florida.  (Ex. 299 at PJD034452.)

60.    Also on March 25, 2021, Sterling and Callahan emailed about sending Ratliff a non-disclosure agreement and setting up an in-person meeting with Sterling, Callahan, and Ratliff/ConApp.  (Ex. 67.)  That same day, Friese sent Ratliff a form non-disclosure agreement and asked to meet in mid-April 2021.  (Ex. 70.)  Ratliff executed the non-disclosure agreement that day.  (Ex. 71.)

61.    In contrast, Sterling never directed ConApp to comply with the NDA between Sterling and PJD and never required ConApp to sign any agreement to be bound by the terms of that NDA.  (Doc. 267-4 at 7 [Ratliff deposition at 68, 82-83].)

62.    On April 1, 2021, PJD and Sterling held another M&A weekly call.  (Ex. 299 at PJD034459.)  During that call, Sterling informed PJD that it had a non-disclosure agreement in place with ConApp and that it had received information suggesting ConApp was a similar size as PJD.  (*Id.*)  Friese also stated that the "initial platform" would be "ideally PJD + CA."  (*Id.*)

63.    On April 8, 2021, PJD and Sterling held another M&A weekly call.  (Ex. 299 at PJD034461.)  During that call, Sterling again informed PJD that it had a non-disclosure agreement with ConApp and stated that there was a planned breakfast meeting with ConApp for the following Tuesday morning (April 13, 2021).  (*Id.*)  Johnson asked to attend the breakfast meeting but Friese stated Ratliff might feel more comfortable with a sponsor-only meeting.  (*Id.*)

64.    On April 13, 2021, Sterling's Friese and Apple met with ConApp's Ratliff at Dulles airport.   Friese brought a written presentation entitled "Drywall Installation Platform Introduction," which included both the Cost Stack Slide and the Procurement Slide.  (Ex. 81; Tr. 686.)  During that meeting, Ratliff talked about ConApp's business and Sterling presented the idea or thesis of a national drywall installation platform.  (Tr. 440-41, 446, 686.)  Sterling and Ratliff went through some of the slides but not all of them.  (Tr. 686-87, 785.)  Friese did not recall presenting the Cost Stack Slide to Ratliff, and the Court found that testimony credible.  (Tr. 687.)  Friese also testified that he did not present the Procurement Slide to Ratliff at this meeting, and the Court found that testimony credible.  (Tr. 789-90; Doc. 267-4 at 46 [Ratliff deposition at 333-34].)  Ratliff did not take a physical copy of the presentation following the meeting.  (Doc. 267-4 at 48 [Ratliff deposition at 336-37].)

65.    On April 20, 2021, Sterling executed a letter of intent to acquire ConApp.

(Ex. 94; Ex. 100-1.)   Sterling proposed purchasing ConApp for $120 million, which represented a 7.5 multiple of its trailing twelve-month EBITDA.  (Ex. 97.)

66.    That same day, Sterling and PJD held a video call in which Sterling presented Johnson with "deal economics," which included some diligence results from Sterling's diligence team.  (Ex. 80.)  In this presentation, Sterling proposed a structure for the new platform that would include two branches—a West Coast branch led by Johnson and an East Coast branch led by Ratliff.  (Ex. 80 at PJD002246.)  The presentation also showed that Sterling intended to acquire both PJD and ConApp for the same purchase price multiple of 7.5.  (Ex. 80 at PJD002244.)

X.    The LOI Between Sterling And PJD

67.    A few days later, on April 25, 2021, Sterling and PJD executed a non-binding Letter of Intent ("LOI") under which Sterling would acquire PJD.  (Ex. 108.)

68.    On April 27, 2021, Friese began organizing a joint in-person meeting that would bring together Sterling, PJD, ConApp, and Callahan at Sterling's offices in Houston.  (Tr. 692; Ex. 117.)

69.    In early May 2021, Sterling began its confirmatory due diligence on both PJD and ConApp.  (Tr. 688-90; Ex. 480.)  Sterling employed a handful of consultants to conduct due diligence, including financial and tax diligence by Houlihan Lokey, insurance diligence by Willis Towers Watson, legal diligence by Kirkland & Ellis, employee benefits diligence by Alliant, procurement analysis by Alvarez & Marsal ("A&M"), and environmental diligence by SLR.  (Tr. 688-90.)

70.    At the same time, Sterling internally continued to conduct its own commercial industry research to learn more about turnkey projects, purchasing, labor models, and value-added services in the market.  Sterling did so by conducting numerous expert and industry professional interviews and utilizing a survey.  (Tr. 705-06, 709.)

71.    On May 6, 2021, one day before the planned joint meeting between Sterling, PJD, ConApp, and Callahan in Houston, Sterling representatives met with Johnson and

walked Johnson through a slide deck that Sterling was planning to present during the meeting.  (Tr. 692-94.)  Among other things, it included a slide that identified the top customers—and revenues associated with those customers—for both PJD and ConApp (hereinafter, the "Customer Slide").  (*Id.*)  Initially, Johnson stated that he was uncomfortable about the "information stream" that might occur at the joint meeting.  (Tr. 314.)  In response, a Sterling representative stated: "If we are going to be able to close a deal, this is a path we have to go down to see if we can close a deal." (Tr. 315-16.)  Johnson, in turn, "reluctantly acquiesced."  (Tr. 316.)

72.     On May 7, 2021, the joint meeting occurred in Houston.  During the meeting, Frise distributed the Customer Slide.  (Tr. 693-94.)  Frise testified: "[W]hat it essentially looked like was rows with customer names, specific customer names like Lennar, DR Horton, and then it would have one column for PJD, and then it would sort of state a sales number.  Then it would have another column for Con App.  We would essentially put in top 10 customers from each, and sometimes there was overlap.  And then we would show a pro forma column, like the combined sales." (Tr. 694.)  Ratliff left the joint meeting with a copy of the Customer Slide.  (Doc. 267-4 at 32-33, 47-48 [Ratliff deposition at 293-94, 336-37].)[12]

73.     Following the joint meeting in Houston, Johnson arranged meetings with three additional acquisition targets: TriStar Drywall, T&R Drywall, and C&S Drywall. Sterling had never interacted with these targets and Johnson was aware that Sterling had

---

[12]     To the extent there is any record of the information shared at the joint meeting beyond the Customer Slide, the evidence was insufficiently specific to establish that it included the sharing of other Confidential Information.  For example, although Blevins's notes from the meeting indicate that single-family and multi-family market make-up was discussed (Ex. 299 at PJD034470), PJD disclosed that same information in the teaser.  (Ex. 2 at TSG014306.)  Because the teaser was distributed before the NDA was executed, that information is not Confidential Information.  The remainder of the notes appear to show that the discussion addressed the topics of "how to win" and the ambition to have $1 billion in revenue and $125 million in EBITDA in three years.  (Ex. 299 at PJD034470.)  The Court is not persuaded that such information qualifies as Confidential Information.  Instead, it is more likely this meeting was about aspirations and forward-thinking strategy.

not arranged any confidentiality protections for those meetings.  (Tr. 321.)  During these meetings, the parties used a version of the "Drywall Installation Platform Introduction" that contained the Cost Stack Slide.  (Ex. 121 at TSG001941.)  Johnson acquiesced in sharing the presentation at the meetings:

> Q.    Ultimately, you acquiesced to having the presentation go forward?
>
> A.    I did, but without the benefit of having the ability to review it, as we discussed. So conditioned on that, then yes.
>
> Q.    And if that's accurate, that would mean you simply did not have the time the night before for whatever meetings were the next day, the next morning, the next evening, correct?
>
> A.    Go back to your first point, which is that I deferred or acquiesced to what Sterling chose to disclose.

(Tr. 326.)

74.    Also following the joint meeting in Houston, Johnson also regularly updated Sterling and Callahan regarding his outreach efforts to potential acquisition targets, including Vatos.  (Tr. 777-78; Ex. 151.)  For example, on May 12, 2021, Johnson forwarded to Sterling a spreadsheet of the seven acquisition targets he was actively pursuing. (Ex. 134.)  Sterling forwarded this spreadsheet to Callahan.  (*Id.*)

XI.    Sterling Develops Legitimate Concerns About PJD

75.    Following the joint meeting in Houston, Sterling and its third-party diligence partners requested additional information from PJD and held several calls related to the ongoing due diligence.  (*See, e.g.*, Ex. 142; Ex. 148; Ex. 152; Ex. 153; Ex. 155; Ex. 160; Ex. 164; Ex. 165; Ex. 167; Tr. 149-50.)  Despite the many calls and emails regarding the various diligence streams, none appear to include Callahan, and Friese credibly testified that Callahan only attended diligence meetings that were "industry level."  (Tr. 784-85.)  Likewise, Callahan credibly testified that "[a]ny communication" to him during this period "was very high level" and that "[t]here was nothing specific because [he] wasn't really a

part . . . of the diligence team.  That was not [his] role at all."  (Doc. 267-3 at 24-25 [Callahan deposition at 97].)

76.    During the latter part of May 2021, Sterling discovered what it considered to be "red flags" regarding PJD.  (Tr. 453.)  The primary red flags concerned PJD's employee health care benefits program.  Sterling was told by its third-party benefits diligence partner, Alliant, that PJD's benefits program was not compliant with federal law and provided suboptimal benefits to lower-paid employees.  (Ex. 145; Tr. 453, 879.)  Additionally, Sterling came to learn—although this fact had not been disclosed by PJD—that the broker who provided the non-compliant health care plan was Johnson's brother.  (Doc. 267-2 at 6 [Cueter deposition at 107-09].)

77.    It should be noted that Alliant characterized the compliance issue with the health care plan as a "low financial risk."  (Ex. 145.)  Additionally, some documents suggest that Sterling instructed Alliant to identify the red flags related to the health care plan as "a reason" for backing out of the LOI.  (*Id.*)  In its proposed findings of fact, PJD asks the Court to "find[]that the reasons that Sterling gave PJD for its decision not to proceed with the PJD acquisition were primarily pretextual in order, and created by the deal team, to provide a basis to get out of the deal with PJD so that Sterling could proceed with Callahan and Con App and/or force PJD to accept substantially less consideration in order for Sterling to proceed."  (Doc. 286 at 24 ¶ 85.)

78.    The Court rejects this argument in its capacity as factfinder and concludes that Sterling's concerns about the health care plan were genuine.  First, Sterling's representatives credibly testified that PJD's failure to affirmatively disclose the potential conflict of interest created by Johnson's brother's role as the broker for the health care plan was a red flag because it suggested a lack of candor.  (Tr. 453-54 [Elliot: "[I]t really was a trust issue too to me with some credibility and I was not comfortable."]; Doc. 267-1 at 8-9 [Henry deposition at 107-08: "[W]hen you request information in a process . . . and the company gets defensive when you're asking about that information, and then finally, when

that information is obtained, the answers are not good, . . . that's a data set beyond just the answers in the . . . employment information, which was not good. . . .  [I]t brings into question the character and the trustworthiness of the party that you're about to partner with."].)  Second, separate and apart from the trust issue, Sterling's representatives credibly testified that the suboptimal nature of the health care plan created a significant public relations risk—as distinguished from the low financial risk of a fine imposed by the government—that could imperil the reputation of both PJD and Sterling.  (*See, e.g.*, Doc. 267-2 at 7 [Cueter deposition at 108-09: "The concern was that PJD was funneling its employees into this suboptimal program that was not compliant with ACA in order to get . . . [Johnson's] brother, who owned the brokerage firm, more money than if they had picked an ACA-compliant plan."]; Tr. 876-77 [Friese: "I would say for me, first and foremost the reputational risk both with the general public from a headline risk and with customers we considered, you know, basically a discriminatory health plan or benefits plan risk."].)

XII.  <u>Sterling Continues Pursuing The Roll-Up In Good Faith Despite Its Concerns</u>

79.    A hotly disputed issue at trial was when, exactly, Sterling decided to discontinue its pursuit of a roll-up involving PJD.  In its proposed findings of fact, PJD asks the Court to find that "[b]y no later than middle to late May 2021, Sterling had internally decided not to acquire PJD but instead to continue going forward with a national drywall roll-up transaction with Callahan and Con App."  (Doc. 268 at 20 ¶ 74.)  The Court rejects this argument in its capacity as factfinder and concludes that although Sterling may have developed concerns about PJD by the latter part of May 2021, it continued pursuing and investigating a potential roll-up involving PJD in good faith until June 18, 2021.

80.    To that end, in an effort to determine whether a deal with PJD could be consummated despite its concerns, Sterling and its third-party diligence providers continued to conduct diligence on PJD in late May 2021 and into June 2021.  (Tr. 712-13, 857-58.)  One of the areas of continued diligence involved a final "roll-forward," including

an updated quality of earning analysis involving PJD's financials through Q1 of 2021. (Tr. 858-60.)

81.    The continued diligence also encompassed PJD's pricing and procurement advantages. On May 25, 2021, Sterling asked A&M, which was performing an analysis of procurement opportunities for the roll-up platform, if it could "structure the SOW [statement of work] to be for one of the two entities [ConApp] with an option for the second [PJD] if we move forward." (Ex. 144.) Although PJD views this email as proof that Sterling had decided not to acquire PJD by this point—which would, in PJD's view, make it impermissible under the NDA for Sterling to make any subsequent requests for confidential information related to PJD or use that information (Doc. 268 at 21 ¶ 75)—the Court rejects this interpretation in its capacity as factfinder. True, Sterling's May 25, 2021 email to A&M reflects that Sterling had developed concerns about acquiring PJD, but it does not show that Sterling had conclusively rejected the possibility of such an acquisition. Instead, Sterling was keeping open the possibility of a PJD acquisition while simultaneously considering how it might proceed without PJD.

82.    Consistent with that approach, on June 2, 2021, Sterling sent an email to PJD, copying A&M, asking PJD to provide it with "procurement /purchase detail" regarding the prices and rebates that PJD was receiving from L&W, PJD's primary drywall supplier. (Ex. 153.) Although PJD views this email as improper (Doc. 268 at 21-22 ¶ 78), the Court rejects that interpretation in its capacity as factfinder and concludes that the June 2, 2021 email was part of Sterling's continued good-faith evaluation of the potential acquisition of PJD.

83.    In a related vein, although PJD contends that Sterling improperly concealed its concerns in an effort to dupe PJD into continuing to disclose confidential information (see, e.g., Doc. 268 at 21-22 ¶ 78 ["[W]hile Sterling was seeking more details about PJD's Confidential Information, Sterling intentionally sought to keep PJD in the dark about Sterling's true intentions . . . ."]), the Court rejects this contention in its capacity as

- 23 -

factfinder.  On June 6, 2021, Sterling's counsel, Kirkland & Ellis, informed PJD's counsel that, among other things, "[m]y client is getting increasingly uncomfortable with both the outcome of our labor/benefits diligence and the fact that we are still missing several customary diligence materials, and as more time passes it is only making folks feel less confident." (Ex. 164 at PJD001353.)  That same day, this message was forward to Johnson and his son at PJD.  (Ex. 164 at PJD001352.)  This email undermines Johnson's testimony that he was unaware until June 11, 2021, that Sterling had formed any concerns about the deal.  (Tr. 146, 302.)[13]

84.    On June 9, 2021, PJD sent Sterling its "Material Purchases by skew 2019-June 7, 2021" for L&W.  (Ex. 169.)  This Excel spreadsheet included over 16,000 lines of detailed pricing and quantity information about PJD.  (Tr. 809.)  Sterling forwarded this file to A&M and Houlihan Lokey.  (Ex. 170.)

85.    This Excel file was never sent to Callahan or ConApp.  With that said, A&M relied upon the information in this Excel file to create "preliminary slides regarding drywall" (Ex. 179) and, later, a formal report identifying procurement opportunities for a national roll-up (Ex. 192 at TSG034065).  On June 11, 2021, A&M forwarded its preliminary slides to Callahan (Ex. 179), and the following day, Callahan remarked: "Very interesting data to be sure." (Ex. 184 at TSG033314.)

86.    On June 9, 2021, Alliant sent Sterling a final benefits diligence report regarding PJD.  (Ex. 171.)  Among other things, Alliant concluded that "[w]e are concerned that a compliant medical plan was not offered to every employee"; that "an IRS penalty could be assessed based on certain criteria"; and that although "PJD has saved several

---

[13]    The Court acknowledges that some of Sterling's internal communications reflect a hesitance to share its concerns with PJD.  (*See, e.g.*, Ex. 168 at HL008574 [June 8, 2021 email from Friese: "I won't join the call with PJD.  I don't way to say anything negative on these call[s], but I also don't want to pretend that everything is just fine."].)  Nevertheless, Sterling expressly disclosed to PJD on June 6, 2021 that it was "increasingly uncomfortable with both the outcome of our labor/benefits diligence and the fact that we are still missing several customary diligence materials, and as more time passes [this] is only making folks feel less confident." (Ex. 164 at PJD001353.)

million dollars annually with their current benefit strategy . . . we are unsure of the long term viability of relying on low participation in an ACA compliant plan while employee[s] bear the full cost of non compliant plans."  (Ex. 171 at TSG033735.)

87.     Based on these developments, between June 10 and June 11, 2021, Sterling decided to disclose to Truist its concerns about continuing with the potential acquisition of PJD.  (Ex. 177; Ex. 178; Ex. 510.)

XIII.    Sterling Informs PJD Of Its Tentative Decision Not To Proceed And Is Asked To Reconsider

88.     On June 11, 2021, Sterling informed Truist (via a phone call) that it would not be able to move forward with the acquisition of PJD due to two primary issues: (1) the employee benefits issues, and (2) the roll-forward of PJD's quality of earnings and audit adjustments. (Ex. 183; Ex. 511; Tr. 454-57.)

89.     At the time of this call, Sterling believed it would likely not pursue an acquisition of PJD and instead would likely pursue a possible acquisition of ConApp.  This intention is reflected in contemporaneous emails.  (Ex. 180 [June 11, 2021 email from Apple: "Just wrapping up drywall stuff (killing PJD, trying to pivot to Con App)."].)  Nevertheless, the Court concludes in its capacity as factfinder that Sterling still had not conclusively rejected the idea of a PJD acquisition at this point.  Friese credibly testified that, in the private equity world, "red flags . . . are not insurmountable" because they can "be structured or negotiated around" and it always "ultimately comes down to economics."  (Tr. 719-20.)  Likewise, Elliott credibly testified that although Sterling "was already moving in the direction [on June 11, 2021] that we should not move forward with Paul Johnson for sure, but you never want to close the book completely because there could be some proposal that comes back that could be interesting and I'm going to listen to that."  (Tr. 386.)  Additionally, Sterling had invested significant resources in the due diligence process surrounding its potential acquisition of PJD—according to one estimate, Sterling spent over $1.2 million of its own money during that process.  (Tr. 425; Ex. 202 at

TSG025162.)  Such expenditures created an additional financial incentive for Sterling to find some way to resolve its concerns related to PJD.  Thus, the Court accepts that even after Sterling's June 11, 2021 call with Truist, Sterling's acquisition of PJD remained a possibility.

90.      On June 14, 2021, Johnson sent a letter to Elliott asking that Sterling continue engaging in negotiations regarding a potential acquisition of PJD.  (Ex. 190.)  In this letter, Johnson also questioned whether Sterling could lawfully proceed with a roll-up involving ConApp but not PJD: "[H]ow can you think it is acceptable to utilize PJD's proprietary 'rollup' information to close on PJD identified targets without owning PJD?"  (*Id.* at TSG004309.)

91.      That same day, A&M and Callahan had a call regarding savings opportunities in procurement.  (Ex. 191.)  One of the topics discussed during this call was the specific percentage discount rate that PJD received from its main drywall supplier—a rate that A&M deemed "fairly significant."  (Ex. 191 at TSG025085 ¶ 3(1).)  At the time of the call, neither Callahan nor A&M was aware of Sterling's call with Truist on June 11.  (Tr. 714-15; Ex. 191 ["Have you heard anything yet on whether you all plan to move forward w/ PJD . . . ?].)

92.      On June 14 and 15, 2021, Sterling began informing its third-party diligence providers that it was "pencils down" on PJD because of red flag diligence issues.  (Ex. 194; Ex. 196; Ex. 199.)

93.      On June 16, 2021, Elliott and Johnson had a call to discuss Sterling's potential acquisition of PJD.  (Tr. 459-60, 533-36.)  During this call, Elliott reiterated the diligence issues and stated that they posed significant risk.  (Ex. 299 at PJD034483.)  Johnson, in turn, asked Elliott to consider a reformulated transaction in which Johnson would not be a part of PJD's business going forward.  (Ex. 299 at PJD034484.)  Elliott responded that he needed to present the proposal to the Sterling partners, who would be meeting on June 18, 2021.  (*Id.*)

XIV.   The June 18, 2021 Partner Meeting

94.     At the June 18, 2021 partner meeting, Sterling presented a slide deck entitled "National Drywall Holdings Partner Update" to its seven partners (the "Partner Update"). (Ex. 202.)  The purpose of the Partner Update was "to aid the partner group to make a final decision on . . . whether to move forward with . . . Paul Johnson Drywall and Con App, or just Con App, or none of the above, essentially."  (Tr. 719.)

95.     Sterling's standard practice for approving or withdrawing from a potential transaction requires a partner meeting at which every partner must unanimously approve the investment decision.  (Tr. 424, 717.)  The deal team does not have the authority to make an investment decision without the approval of the Sterling partners.  (Tr. 719.)

96.     On the one hand, the Partner Update included the possibility of structuring or negotiating around the red flag diligence issues concerning PJD and then acquiring PJD. (Ex. 202 at TSG025161.)  To that end, the Partner Update contained a slide detailing the key diligence issues and a slide from the A&M report showing procurement opportunities for PJD and ConApp.  (Ex. 202 at TSG025179, TSG025181.)  On the other hand, the Partner Update also presented the deal team's recommendation that Sterling pursue a national drywall platform involving ConApp but not PJD.  (Ex. 202 at TSG025161 ["While ConApp on its own is too small as a starting point for a rollup in the drywall industry, we continue to like the space and ConApp as an acquisition opportunity.  We are also excited to continue to partner with Mike Callahan who is serving as our industry advisor. . . .  In partnership with Mike Callahan and the ConApp team, we would like to . . . find 1-2 targets through which we could increase the scale of the opportunity to $25-30M of EBITDA at entry."].)  The Partner Update also recognized that, if Sterling pursued this path, it would likely be doing so in competition with PJD.  (Ex. 202 at TSG025166 ["Cole will likely attempt to pursue a roll-up on his own . . . ."].)

97.    The Sterling partners ultimately accepted the deal team's recommendation to not acquire PJD and investigate whether a roll-up could go forward with ConApp and at least one other anchor target.  (Tr. 384, 403.)

XV.    Sterling Briefly Explores A Roll-Up Involving ConApp But Then Discontinues Those Efforts After Threats And Litigation By PJD

98.    In the immediate aftermath of the June 18, 2021 partner meeting, Sterling took steps to explore a potential roll-up involving ConApp.  To that end, on June 20, 2021, Friese sent version 11 of the "Drywall Target List" to Ratliff.  (Ex. 207; Tr. 843.)

99.    On June 28, 2021, Sterling informed PJD (via Truist) that it had decided not to proceed with an acquisition of PJD.  (Ex. 517.)  That same day, Johnson sent Elliott an email asserting that, in PJD's view, Sterling could not acquire ConApp "or any of the other targets" or use PJD's "proprietary information."  (*Id.*)

100.    On June 29, 2021, Elliott responded to Johnson's email by stating that he disagreed with "any assertion or implication that a roll-up strategy in the drywall industry is proprietary information of PJD or anyone else."  (Ex. 212.)  Elliott also stated that Sterling was "still considering executing on a platform investment in the drywall space" that may "include a transaction involving [ConApp], a business that Sterling independently identified and sourced through its established expert and executive networks."  (*Id.*)  Finally, Elliott stated that "[a]s to information received by Sterling from PJD," Sterling understood and intended to honor its obligations under the NDA.  (*Id.*)

101.    On July 1, 2021, Frise sent version 12 of the "Drywall Target List" to Ratliff and Callahan.  (Ex. 216.)  In the cover email, Frise asked the recipients to "please delete all prior versions of M&A lists/trackers that you have previously received from me" because "we are trying to disentangle our own information from information that we may have gotten from [Johnson]."  (*Id.*)

102.    On July 13, 2021, PJD sued Sterling in Maricopa County Superior Court (which lawsuit was later removed to this Court).  (Doc. 1.)

103.    At some point in September 2021, Sterling notified ConApp that it was no

longer considering moving forward with an acquisition of ConApp.  (Ex. 229 [August 31, 2021 email correspondence involving Callahan, Sterling, and ConApp attempting to schedule a telephone call for "next week" to discuss "Status of Expansion Discussions with Con App"]; Ex. 235 [September 29, 2021 email from Ratliff: "Obviously we have been informed by Sterling on our last calls that our discussions are no longer moving forward."].)

104.    On September 8, 2021, Sterling (through its general counsel) submitted a declaration avowing that it was no longer pursuing or considering a potential investment in the drywall industry with ConApp or otherwise.  (Ex. 232.)

XVI.    Callahan Engages A New Private Equity Partner To Pursue A Roll-Up Involving ConApp

105.    On September 13, 2021, Callahan had a call with another private equity firm, AEA, to see if AEA would be interested in partnering with him to pursue a national drywall roll-up that would include ConApp.  (Ex. 233.  *See also* Doc. 267-3 at 41-42 [Callahan deposition at 168-69, explaining that "[w]hen the conversation ceased with Sterling, and Con App and I were talking about pursuing it further, I proposed the idea that maybe we would talk to some alternative sources for financing, and AEA was one of them . . . [s]o I reached out to these guys in September of '21 or so to set up just a preliminary conversation"].)  Callahan intended to use the information he had learned "[f]rom the Sterling presentations" as "kind of the central thesis" for the contemplated roll-up involving ConApp.  (Doc. 267-3 at 41 [Callahan deposition at 156].)

106.    On September 29, 2021, Ratliff emailed Friese to request the diligence reports generated by Sterling's third-party providers, Houlihan, Kirkland & Ellis, Alliant, and Sterling itself, about ConApp.  (Ex. 235.)  Ratliff stated he hoped to have the ability to use those reports "moving forward in our own pursuits."  (*Id.*)

107.    That same day, ConApp had a call with AEA and executed a non-disclosure agreement with AEA.  (Ex. 236.)

108.    On September 30, 2021, Friese responded to Ratliff's September 29, 2021 email and advised Ratliff that ConApp had no exclusivity obligations to Sterling.  (Ex.

238.)

109.    On October 13, 2021, Friese sent Ratliff some of the reports and a "summary of all the work product / reports and what the status of each is." (Ex. 240.)  Friese's email stated: "To be clear, all of these reports should only include Construction Applicator information and we have reviewed accordingly and believe that they do.  However, should something have slipped through the cracks and information related to other targets in the space is included please notify us and destroy or return the information." (*Id.*)  Friese also stated that ConApp should "feel free to use these reports for your own internal purposes, but ideally do not share them with third parties." (*Id.*)

110.    On February 10, 2022, Ratliff sent an email to an AEA representative that included, as an attachment, version 11 of Sterling's "Drywall Target List." (Ex. 267-1.)  As noted above, this is the version that Friese sent to Ratliff on June 20, 2021 (Ex. 207) but later asked Ratliff to destroy as part of an effort "to disentangle [Sterling's] own information from information that [Sterling] may have gotten from [PJD]." (Ex. 216).  Ratliff obviously did not heed that request, as evidenced by the February 10, 2022 email to AEA.  Version 11 of the "Drywall Target List" includes Vatos as a potential target.  (Ex. 267-2.)

XVII.  PJD's Acquisition Of Vatos

111.    As Callahan was attempting to pursue a national roll-up that would involve ConApp, PJD was also exploring the acquisition of other drywall installers.  To that end, on July 29, 2021, Johnson proposed making an offer to acquire T&R Drywall.  (Ex. 521.)

112.    PJD also pursued efforts to acquire Vatos.  On November 5, 2021, Vatos's attorneys sent an email to PJD's attorneys stating: "Sounds like we may be back on track with the potential purchase of Vatos, Inc." (Ex. 558 at PJD030354.)

113.    On December 21, 2021, PJD entered into a letter of intent with Vatos to acquire Vatos for $35 million.  (Ex. 256.)

114.    One of the disputed factual issues in this case is whether—and if so, to what extent—Callahan engaged in competing efforts to acquire Vatos following the execution

of this letter of intent.  Unfortunately, the evidence bearing on this issue at trial was difficult to parse.

115.    On the one hand, Callahan testified that he never met with anyone from Vatos or made a formal offer to acquire Vatos and that his outreach efforts were limited to making an unsuccessful request—communicated through a shared acquaintance named Bob Grayson ("Grayson")—to set up a meeting with Vatos's owners.  (Doc. 267-3 at 31-32, 49-50, 53 [Callahan deposition at 128-29, 186-88, 199].)

116.    On the other hand, on February 15, 2022, Callahan, Ratliff, and representatives from AEA met to discuss Callahan's plan to pursue a roll-up involving ConApp.  (Ex. 269.)  During that meeting, the parties discussed a slide deck that had been circulated between them a few days earlier.  (Ex. 268.)  This slide deck identified T&R Drywall in Arizona and Vatos in Florida as potential acquisition targets.  (Ex. 268 at AEA_PJD_00004488.)  The management agenda for the meeting also identified Vatos as a potential acquisition target and characterized Vatos as a "Key" target.  (Ex. 269.)

117.    Consistent with those materials, in a March 18, 2022 email, an AEA representative who was purporting to take "some notes from our call with Mike Callahan and Jeff Ratliff this morning" wrote under the heading "Vatos update" that "Mike [Callahan] had a discussion with the CEO of Vatos and it seems that he has soured on the idea of meeting on 4/4. . . .  Mike was disappointed by this, but is planning to look into other potential targets in Florida . . . [and] also plans to stay in touch with Vatos in case the CEO changes his mind."  (Ex. 275.)

118.    Finally, when Louis Rodriguez ("Rodriguez"), one of Vatos's founders, was asked questions about Callahan's efforts to acquire Vatos, Rodriguez provided inconsistent testimony.  At first, Rodriguez denied even knowing who Callahan was and denied ever "hear[ing] from anyone that Mr. Grayson was interested in a potential acquisition of Vatos."  (Doc. 267-9 at 11-12 [Rodriguez deposition at 67].)  However, Rodriguez then testified that he had learned, through conversations with his brother Tony Rodriguez that occurred during "the midst of" PJD's acquisition efforts, that "Mr. Callahan was interested

in acquiring Vatos." (Doc. 267-9 at 12 [Rodriguez deposition at 68-69].) Rodriguez elaborated: "Somebody reached out to Tony, my brother. I think it was Mike Callahan or somebody in that outfit, and that's how it all began. . . . I told Tony we're not interested. We're going to deal with this [offer from PJD] and see if we can figure this out; if not, we'll move on. Then we'll look at that. We're not going to deal with two things at the same time." (Doc. 267-9 at 14 [Rodriguez deposition at 71].)

119.  Having weighed all of this evidence and viewed the demeanor of Callahan and Rodriguez during their videotaped depositions, the Court concludes in its capacity as factfinder that Callahan's outreach efforts to Vatos were more substantial than Callahan described them during his deposition. More specifically, the Court concludes that either Grayson or Callahan had a discussion with a Vatos principal in early 2022 during which Vatos became aware of Callahan's interest in acquiring Vatos. Although this conversation did not involve a formal offer to acquire Vatos for a particular price, it still left Vatos with the impression that Callahan was a ready and willing bidder.

120.  A related disputed factual issue in this case is the impact, if any, that Callahan's inquiry had on PJD's efforts to purchase Vatos. As noted, PJD executed a letter of intent in December 2021 to purchase Vatos for $35 million. (Ex. 256.) On March 30, 2022, PJD and Vatos executed a final asset purchase agreement in which the purchase price rose to $40 million. (Ex. 278.) In its proposed findings of fact, PJD asks the Court to find that Callahan's inquiry was the cause of this $5 million increase in the purchase price. (Doc. 268 at 47 ¶ 16 ["PJD's acquisition of Vatos then closed . . . at $40,000,000—$5,000,000 more than PJD would have had to pay if Callahan and Con App had not misused and misappropriated PJD's Confidential Information for purposes other than Sterling's acquisition of PJD and unfairly competed for the acquisition of Vatos."].)

121.  The Court rejects PJD's position and concludes, in its capacity as factfinder, that Callahan's inquiry did not have any causal effect on the $5 million increase in the purchase price. Once again, the analysis is complicated by the fact that the trial evidence on this issue was conflicting. On the one hand, Rodriguez testified that he "probably" told

PJD that there were other interested parties and "hurry up before you fall off the wagon." (Doc. 267-9 at 21 [Rodriguez testimony at 96].)  In a similar vein, Rodriguez testified that he "might have" told PJD: "Hey, I think you should pay more for this because we have other interested buyers."  (*Id.* at 20 [Rodriguez testimony at 94].)  Johnson provided a similar account of the negotiations.  (Tr. 170 ["[Tony Rodriguez] tells me that that competitor is the big dog at GMS, and he tells me that we better hurry or we're going to miss out because they've represented that they're willing and able to pay more money than I am, and that if I don't increase my offer, that they're going to go consider this second offer, and, you know, initiate negotiations with my competitor at that time."].)  Based on this testimony, the Court accepts that Rodriguez realized Vatos could use Callahan's interest as leverage when negotiating with PJD.

122.   On the other hand, leverage is not the same thing as a causal effect, and Rodriguez credibly testified that the reason the Vatos owners ultimately decided to insist on an increased purchase price was because they came to conclude, after giving more thought to the transaction after signing the letter of intent, that the $35 million purchase price was inadequate to compensate them for all of the operational cash Vatos had on hand:

> Q.   And what I want to know is how did the purchase price increase to $40 million from what we saw in the letter of intent which was $35 million?
>
> A.   How did it increase?  Because we had a lot of money in Vatos that was running Vatos.  It was pretty much our money.
>
> Q.   Okay.
>
> A.   So we take the numbers that we were running our business with, which is roughly quite a bit of money; that's why we came up with that number.
>
> Q.   So the additional 5 million would have been cash you as the founders had in the company that you'd invested in it to run it?
>
> A.   Not invested, it's just money that it takes to run the business on a monthly, bimonthly or whatever, every couple months, you know, we've got a lot of—incoming/outgoing.  Do you understand?  So . . .

it takes that kind of money to run that kind of business.

Q.    Okay.  And –

A.    So instead of us leaving our money, that's 35, you know—but we've got . . . quite a bit of money in there.  It's our money.

Q.    Understood.  And . . . did you have a valuation of that money at around $5 million or how did the $5 million get decided upon?

A.    We talked about it one day.

Q.    Okay.

A.    That's what we came up with.

Q.    Is—you're saying you talked about it internally with the other founders?

A.    Yes, the three of us.

Q.    Okay.

A.    We just looked at real numbers.  This is what we pay out every month.  This is what we pay out, this, this, this, that, and this is . . . the bulk amount of money that's ours.

(Doc. 267-9 at 18-19 [Rodriguez at 90-91].)  Later, Rodriguez unequivocally testified that unless PJD agreed to pay the extra $5 million, the deal would have fallen apart:

Q.    Did PJD push back very much on that?

A.    I'm sure they pushed back, but . . . if you knew the group, you understand there's no questioning. . . .  It's simple.  It's simple this way or there's no way.  It's simple for us. . . .  We're not those kind of people.

Q.    Got it.  And so if PJD wasn't going to consider this extra capital you had in the business, the deal would have fallen apart?

A.    That's correct.

(*Id.* at 19-20 [Rodriguez at 93-94].)

123.    For these reasons, the Court concludes in its capacity as factfinder that the

1    Vatos owners would not have agreed to sell their company to PJD (or anybody else) for

2    anything less than $40 million.  Accordingly, Callahan's expression of interest did not

3    cause PJD to pay $5 million more than it otherwise would have paid to acquire Vatos.

4        124.    A final disputed factual issue related to Callahan's inquiry to Vatos is why

5    he chose to make that inquiry and whether that decision was informed by his exposure to

6    PJD's Confidential Information.  (*See generally* Doc. 206 at 29 [determination at summary

7    judgment that "if PJD's Confidential Information informed Callahan's decision to reach

8    out to Vatos, that inquiry itself . . . could reasonably be construed as an impermissible 'use'

9    of Confidential Information under § 2.5 of the NDA, given that it was not for the purpose

10   of evaluating, negotiating, or consummating a transaction with PJD"].)  The Court finds

11   that Callahan's decision to reach out to Vatos was based on his belief and understanding

12   that Vatos was an attractive target, which he formed before receiving any information about

13   Vatos from PJD or Sterling and which was not based on the use of any of PJD's

14   Confidential Information.

15       125.    The Vatos acquisition is the last relevant acquisition in this case—ConApp

16   did not get acquired by AEA, nor did it acquire any other drywall company.  (Doc. 267-4

17   at 25-26 [Ratliff deposition at 271-73].)

**CONCLUSIONS OF LAW**

18

19   I.    The Remaining Claims

20       1.    Before turning to the conclusions of law, it is helpful to set the stage by

21   summarizing PJD's remaining claims and theories of liability.

22       2.    PJD's operative pleading is the Second Amended Complaint ("SAC").  (Doc.

23   56.)[14]  In the SAC, PJD asserts nine claims against Sterling.  Count One is a claim entitled

24   "Declaratory Judgment."  (*Id.* ¶¶ 93-98.)  Count Two is a claim entitled "Injunctive Relief."

25   (*Id.*  ¶¶  99-109.)    Count  Three  is  a  claim  entitled  "Breach  of  Contract—Specific

26   Performance."  (*Id.* ¶¶ 110-16.)  Count Four is a claim entitled "Unjust Enrichment."  (*Id.*

27

---

28   [14]    The SAC also identified two other plaintiffs—the Johnson 2013 Irrevocable Trust, dated December 28, 2013, and RCJ Irrevocable Trust, dated April 29, 2010—but those plaintiffs were previously dismissed.  (Doc. 66.)

¶¶ 117-22.)  Count Five is a claim entitled "Breach of Contract—Damages."  (*Id.* ¶¶ 123-27.)  Count Six is a claim entitled "Breach of Implied Covenant of Good Faith and Fair Dealing."  (*Id.* ¶¶ 128-31.)  Count Seven is a claim entitled "Misappropriation of Trade Secrets—A.R.S. § 44-401 to -407."  (*Id.* ¶¶ 132-45.)  Count Eight is a claim entitled "Breach of Fiduciary Duty."  (*Id.* ¶¶ 146-53.)  Count Nine is a claim entitled "Unfair Competition."  (*Id.* ¶¶ 154-58.)

3.    In December 2021, in response to a motion to dismiss filed by Sterling, the Court dismissed Count Eight.  (Doc. 66 at 13-15.)

4.    In March 2024, following the parties' submission of cross-motions for summary judgment, the Court granted summary judgment in Sterling's favor as to Counts Four and Seven.  (Doc. 206 at 39-45.)

5.    Based on those rulings, only six of PJD's claims remain: Counts One, Two, Three, Five, Six, and Nine.  Moreover, as PJD acknowledges, those six claims only raise "three bases for liability: breach of contract (5th Claim); breach of the implied covenant of good faith and fair dealing (6th Claim); and unfair competition (9th Claim)."  (Doc. 268 at 51-52.)  That is because "[t]he remaining three claims seek various remedies in addition to damages based upon the liability claims: declaratory judgment (1st Claim); injunction (2nd Claim); and specific performance (3rd Claim)."  (*Id.* at 52.)  *See also Kendrick v. World Savings Bank*, 2016 WL 1268519, *5 (D. Ariz. 2016) ("It is well-established law that injunctive relief is not an independent cause of action, and in order to succeed on a claim for injunctive relief, Plaintiff must first offer a valid cause of action for which injunctive relief would be a remedy."); *Santos v. Countrywide Home Loans*, 2009 WL 3756337, *5 (E.D. Cal. 2009) ("Declaratory and injunctive relief are not independent claims, rather they are forms of relief.").

6.    The March 2024 order also narrowed the scope of PJD's remaining claims and theories in two ways.  First, the March 2024 order held that the term "Confidential Information" in the NDA does not include the following categories of information: (a) "[t]he idea of 'expansion through growth or M&A'"; (b) "the idea of creating a national

drywall roll-up"; (c) "the fact that PJD was considering" a national drywall roll-up; (d) "the identity of a drywall installer . . . [if] publicly available"; (e) "the identity of a drywall installer that Sterling or its Representatives identified *before* entering into the NDA"; (f) "the identity of a drywall installer that Sterling or its Representatives . . . identified without reference to any information provided by PJD pursuant to the NDA"; (g) "the identity of Vatos"; and (h) the general notion that PJD "use[s] . . . W-2 labor and turnkey models."[15]  (Doc. 206 at 32-35.)  Second, the March 2024 order held that, to the extent any of PJD's liability theories turn on the improper disclosure of Confidential Information to ConApp, PJD may challenge only the following four disclosures: (a) ConApp's receipt of the Customer Slide; (b) ConApp's receipt of the Target List; (c) ConApp's receipt of information during the April 13, 2021 meeting at Dulles airport; and (d) ConApp's receipt of information during the May 7, 2021 meeting in Houston.  (*Id.* at 37.)

7.    Finally, the March 2024 order noted that Sterling had moved to exclude PJD's damages expert, Paul Duffus ("Duffus"), under Rule 702.  (*Id.* at 47-50; Docs. 247-50.)  Because the Court concluded that it would "be best positioned to make the necessary determinations under Rule 702 after it hears Duffus's testimony," "Sterling's motion to exclude [was] therefore denied without prejudice."  (Doc. 206 at 50.)

II.    Breach Of Contract (Count Five)

8.    PJD's first remaining claim is that Sterling should be liable for breach of contract, as alleged in Count Five of the SAC.  In the Final Pretrial Order ("FPTO"), the parties stipulated that the elements of a "breach of contract claim are: (1) the existence of a contract; (2) breach; and (3) resulting damages."  (Doc. 225 at 4 ¶ 3(d), cleaned up.)  The parties also stipulated that the following principles of contractual interpretation are applicable here: (a) "[w]hen interpreting a contract, the Court seeks to discover and effectuate the parties' expressed intent by construing the contract according to the plain and ordinary meaning of the language the parties chose"; (b) "[i]n interpretating a contract,

---

[15]    As to that category of information, the March 2024 order further clarified that "the Court does not foreclose the possibility that PJD's *specific* W-2 labor and turnkey models might qualify as Confidential Information."  (Doc. 206 at 35.)

courts are required to attempt to give effect to all terms of the contract to avoid rending any language or term superfluous"; (c) "courts are permitted to consider extrinsic evidence to aid in contract interpretation, but not to vary or contradict the terms of the contract"; (d) "[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing"; and (e) "[i]n considering extrinsic evidence, the Court may consider surrounding circumstances, including negotiation, prior understandings, and subsequent conduct."  (*Id.* at 4-5 ¶ 3(e)-(i), cleaned up.)

### A.    Existence Of A Contract

9.    The sole contract giving rise to PJD's breach-of-contract claim is the NDA. (*Id.* at 35-40.)  It is undisputed that the NDA was a valid contract.  (*Id.* at 4 ¶ 3(a).)  Thus, the first element of PJD's contract claim is satisfied.

### B.    Breach

10.    PJD has raised an array of different theories as to how Sterling breached the NDA.  Some of those theories are premised on Sterling's conduct while others are premised on the conduct of Callahan and ConApp (which, according to PJD, may be imputed to Sterling under the NDA).  Each set of theories is addressed below.

#### i.    Breach Theories Premised On Sterling's Conduct

##### a.    Not Directing Representatives To Comply With The NDA (NDA § 2.1)

11.    As noted, under § 2.1 of the NDA, Sterling agreed that it "shall keep confidential and shall not disclose, to any person or entity, the Confidential Information, except to its [Representatives] for the purpose of evaluating the Transaction *and who shall be directed to comply with the terms of this Agreement expressly applicable to them*, and except as otherwise consented to in writing by [PJD]."  (*See* Findings of Fact No. 13, emphasis added.)

12.    One of PJD's liability theories hinges on the italicized language above.  In

PJD's view, "to satisfy this obligation Sterling was required under Section 2.1 of the NDA to inform Representatives of (i) the existence of the PJD NDA, (ii) the definition of Confidential Information, and (iii) the restrictions on the disclosure of PJD Confidential Information to third parties and the use of PJD Confidential Information for any purpose other than Sterling's acquisition of PJD, and to direct Representatives that they were required under the NDA in receiving Confidential Information to comply with the non-disclosure and use restrictions in the agreement."  (Doc. 268 at 53-54 ¶ 9.)

13.    PJD is not entitled to relief based on this theory of liability.  As an initial matter, there is only one relevant "Representative" in this action, Callahan.  (*See also* Doc. 225 at 4 ¶ 3(b) [stipulation that "Callahan is a Representative of Sterling as that term is defined in the NDA"].)  ConApp, in contrast, does not qualify as a "Representative."  Under § 2.1 of the NDA, the term "Representative" is defined as Sterling's "directors, officers, managers, equityholders, members, partners, employees, agents, advisors, affiliates, representatives, consultants, operating partners, insurance providers and potential financing sources."  (*See* Findings of Fact No. 12.)  ConApp does not fall within any of these enumerated categories because it was simply a potential acquisition target.

14.    PJD's only argument as to why ConApp should qualify as a "Representative" is because Sterling initially characterized ConApp as a "Representative" in one of its interrogatory responses.  (Doc. 268 at 57 ¶ 23.)  This argument lacks merit because it was permissible for Sterling to change that interrogatory response once it determined, correctly, that ConApp does not fall within § 2.1's definition of "Representative."  *See generally Donovan v. Crisostomo*, 689 F.2d 869, 875 (9th Cir. 1982) ("Interrogatories do not . . . bind parties as an allegation or admission in a pleading or pre-trial order."); 1 Gensler, Federal Rules of Evidence, Rules and Commentary, Rule 33 (2024) ("Although answers to interrogatories may be used as evidence, they are not binding judicial admissions . . . [and] Rule 26(e) expressly contemplates that parties might add to or change their answers.").[16]

---

[16]    Although "in exceptional circumstances reliance on an answer may cause such prejudice that the court will hold the answering party bound to his answer," Fed. R. Civ. P.

15.    As for Callahan, the Court concludes that Sterling did not breach its duty of "direction" under § 2.1.  Even assuming that Sterling's initial attempts to "direct" Callahan to comply with the NDA were insufficient, Sterling remedied any deficiency in October 2021 by providing the NDA to Callahan, bringing the NDA's use and disclosure restrictions to his attention, and arranging for him to sign an acknowledgement.  (*See* Findings of Fact No. 56.)

16.    Alternatively, and more important, PJD has never developed any coherent theory as to why it was harmed by any breach of Sterling's duty under § 2.1 to "direct" Callahan to comply with the NDA.  As discussed in later portions of this order, the Court agrees with PJD that, under § 2.6 of the NDA, Sterling may be held responsible for the conduct of Callahan if he misused and/or improperly disclosed Confidential Information in violation of §§ 2.1 and 2.5 of the NDA.  Particularly given this backdrop, PJD could not have suffered any independent harm from Sterling's failure to "direct" Callahan to comply with the NDA's use and disclosure restrictions.  Regardless of whether such direction was given, Sterling remained on the hook for Callahan's conduct—a point that PJD's counsel conceded during oral argument.  (Tr. 981-82 [Q: "[L]et's say . . . Callahan never misuses [Confidential Information] and never mis-discloses it.  The only problem is that Sterling didn't actually advise him of his confidentiality obligations.  In that case, even though that would technically violate the NDA, you wouldn't be harmed by that if there was no mis-disclosure or misuse by Sterling or Callahan.  Would you agree with that?"  A:  "That would be—it would still be a breach but maybe a breach without a remedy, I agree."].)[17]

33, advisory committee's notes to 1970 amendment, PJD does not argue that exceptional circumstances are present here and the Court concludes they are not present.

[17]    PJD's proposed findings underscore why PJD cannot demonstrate any independent harm arising from a breach of § 2.1's "direction" requirement.  In its proposed findings, PJD argues that "as a result of Sterling's breach of its obligation under Section 2.1 to properly direct Callahan to comply with the non-disclosure and use restrictions included in the NDA to protect PJD's Confidential Information, Callahan breached those terms of the NDA in his pursuit of a competing national roll-up with AEA by disclosing PJD Confidential Information to AEA and Con App and by using PJD Confidential Information for a purpose other than Sterling's acquisition of PJD."  (Doc. 268 at 57 ¶ 22.)  In other words, PJD simply contends that Sterling's alleged breach of § 2.1's "direction" requirement made it more likely that Callahan would subsequently engage in other breaches of the NDA.  But because Sterling is liable under § 2.6 for any such subsequent

b. **Disclosing Confidential Information To A Non-Representative (NDA § 2.1)**

17.     PJD's next liability theory hinges on the portion of § 2.1 that required Sterling to "not disclose, to any person or entity, the Confidential Information, except to its [Representatives] for the purpose of evaluating the Transaction."  (*See* Findings of Fact No. 13.)

18.     One of PJD's theories as to this provision is that if ConApp was not a Representative—and as discussed above, ConApp was not—it follows that Sterling was prohibited from sharing Confidential Information with ConApp.  (Doc. 268 at 58 ¶ 25 ["[I]f Con App was not a Representative, Sterling breached Section 2.1 when it shared PJD Confidential Information with Con App because it was not permitted to share such information with Con App under the NDA . . . ."].)

19.     The Court agrees with PJD on this point—under § 2.1 of the NDA, Sterling was not authorized to disclose Confidential Information to ConApp.  Thus, the question of breach turns on whether any of the information that Sterling shared with ConApp falls within the NDA's definition of "Confidential Information."

20.     As noted, in the March 2024 summary judgment order, the Court held that PJD is limited to arguing that the following four disclosures to ConApp involved Confidential Information: (a) ConApp's receipt of the Customer Slide; (b) ConApp's receipt of the Target List; (c) ConApp's receipt of information during the April 13, 2021 meeting at Dulles airport; and (d) ConApp's receipt of information during the May 7, 2021 meeting in Houston.  (Doc. 206 at 37.)

21.     As for the first challenged disclosure, the Customer Slide identified PJD's top 10 customers and the amount of revenue that PJD earned from each of those customers.  (*See* Findings of Fact No. 71.)  Sterling provided the Customer Slide to Ratliff during the May 7, 2021 meeting in Houston.  (*See* Findings of Fact No. 72.)

---

breaches by Callahan, any violation of § 2.1's "direction" requirement is not separately actionable.  Tellingly, PJD's expert, Duffus, made no effort to separately quantify the harm flowing from any breaches of § 2.1's "direction" requirement.

22.    The Court has little trouble concluding that the customer and customer-revenue information contained within the Customer Slide qualifies as "Confidential Information" under the NDA.  It is "non-public, confidential, or proprietary information" that PJD did not disclose to Sterling until "on or after the date" that the NDA was executed, and Sterling and Callahan did not independently develop or discover this information through their own investigatory efforts.

23.    Although Sterling offers several arguments as to why the Customer Slide should not be deemed to include Confidential Information, those arguments are unavailing. For example, although Sterling notes that "Sterling created the Customer Slide that was disclosed to ConApp" (Doc. 273 at 47 ¶ 154), the identity of the slide's creator is a red herring—the point is that the slide itself included information regarding PJD's customers and associated revenues that qualifies as Confidential Information.  Sterling also asserts that "Johnson and Blevins . . . were excited about looking at the Customer Slide and sharing the information in it" with ConApp (*id.* at 49 ¶ 160), but such assertions go at most to whether Sterling can invoke the affirmative defenses of ratification, waiver, and estoppel—inquiries that are distinct from whether the Customer Slide qualifies as Confidential Information.

24.    For these reasons—and subject to the analysis of affirmative defenses that appears later in this order—Sterling breached § 2.1 of the NDA by sharing the Customer Slide with ConApp.

25.    As for the second challenged disclosure, the Target List was a document that evolved over time and identified various companies that might be attractive acquisition targets as part of a national roll-up.  (*See, e.g.*, Findings of Fact Nos. 36-38, 41-42, 44.)  On June 20, 2021, Friese sent version 11 of the Target List to Ratliff.  (*See* Findings of Fact No. 98.)  Friese later sent version 12 of the Target List to Ratliff and asked him to destroy version 11—a request that Ratliff ignored.  (*See* Findings of Fact Nos. 101, 110.)

26.    Sterling advances several arguments as to why versions 11 and 12 of the Target List should be deemed to fall outside the NDA's definition of "Confidential

Information."   First, Sterling emphasizes that § 1 of the NDA defines "Confidential Information" as "all non-public, confidential, or proprietary information or material disclosed or provided by or on behalf of [PJD] to [Sterling] on or after the date hereof, either orally or in writing, *concerning any aspect of the business or affairs of [PJD] or its 'subsidiaries.'*"  (*See* Findings of Fact No. 11, emphasis added.)  According to Sterling, the Target List does not fall within this italicized language because "the Target List is not *about PJD* or its business affairs—it contains information about other companies in the market."  (Doc. 273 at 36 ¶ 125.)  This argument is unavailing.  One aspect of PJD's business was to expand through acquisitions, so information pertaining to potential acquisition targets qualifies as "information . . . concerning any aspect of the business or affairs of" PJD.

27.    Next, Sterling emphasizes that the term "Confidential Information" is defined in the NDA as excluding "information or material that . . . is publicly available." (*See* Findings of Fact No. 11.)  This argument has more force.  Versions 11 and 12 of the Target List are, at their core, lists of companies that might be attractive acquisition targets. At trial, PJD failed to establish that the identity of any of those companies was not publicly available.  Additionally, the March 2024 summary judgment order clarified that the term "Confidential Information" does not include such general concepts as "[t]he idea of 'expansion through growth or M&A'" or "the idea of creating a national drywall roll-up" and does not include "the identity of Vatos."  (Doc. 206 at 32-35.)  It is difficult to see how much of the information appearing in versions 11 and 12 of the Target List could qualify as "Confidential Information" in light of those clarifications.  Furthermore, although it is possible that certain isolated pieces of information about the companies listed in versions 11 and 12 of the Target List—such as their revenue and EBIDTA—could theoretically qualify as Confidential Information, PJD failed to establish at trial that those isolated pieces of information in fact qualify.[18]

---

[18]    Additionally, as discussed in later portions of this order, PJD never sought to calculate the individual value of those unspecified pieces of information.

28.    Finally, Sterling emphasizes that the term "Confidential Information" is also defined in the NDA as excluding "information or material that . . . was already in [Sterling's] or its Representatives' possession or known to [Sterling] or its Representatives prior to being disclosed or provided to [Sterling] by or on behalf of [PJD]" and/or was "independently developed or derived by [Sterling] or its Representatives without reference to the Confidential Information in violation of this Agreement." (*See* Findings of Fact No. 11.) That exception is implicated here because Sterling created the Target List through its own industry research, expert calls, and general Google searches and was responsible for identifying the great majority of the targets that appeared in the various versions of the Target List, including Vatos and ConApp. (*See* Findings of Fact Nos. 23, 34, 36, 44.) And even if PJD was responsible for independently identifying a handful of the targets, such as Stratis and TriStar, the Court cannot see how the identity of those two companies (or any isolated pieces of information concerning them) could qualify as "Confidential Information" in light of the preceding analysis.

29.    For these reasons, Sterling did not breach § 2.1 of the NDA by sharing versions 11 and 12 of the Target List with ConApp.

30.    As for the third challenged disclosure—Sterling's provision of information to Ratliff during the April 13, 2021 meeting at Dulles airport—PJD's theory is that Sterling "made a presentation" during that meeting "that included [additional] Confidential Information, including but not limited to PJD's cost stack and buying advantage." (Doc. 268 at 58 ¶ 24.) This argument lacks merit because it rests on an unproven factual premise. Although Friese brought a written presentation to the April 13, 2021 meeting that included the Cost Stack Slide and the Procurement Slide, Friese did not display those slides during the meeting and Ratliff was not given a copy of the slide deck. (*See* Findings of Fact No. 64.) Thus, no additional disclosures of Confidential Information occurred during the April 13, 2021 meeting.

31.    As for the fourth challenged disclosure—Sterling's provision of information to Ratliff during the May 7, 2021 meeting in Houston—the record is clear that Sterling

provided Ratliff with a copy of the Customer Slide during this meeting.  (*See* Findings of Fact No. 72.)  However, Sterling did not provide Ratliff with any of the other slides that, in PJD's view, include Confidential Information, such as the Cost Stack Slide or the Procurement Slide.  Thus, no additional disclosures of Confidential Information occurred during the May 7, 2021 meeting.

32.    In summary, as for PJD's theory that Sterling breached § 2.1 of the NDA by disclosing Confidential Information to ConApp, the sole breach occurred when Sterling disclosed the Customer Slide to Ratliff (and that conduct is the subject of certain affirmative defenses that are addressed in later portions of this order).

> c.    **Disclosing Confidential Information To A Representative, But Not For The Purpose Of Evaluating The Transaction (NDA § 2.1)**

33.    PJD's final theory of liability concerning § 2.1 turns on the fact that this provision only authorized Sterling to disclose Confidential Information to its Representatives "for the purpose of evaluating the Transaction."  (*See* Findings of Fact No. 13.)  In PJD's view, this means that any disclosure by Sterling to a Representative (*i.e.*, Callahan) that occurred after Sterling decided not to pursue an acquisition of PJD was impermissible, because the purpose of that disclosure could not have been "for the purpose of evaluating the Transaction."  (Doc. 268 at 53 ¶ 7 ["Under Section 2.1, Sterling was permitted to disclose PJD Confidential Information to Representatives only 'for the purpose of evaluating the Transaction,' which was defined as an acquisition of PJD."].)

34.    This theory of liability overlaps with PJD's separate theory, addressed below, that any "Use" of Confidential Information by Sterling after Sterling had decided not to pursue an acquisition of PJD was impermissible under § 2.5 of the NDA.  The Court will thus turn to that theory.

> d.    **Using Confidential Information, But Not For The Purpose Of Evaluating, Negotiating, Or Consummating The Transaction (NDA § 2.5)**

35.    Under § 2.5 of the NDA, Sterling agreed that it "shall use the Confidential Information only to evaluate, negotiate and, if applicable, consummate the Transaction in

a manner consistent with the terms and conditions of this Agreement."  (*See* Findings of Fact No. 14.)

36.    One of PJD's breach theories is that Sterling violated § 2.5 when it initially asked Callahan to reach out to ConApp.  (Doc. 268 at 59 ¶ 29 ["Even before informing PJD that Sterling was not proceeding with the Transaction, the Sterling deal team began to use PJD Confidential Information for purposes that were not related to the Transaction with PJD.  Unbeknownst to PJD at the time, Sterling asked Callahan to reach out to the principals of Con App, with whom he had a longstanding relationship, to bring them up to speed on the roll-up thesis."].)  This theory lacks merit.  By February 14, 2021, during the early stages of the parties' discussions, Sterling identified ConApp as a potential acquisition target as part of the roll-up strategy and disclosed ConApp's status as a potential acquisition target to PJD.  (*See* Findings of Fact No. 44.)  Because Sterling believed that it needed to purchase both PJD and another large drywall installer to "start [the roll-up] with adequate scale" (*see* Findings of Fact No. 45), Sterling's efforts during this time period to connect with ConApp (via Callahan) were for the purpose of evaluating, negotiating, or consummating the Transaction.[19]

37.    Some of PJD's other breach theories regarding § 2.5 rest on the premise that Sterling "decid[ed] in May 2021 not to proceed with the PJD Transaction."  (Doc. 268 at 59 ¶ 30.)  Operating from that premise, PJD argues that various information requests by Sterling in the late May 2021 and early June 2021 timeframe—such as requesting procurement information from PJD and forwarding that information to A&M for analysis—could not have been for the purpose of evaluating, negotiating, or consummating the Transaction.  (*Id.*)  This theory is unavailing because, as discussed in the findings of fact, Sterling did not definitively reject the possibility of acquiring PJD as part of a national roll-up until the partner meeting on June 18, 2021.  (*See* Findings of Fact Nos. 79, 81, 82, 89.)  All of Sterling's "uses" of PJD's information up to that point were permissible under

---

[19]    This conclusion makes it unnecessary to decide whether any of the information on which Sterling relied when asking Callahan to reach out to ConApp qualifies as "Confidential Information" under § 2.1 of the NDA.

§ 2.5 because they were still for the purpose—however unlikely in light of the red flags identified by Sterling—of consummating the Transaction.[20]

38.    PJD's next breach theory regarding § 2.5 concerns the "Partner Update" that was presented during the Sterling partner meeting on June 18, 2021.  In PJD's view, the presentation of this slide deck amounts to an impermissible use because "the same Sterling deal team that had spent the previous six months receiving and analyzing Confidential Information concerning PJD's proprietary systems and models and how PJD intended to replicate those systems and models as part of a national roll-up decided that they would pursue a roll-up with Callahan and Con App while recognizing that they would be doing so in competition with PJD, including by pursuing targets in Arizona and Nevada that had been identified by PJD."  (Doc. 268 at 59 ¶ 31.)  This theory lacks merit.  Although certain slides within the Partner Update contemplated Sterling's pursuit of a competing roll-up not involving PJD, other slides contemplated the pursuit of a roll-up that would include acquiring PJD.  Thus, the overall purpose of the Partner Update included evaluating, negotiating, or consummating the Transaction, making it a permissible use under § 2.5.[21]

39.    PJD's next breach theory regarding § 2.5 concerns Friese's communications with ConApp's Ratliff after June 18, 2021.  (Doc. 268 at 60 ¶ 32 ["Following the June 18, 2021, partner meeting, Sterling continued to pursue the national drywall contractor roll-up with Con App and Callahan, including by sharing the target list prepared in conjunction with PJD with Callahan and Con App . . . ."].)  More specifically, on June 20, 2021 and July 1, 2021, Friese sent emails to Ratliff that included versions 11 and 12 of the Target List as attachments.  (*See* Findings of Fact Nos. 98, 101.)  On the one hand, PJD is correct that those emails could not have been for the purpose of evaluating, negotiating, or consummating the Transaction because Sterling had definitively decided on June 18, 2021

---

[20]    This conclusion makes it unnecessary to decide whether any of the information disclosed by Sterling to Callahan or Sterling's diligence partners during this mid-May to mid-June period qualifies as "Confidential Information" under § 2.1 of the NDA.

[21]    This conclusion makes it unnecessary to decide whether any of the specific pieces of information included in the Partner Update qualifies as "Confidential Information" under § 2.1 of the NDA.

not to pursue the Transaction.  On the other hand, those emails could only violate § 2.5 if they involved the use of "Confidential Information."  The Court has already analyzed that issue above and concluded that versions 11 and 12 of the Target List do not qualify as "Confidential Information."  (*See* Conclusions of Law Nos. 25-29.)  Thus, Friese's emails to Ratliff on June 20, 2021 and July 1, 2021 did not violate § 2.5.

40.    PJD's final breach theory regarding § 2.5 turns on Sterling's pursuit of a competing roll-up plan after deciding not to acquire PJD.  According to PJD, Sterling did not "misuse only one single piece, or even a few pieces, of PJD's Confidential Information; rather, [it was] granted access to and disclosed, misappropriated, and misused PJD's entire proprietary business model, business systems, and drywall contractor roll-up thesis," and "it was this proprietary drywall contractor roll-up thesis and its underlying business model and systems that [Sterling] . . . took from PJD without compensation and misused in pursuing [its] own national roll-up."  (Doc. 268 at 49 ¶¶ 167-68.)

41.    This breach theory fares no better than the others.  As noted in the March 2024 summary judgment order, such general concepts as "[t]he idea of 'expansion through growth or M&A,'" "the idea of creating a national drywall roll-up," and "the fact that PJD was considering" a national drywall roll-up do not qualify as "Confidential Information" under § 2.1 of the NDA.  (*See* Conclusions of Law No. 6.)  Likewise, the fact that PJD "use[s] . . . W-2 labor and turnkey models" does not qualify as "Confidential Information" under § 2.1.  (*Id.*)  Because these general categories of information do not qualify as Confidential Information, the only way Sterling's pursuit of a competing roll-up could even theoretically implicate § 2.5 is if Sterling's strategy was based on some specific piece of Confidential Information that PJD had previously disclosed.  The Court concludes that PJD failed to meet its burden of making such a showing.

42.    For example, although Sterling's competing roll-up strategy involved the idea of pursuing certain acquisition targets, Sterling was responsible for identifying Vatos and ConApp as potential targets.  (*See* Findings of Fact Nos. 23, 34, 36, 44.)  And more broadly, the identity of a particular acquisition target does not fall within § 2.1's specific

definition of "Confidential Information." (*See* Conclusions of Law Nos. 25-29.)

43. As for PJD's contention that Sterling's competing roll-up strategy was "infected with knowledge of PJD's Confidential Information concerning PJD's business practices," the Court agrees with Sterling that "the evidence PJD presented regarding its Confidential Information to this end was vague, generic, and non-specific." (Doc. 273 at 59 ¶ 188.)

44. For example, although there was frequent mention at trial of PJD's "estimating process," PJD's witnesses acknowledged that PJD did not train Sterling on its estimating process. (Doc. 267-7 at 12-13 [A. Johnson deposition at 116-18].) Nor was there any evidence at trial that Sterling received PJD's proprietary job cost sheet—Blevins testified that she did not believe it was in the VDR (Tr. 495) and the VDR index does not reflect its presence (Ex. 270). Likewise, Friese, the most knowledgeable witness regarding Sterling's evaluation of PJD, did not know about PJD's estimating process, other than the fact that they were "strong processes," and credibly testified that neither he nor Sterling implemented any estimating processes in any company. (Tr. 636-37, 722, 761, 836.)

45. Additionally, Sterling established at trial that its knowledge of pricing, rebates, procurement strategies, and other business practices in the drywall installation industry was informed by its extensive industry research and the independent knowledge of Callahan, whose decades of experience in the industry gave him deep insight into these topics.[22] As one example, Friese specifically researched the ability to source drywall materials directly from the manufacturer and how to achieve advantageous economies of scale in drywall purchasing and procurement. (Tr. 648-49.) Another example is the "Theme Working Materials" deck that Friese compiled, which included Sterling's assessment of the viability of a buy-and-build strategy in the residential new construction drywall installation market. (Tr. 652-53; Ex. 23 at TSG002553.) Among other things,

---

[22] As noted, § 1's definition of "Confidential Information" excludes "information or material that . . . was or is obtained by [Sterling] or its Representatives from a third party . . . [or] is independently developed or derived by [Sterling] or its Representatives without reference to the Confidential Information in violation of this Agreement." (*See* Findings of Fact No. 11.)

Sterling independently determined that the market was highly fragmented with only a few regional players and no national players.  (Tr. 652-53; Ex. 23 at TSG002553.)  The Theme Working Materials also included Friese's notes from six expert interviews, which reveal that Sterling (through Friese) independently learned about relationships with manufacturers and distributors (including the market's use of guaranteed pricing and rebates) and sourcing.  (Tr. 655; Ex. 23 at TSG002571-82.)

46.    Similarly, although Johnson testified about PJD's "turnkey approach," which "means that the price that we give to one of our customers includes all of the labor and all of the material versus at a fixed price" (Tr. 129-30), that explanation does not vary or differ from how a turnkey approach was independently understood by Callahan.  (Doc. 267-3 at 77-78 [Callahan deposition at 259-60].)

47.    For these reasons, Sterling's brief pursuit of a roll-up strategy after June 18, 2021 did not violate § 2.5 of the NDA.  To the contrary, Sterling's pursuit of that roll-up strategy was explicitly permitted by § 9 of the NDA, in which PJD acknowledged that "this Agreement shall not prevent [Sterling], its affiliates or [Sterling's] portfolio companies from (a) engaging in or operating any business, (b) entering into any agreement or business relationship with any third party or (c) evaluating or engaging in investment discussions with, or investing in, any third party, whether or not competitive with [PJD] or its affiliates, in each case, so long as Confidential Information is not used by such person in violation of this Agreement."  (*See* Findings of Fact No. 17.)[23]

48.    In sum, PJD failed to establish at trial that Sterling directly committed any violations of § 2.5 of the NDA.  For similar reasons, PJD failed to establish at trial that Sterling committed any violations of § 2.1 of the NDA through its disclosure of information to Callahan.

…

---

[23]    In a related vein, the Court finds that the NDA did not require any kind of "screening" of Sterling employees if the contemplated transaction with PJD fell through. The NDA does not compel such an approach and permits competition and retention of mental impressions.  (Ex. 4.)

ii.    Breach Theories Premised On The Conduct Of Representatives

a.    **Interpretation Of § 2.6**

49.    A threshold issue presented by PJD's breach theories premised on the conduct of Representatives is whether Sterling may be held liable for Representatives' conduct under the NDA.

50.    As noted, under § 2.6 of the NDA, Sterling agreed that it "shall be responsible for any breaches by its Representatives of the terms of this Agreement expressly applicable to them." (*See* Findings of Fact No. 15.) Relying on this language, PJD argues that "the non-disclosure and use restrictions contained in Section 2 of the NDA . . . apply to Representatives" and, accordingly, Sterling may be held liable "for any breach by its Representative of those [use and non-disclosure] provisions." (Doc. 268 at 61 ¶¶ 37-38.) Sterling disagrees, arguing that "the parties did not intend the NDA to make Sterling responsible for the conduct of its Representatives." (Doc. 273 at 91.)

51.    This issue presents a close call. The interpretive difficulty arises from the fact that although § 2.6 deems Sterling responsible for any breaches of NDA provisions that are "expressly applicable" to Representatives, no provision of the NDA expressly states that it applies to Representatives. For example, the "Non-disclosure" requirement of § 2.1 expressly obligates *Sterling* to "keep confidential and . . . not disclose, to any person or entity, the Confidential Information, except to its [Representatives] for the purpose of evaluating the Transaction." (*See* Findings of Fact No. 13.) However, this provision does not expressly obligate *Representatives* to comply with the same non-disclosure obligation—instead, it simply obligates Sterling to "direct[]" Representatives "to comply with the terms of this Agreement expressly applicable to them, and except as otherwise consented to in writing by [PJD]." (*Id.*) Similarly, the "Use" requirement of § 2.5 expressly obligates *Sterling* to "use the Confidential Information only to evaluate, negotiate and, if applicable, consummate the Transaction in a manner consistent with the terms and conditions of this Agreement." (*See* Findings of Fact No. 14.) However, this provision does not expressly obligate *Representatives* to comply with the same use restriction.

52.     In Sterling's view, these features of the NDA are dispositive.  Sterling argues that because §§ 2.1 and 2.5 do not expressly apply to Representatives, and § 2.6 only deems Sterling responsible for breaches of contractual provisions that are "expressly applicable" to Representatives, it follows that Sterling cannot be held responsible for any alleged use and disclosure violations committed by Representatives.  (Doc. 273 at 74-78.)  As noted in the March 2024 summary judgment order, this interpretation is reasonable.  (Doc. 206 at 15 ["Given the presence of that ['expressly applicable to them'] clause, it is reasonable (as Sterling argues) to construe § 2.6 as only authorizing liability against Sterling for the conduct of Representatives if that conduct violates a clause of the NDA that expressly applies to Representatives.  But . . . § 2.1 does not expressly require Representatives to maintain the confidentiality of any Confidential Information they may receive from Sterling.  The Court does not foreclose the possibility that the parties' intent may have been to impose such a confidentiality requirement on Representatives—it would be surprising not to include one—but the text of § 2.1 says nothing to that effect."].)  Indeed, the parties agree that two of the applicable interpretive principles in this case are that (1) "[w]hen interpreting a contract, the Court seeks to discover and effectuate the parties' expressed intent by construing the contract according to the plain and ordinary meaning of the language the parties chose"; and (2) "[i]n interpretating a contract, courts are required to attempt to give effect to all terms of the contract to avoid rending any language or term superfluous."  (*See* Conclusions of Law No. 8.)  An argument can be made that both principles support Sterling's position—the former because the phrase "expressly applicable to them," at least when viewed in isolation, seems to connote that a cross-referenced provision must expressly state that it applies to Representatives (which §§ 2.1 and 2.5 fail to do) and the latter because adopting PJD's interpretation could result in the phrase "expressly applicable to them" being rendered superfluous.  (*See also* Doc. 206 at 11-12 ["PJD ignores the second half of the italicized language, 'expressly applicable to them.'  As Sterling correctly notes in its response brief, that language must mean something under Arizona contract law."].)

- 52 -

53.     Nevertheless, the rule in Arizona is that when "contract language is reasonably susceptible to more than one interpretation," "extrinsic evidence is admissible" to discern the intention of the parties. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1144-45 (Ariz. 1993).  Here, for several reasons, the Court concludes that PJD's competing interpretation of the NDA—that is, that Representatives must comply with the disclosure and use restrictions set forth in §§ 2.1 and 2.5 of the NDA and that Sterling may be held responsible for Representatives' violations of those provisions under § 2.6 of the NDA—is also reasonable.

54.     The first reason why PJD's interpretation is reasonable is that Sterling's competing interpretation would negate the very purpose of the NDA as identified in its preamble, which was "to protect and preserve the confidentiality of" the information that PJD was agreeing to disclose to Sterling as part of the evaluation process.  (Ex. 4 at TSG000633.)  As PJD correctly notes, "if the disclosure and use restrictions [in §§ 2.1 and 2.5] did not apply to Representatives, Sterling could receive PJD Confidential Information and the very next day share it with Representatives, who would be free to publicly disclose the Confidential Information, thus eviscerating the protection of the NDA."  (Doc. 268 at 54 ¶ 11.)  It is nonsensical that PJD would have agreed to such an arrangement.  *Cf. Roe v. Austin*, 433 P.3d 569, 574-75 (Ariz. Ct. App. 2018) ("[C]ourts must avoid an interpretation of a contract that leads to an absurd result."); *Aztar Corp. v. U.S. Fire Ins. Co.*, 224 P.3d 960, 973-74 (Ariz. Ct. App. 2010) ("Although Part II, ¶ 1 [of the contract] does not explicitly state the property must be 'covered,' applying these standard rules of contract interpretation, we are persuaded that 'all real or personal property' is shorthand for covered property under Part I because a contrary interpretation would result in . . . an absurd and unreasonable interpretation of the contract.").

55.     The second reason why PJD's interpretation is reasonable is that Sterling's competing interpretation would create its own surplusage issue.  Although § 2.6 provides that Sterling "shall be responsible for any breaches by its Representatives of the terms of this Agreement expressly applicable to them," Sterling concedes that "there are no terms

in the NDA that are 'expressly applicable' to Representatives." (Doc. 273 at 77.) The Court rejects Sterling's strained attempt to offer a comprehensible explanation for this approach. (*Id.* ["It simply means the parties chose not to make any of the terms of the NDA expressly applicable to Representatives."].) It is nonsensical that the parties would have gone to the trouble of adding § 2.6 to the NDA, which is entitled "Other Parties Bound," only for that clause to accomplish nothing and bind nobody.

56.    Because each side has proffered a reasonable interpretation of the disputed contractual language, the Court may consider extrinsic evidence in determining "what was within the contemplation of the parties when the [contract] was executed, which, in turn, is to be resolved in the light of all of the surrounding facts and circumstances under which the parties acted." *Taylor*, 854 P.2d at 1145. As the parties have stipulated, "[i]n considering extrinsic evidence, the Court may consider surrounding circumstances, including negotiation, prior understandings, and subsequent conduct." (*See* Conclusions of Law No. 8.)

57.    As for negotiation, Sterling places heavy emphasis on the fact that the phrase "expressly applicable to them" did not appear in the originally proposed version of the NDA[24] and was only added after the parties engaged in contract negotiations. (*See, e.g.*, Doc 273 at 76 [urging the Court to place "heavy weight on the negotiated nature of the NDA"]; Tr. 1035 [Sterling's closing argument: "The only alternative that's been given to you is to ignore the fact that expressly applicable got added to this. I think I'd be in a different position if this was a form document and nobody really knew—nobody added expressly applicable and everything operated—no. This was specifically bargained for because it did not appear in what was sent to Sterling. It appeared in what was executed."].)

---

[24]    In the originally proposed version of the NDA, the "Other Parties Bound" clause (which would have been denominated as § 2.5) provided: "All affiliates of [Sterling] and all directors, officers, employees, agents and representatives of [Sterling] or its affiliates shall be included within the definition of the term [Sterling] for purposes of this Agreement and shall be bound by the terms and conditions of this Agreement. [Sterling] shall be responsible for any breaches of this Agreement by any of its affiliates and any directors, officers, employees, agents and representatives of [Sterling] or its affiliates." (Ex. 2 at TSG014302.)

The Court finds this consideration unpersuasive because no evidence was offered at trial about the substance of the parties' contract negotiations or why any particular clauses of the originally proposed contract were modified. As a result, the Court can only speculate about why particular changes were made.

58.    In contrast, the evidence concerning prior understandings is more concrete. Elliott did not dispute that "it was a typical process of Sterling that applied here that under the NDA Sterling was required to direct any representative with whom it shared confidential information that they were required to comply with the terms of the NDA." (Tr. 354.) Elliott also testified that it would be "typical" for Sterling to "be responsible if any of its representatives breached the NDA that it had entered into with PJD." (Tr. 355.) Similarly, Friese "generally" agreed with the proposition "that if Sterling engaged a representative to assist it, that Sterling was required, under this NDA to direct that representative that received PJD confidential information—that the information was confidential and was subject to the PJD NDA." (Tr. 747.) Such testimony suggests that Sterling interpreted the NDA just as PJD contends it should be interpreted, *i.e.*, as subjecting Representatives to the disclosure and use restrictions in §§ 2.1 and 2.5 and subjecting Sterling to liability for any such violations under § 2.6.

59.    Likewise, as for subsequent conduct, it is notable that in May 2021, before initiation of this litigation, Sterling required some of its advisors to sign acknowledgments confirming that they had been given a copy of the NDA and agreed to comply with the terms of the NDA. (Ex. 126.) In those acknowledgements, Sterling referred to the need for Representatives "to maintain the confidentiality of the information *as contemplated by the terms of the [NDA]*." (*Id.*, emphasis added.) It is difficult to reconcile this language with Sterling's current litigation position, which is that the NDA did not contemplate any need for Representatives to maintain the confidentiality of PJD's Confidential Information. And under Arizona law, "[t]he acts of parties under a contract, before disputes arise, are the best evidence of the meaning of doubtful contract terms." *Associated Students of the Univ. of Ariz. v. Arizona Bd. of Regents*, 584 P.2d 564, 569 (Ariz. Ct. App. 1978).

60.     Having carefully weighed all of this evidence, the Court concludes that PJD's proposed interpretation of § 2.6 is most reasonable and reflects the parties' intent.  This is not a situation, as Sterling suggests, where the problem is a mere "lack of precision" that "does not render the NDA ambiguous, unenforceable, or absurd."  (Doc. 273 at 77.) Although PJD's proposed interpretation is not airtight and creates a surplusage issue, Sterling's competing interpretation creates a different surplusage issue and would result in absurd outcomes that would negate the stated purpose of the NDA.  Additionally, although Sterling's plain-meaning arguments have force when §§ 2.1, 2.5, and 2.6 are viewed in isolation, it must not be forgotten that, "to determine what the parties intended, we first consider the plain meaning of the words *in the context of the contract as a whole*." *Grosvenor Holdings, L.C. v. Figueroa*, 218 P.3d 1045, 1050 (Ariz. Ct. App. 2009) (emphasis added).  As explained above, when the contract is considered as a whole, PJD's proffered interpretation is most reasonable.

### b.     **Conduct Of ConApp**

61.     Some of PJD's breach theories regarding § 2.6 seem to turn on the conduct of ConApp.  More specifically, PJD argues that "Sterling's Representatives Callahan *and Con App* also breached the NDA obligations by, among other things, sharing PJD Confidential Information with a third-party private equity firm and using PJD Confidential Information to pursue a national drywall roll-up in competition with PJD"; that "Callahan *and Con App* also shared with the third-party private equity firm the target list that had been developed by PJD and Sterling"; and that "Sterling was not only aware that Callahan *and Con App* were pursuing a national roll-up with a new private equity firm in competition [with] PJD, but actively encouraged and assisted them at during so while failing to ensure that they complied with the terms of the PJD NDA."  (Doc. 268 at 61-62 ¶¶ 40-41, 43, emphases added.)

62.     PJD's breach theories related to ConApp lack merit for the simple reason that, under § 2.6, Sterling only agreed to responsible for certain "breaches by its Representatives."  As noted, ConApp was not Sterling's Representative.  (*See* Conclusions

1    of Law No. 13.)  It follows that § 2.6 does not provide a conduit for holding Sterling liable

2    for ConApp's conduct.[25]

3    ### c.    Conduct Of Callahan

4    63.    This determination means that Sterling could only be held liable, under § 2.6,

5    for any misuse or disclosure violations committed by Callahan.  PJD's first argument turns

6    on Callahan's communications with Ratliff on March 19, 2021.  On that date, Callahan

7    reached out to Ratliff to see if ConApp would consider being acquired by Sterling as part

8    of a roll-up strategy, disclosed that PJD was participating in the strategy, and confessed

9    that "[t]hey are obviously trying to keep PJD confidential."  (*See* Findings of Fact No. 57.)

10   Callahan later expressed misgivings about disclosing PJD's involvement.  (*Id.*)  PJD

11   contends that Callahan breached § 2.1 of the NDA through this conduct.  (Doc. 268 at 61

12   ¶ 39 ["Callahan first breached the non-disclosure restriction of the NDA when he brought

13   Con App 'up to speed' about the roll-up thesis and Sterling's discussions with PJD and

14   asked Ratliff to 'keep it under your hat.'"].)

15   64.    This argument is unavailing.  Notwithstanding Callahan's subjective belief

16   that he acted impermissibly by disclosing PJD's involvement in the roll-up strategy to

17   Ratliff, the relevant portion of § 2.1 of the NDA only bars the disclosure of information

18   that falls within the NDA's definition of "Confidential Information."  The isolated pieces

19   of information that Callahan disclosed to Ratliff on March 19, 2021—namely, the notion

20   of a roll-up strategy and PJD's involvement in that strategy—do not qualify as

21   "Confidential Information."  (Doc. 206 at 32-35.)  This is because PJD disclosed both of

22   those concepts to Sterling no later than February 27, 2020, when Phipps sent the "teaser"

23   to Apple and provided details regarding PJD's roll-up thesis.  (*See* Findings of Fact No. 7.)

24   That date is significant because it occurred more than a month before March 30, 2020, the

25   effective date of the NDA, and the NDA's definition of "Confidential Information" only

26

27   [25]    This determination, to be clear, does not inoculate Sterling from any liability for its
conduct in relation to ConApp.  As noted in earlier portions of this order, ConApp's status

28   as a non-Representative means that Sterling was prohibited under § 2.1 from disclosing
Confidential Information to ConApp.  (*See* Conclusions of Law No. 18.)

1    encompasses information "disclosed or provided by or on behalf of [PJD] to [Sterling] on

2    or after the date thereof." (Ex. 4 at TSG000633.)[26]

3        65.    PJD's next argument regarding Callahan is that he breached the disclosure

4    obligations in § 2.1 of the NDA by "sharing PJD Confidential Information with a third-

5    party private equity firm." (Doc. 268 at 61 ¶ 40.) PJD elaborates: "Using what he had

6    learned about the potentially lucrative opportunity for a national drywall roll-up from the

7    PJD Confidential Information, the evidence shows that Callahan educated AEA on the

8    benefits that could be achieved through a national roll-up using PJD Confidential

9    Information, including PJD's procurement advantages that it received through its contracts

10   and primary supplier, and the immediately actionable targets that PJD had identified and

11   was pursuing. Callahan . . . also shared with the third-party private equity firm the target

12   list that had been developed by PJD and Sterling. Further, Callahan described to AEA PJD

13   and its national roll-up thesis, and the contemporaneous notes of AEA memorialize that

14   AEA was well aware that it was pursuing the national roll-up in competition with PJD and

15   was encouraging Callahan to reach out to material regional drywall installers, including the

16   CEO of Vatos, about the roll-up that Callahan and AEA were pursuing." (*Id.* at 61-62

17   ¶¶ 41-42.)

18       66.    These arguments are unavailing. As an initial matter, to the extent PJD

19   challenges Callahan's disclosure to AEA of "the benefits that could be achieved through a

20   national roll-up," this challenge fails because such general concepts as the idea of doing a

21   national drywall roll-up and achieving expansion through growth or M&A do not qualify

---

[26] In addition to prohibiting the disclosure of "the Confidential Information," § 2.1 of the NDA also prohibits the disclosure of "any information about the Transaction or the fact that [Sterling] has received the Confidential Information." (Ex. 4.) During closing argument, PJD's counsel asserted that Callahan's March 19, 2021 email to Ratliff "technically" violated the latter portion of § 2.1 because it disclosed the fact that PJD was pursuing a roll-up—information that is not "Confidential Information" but still qualifies as "information about the Transaction." (Tr. 978-79.) However, in its proposed findings, PJD does not develop any independent breach arguments regarding the "information about the Transaction" portion of § 2.1. Any such argument is thus waived. Also, regardless of waiver, PJD and its expert, Duffus, never attempted to quantify the value of this isolated piece of non-confidential information. Thus, any claim premised on the March 19, 2021 email from Callahan to Ratliff would fail, at a minimum, due to a lack of damages.

as "Confidential Information."  (*See* Conclusions of Law No. 6.)  Thus, nothing in § 2.1 of the NDA precluded Callahan from disclosing those general concepts to AEA.  Instead, to prevail on its § 2.1 theory, PJD would need to establish that Callahan disclosed some specific piece of Confidential Information to AEA in the course of describing the contemplated roll-up strategy.

67.    In a related vein, although PJD places heavy emphasis on Callahan's statement that he used information he learned from "Sterling presentations" as a "central thesis" in moving forward with ConApp (*see* Findings of Fact No. 105), this testimony does not establish that Callahan used Confidential Information in developing his competing roll-up strategy.  The "Sterling presentations" that Callahan received were overwhelmingly composed of information that Sterling had independently discovered or that otherwise fell outside the definition of "Confidential Information."  Thus, to prevail on its theory of liability, PJD again needed to go beyond generalities and identify some specific piece of Confidential Information that Callahan disclosed to AEA.

68.    PJD's first argument on this topic is that Callahan shared "PJD's procurement advantages that it received through its contracts and primary supplier," but that assertion is not borne out by the record.  As for the rebate-based procurement advantage that PJD allegedly derived from its contracts, Sterling correctly notes that, "[c]onsistent with ConApp's testimony that it was 'kind of anti-rebate' and preferred a lower up-front price, the AEA materials do not even mention rebates much less somehow use PJD's stated procurement strategy."  (Doc. 273 at 55-56 ¶ 182.)  Similarly, as for the procurement advantage that PJD allegedly derived from negotiating favorable terms from its primary supplier (L&W)—and putting aside the fact that Callahan never even received the Excel file containing PJD's detailed pricing data with L&W and at most reviewed preliminary slides containing A&M's analysis of the Excel file (*see* Findings of Fact No. 85)—there is no evidence that Callahan disclosed, to AEA, any Confidential Information he may have obtained from viewing those slides.  The AEA materials do not even mention L&W and reflect an intention to move forward with GMS (rather than L&W) as a

1    distributor.   (Ex. 268 at AEA_PJD_00004493-94 [discussing GMS's average cost for

2    drywall].)

3         69.    PJD's other argument on this topic is that Callahan improperly disclosed to

4    AEA "the immediately actionable targets that PJD had identified and was pursuing,"

5    including Vatos.  As it relates to Vatos, this argument is a non-starter—as noted, Sterling

6    and Callahan were responsible for identifying Vatos as a potential target, not PJD.  (*See*

7    Findings of Fact No. 34.)   Additionally, Callahan's decision to reach out to Vatos was

8    based on beliefs he formed and information he obtained before being exposed to any of

9    PJD's Confidential Information.  (*See* Findings of Fact No. 124.)   For these and other

10   reasons, Vatos's status as a potential acquisition target does not qualify as "Confidential

11   Information."  (*See* Conclusions of Law Nos. 26-29.)[27]

12        70.    As for the remaining "immediately actionable targets," the "Growth

13   Strategy" section of the AEA slide deck includes a slide that identifies two major drywall

14   installers in Mid-Atlantic region, Eastern Applicators and Wayne Drywall.  (Ex. 268 at

15   AEA_PJD_00004487.)  On the next page, which is an "Acquisition Targets" slide, there is

16   a map with approximately 35 drywall installation companies named and pinned on the map.

17   (*Id.* at AEA_PJD_00004488.)   The analysis as to these slides mirrors the analysis of the

18   Target Lists that Sterling sent to Ratliff on June 20, 2021 and July 1, 2021.  The information

19   appearing on these slides does not fall within the NDA's definition of "Confidential

20   Information" because PJD failed to establish that the identity of any of those targets was

21   not publicly available and, with the possible exception of Stratis, also failed to establish

22

23   [27]    To the extent PJD argues that Johnson was personally responsible for identifying
24   certain pieces of information regarding Vatos after being designated as the relationship
     leader (Doc. 268 at 19 ¶ 67 ["[Johnson] also advised Sterling and Callahan that he had
     spoken to one of the owners of Vatos in the summer of 2020 . . . and learned that Mr.
25   Rodriguez's son had passed away and the owners might be looking to sell the business."]),
     the Court is unpersuaded that these isolated pieces of information qualify as "Confidential
26   Information" under the NDA (or that those isolated pieces of information had any
     independent value).  At any rate, Callahan's decision to reach out to Vatos was informed
27   by the information regarding Vatos that he independently knew and/or developed.  Indeed,
     by February 2021, Callahan and Sterling had identified Vatos as the first company listed
28   among the "high priority" targets (Ex. 48 at Callahan 346), but Johnson wasn't given
     "ownership" of Vatos until the March 2021 meeting (*see* Findings of Fact No. 58).

1    that it (rather than Sterling and/or Callahan) was responsible for identifying the companies

2    identified on these slides as acquisition targets.  (*See, e.g.*, Ex. 10 at TSG032117 [Sterling

3    identifying Eastern Applicators and Wayne Drywall as potential acquisition targets in

4    December 2020 slide deck].)

5         71.    For these reasons, the Court fully agrees with and adopts the following

6    summary of Callahan's interactions with AEA, which appears in Sterling's proposed

7    findings: "At best, Callahan presented ConApp as an acquisition opportunity for AEA and

8    provided the firm with information about the drywall market and potential for a

9    consolidation of drywall contractors—i.e., a national drywall roll-up thesis—which is not

10   Confidential Information.  PJD has failed to meet its burden to prove that the information

11   Callahan provided to the private equity firm was Confidential Information, was not

12   publicly available, generic to the industry, known to Callahan before he received

13   Confidential Information or that it did not otherwise fall within the many exclusions in the

14   definition of Confidential Information.  For instance, while the record shows that Callahan

15   received the Drywall Working Session, the Industry Considerations presentation, and the

16   A&M preliminary slides (and no PJD-created materials), there is no evidence that he

17   disclosed those documents to AEA."  (Doc. 273 at 96, citations omitted.)

18        72.    PJD's final theory regarding Callahan, which is closely related to the

19   "disclosure" theory addressed, is that Callahan breached the "use" restrictions in § 2.5 of

20   the NDA by "using PJD Confidential Information to pursue a national drywall roll-up in

21   competition with PJD."  (Doc. 268 at 61 ¶ 40.)

22        73.    This "use" theory fares no better than the "disclosure" theory.  As discussed,

23   there is no evidence that Callahan's roll-up strategy was based on Confidential Information

24   obtained from PJD.  Thus, just as it was permissible under § 9 of the NDA for Sterling to

25   briefly pursue a competing roll-up strategy after June 18, 2021, it was also permissible for

26   Callahan to pursue a competing roll-up strategy during the latter part of 2021 and into 2022.

27   So long as Callahan did not use any of PJD's Confidential Information in the course of

28   pursuing that strategy, nothing precluded him from engaging in competition.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### iii.    Summary As To Breach Theories

74.    Although PJD has advanced a broad array of theories as to how Sterling breached the NDA, PJD has only established one breach—Sterling breached § 2.1 of the NDA when it provided the Customer Slide to Ratliff during the May 7, 2021 meeting in Houston (and that conduct is the subject of certain affirmative defenses that are addressed in later portions of this order).

### C.    **Damages**

75.    The final element of PJD's contract claim is damages.  PJD seeks a total of $50.7 million in contract damages pursuant to the two damages theories discussed below.

### i.    $45.7 Million Based On The Value Of The "Proprietary Information"

76.    PJD's first theory is that it is entitled to $45.7 million in damages for the "Value of the Confidential Information Taken." (Doc. 268 at 48.)  This theory is premised on the opinions of PJD's damages expert, Duffus, who opined "that the fair market value of PJD's proprietary information as of June 11th, 2021, and that's the information that was allegedly wrongfully misappropriated, disseminated, and misused, is $45.7 million." (Tr. 547.)   In its proposed findings, PJD elaborates: "Duffus found that the value of the Proprietary Information that Sterling and its Representatives were given access to pursuant to the protections of the NDA, and latter wrongfully disclosed, misappropriated, and misused, is $45.7 million." (Doc. 268 at 50 ¶ 173.)

77.    Having carefully considered Duffus's testimony, the testimony of Sterling's damages expert Scott Bayley (who persuasively opined that "Duffus's methodology and his opinions are speculative, unreliable, and unsupported," Tr. 892), and the parties' damages-related arguments at trial and in their proposed findings, the Court concludes— for three independent reasons—that PJD has not met its burden of proof regarding its $45.7 million damages theory.

78.    The first reason is that Duffus attempted to calculate the value of the wrong asset.  As noted, Duffus sought to calculate the value of an assortment of information collectively defined as the "Proprietary Information."  Duffus described the "Proprietary

Information" as an "integrated suite" of information composed of four "business processes"—PJD's "customer model," "distributor and manufacturer model," "labor model," and "operations model"—as well as PJD's "financial performance" "resulting from" and "enabled" by those business processes and PJD's roll-up strategy, which was "premise[d]" on that financial performance.  (Tr. 547-48, 602-03.)  Duffus also testified that this "integrated suite" of information included the "subcategories" of information listed at paragraphs 54-60 of the SAC.  (Tr. 576-77, 584-85.)  Duffus assumed for purposes of his analysis that all this information was wrongfully misappropriated, disseminated, and/or misused in violation of the NDA.  (Tr. 575, 577, 579.)

79.    The problem with this approach is that not all of the information that falls within Duffus's definition of "Proprietary Information" also falls within the NDA's narrower definition of "Confidential Information."  For example, Duffus testified that he assumed that "the fact that PJD's EBITDA margin was 18 percent" was "in and of itself part of the proprietary information."  (Tr. 615.)  However, PJD disclosed the existence of its 18 percent EBITDA margin to Sterling in February 2020, as part of Phipps's initial outreach efforts to Sterling.  (*See* Findings of Fact No. 7.)  Because this information was disclosed to Sterling before the execution of the NDA in March 2020, it falls outside the definition of "Confidential Information."[28]

80.    As another example, Duffus seemed to assume that every aspect of PJD's roll-up strategy constituted "Proprietary Information."  (Tr. 603 [agreeing that "one of the six building blocks of this integrated suite is a roll-up strategy"]; Tr. 616 ["[T]his is really based on my understanding of what that roll-up strategy, maybe for lack of a better term, encompassed.  That the application of the four processes . . . yielded superior financial performance for PJD.  So PJD knew how to implement that information in a business and

---

[28]    Although Johnson testified that the 18% EBITDA margin disclosed to Sterling in February 2020 was anonymized (Tr. 216), this number appears identical to the EBITDA margin used later in the "Cost Stack Slide."  (Ex. 36 at TSG000222). Further, although Johnson testified that this 18% EBITDA margin was "rounded in different directions" and didn't "talk about market segments" (Tr. 216), it does not appear that Duffus accounted for these nuances.

how to generate financial results that, based on my analysis, exceeded industry, exceeded competitors, so on and so forth. The thesis behind the roll-up strategy then was they could identify companies where they thought they could similarly apply those processes to drive margins or increase margins and enhance value. So that's really how I viewed the application of the proprietary information, including within the context of the roll-up strategy."].) However, as recognized in the March 2024 summary judgment order, "the idea of creating a national drywall roll-up—or even the fact that PJD was considering doing so—are not Confidential Information as that term is defined in the NDA." (Doc. 206 at 33.) Additionally, as recognized in earlier portions of this order, many if not all aspects of PJD's roll-up strategy do not qualify as "Confidential Information" under the NDA because they are based on information that Sterling and/or Callahan independently knew or discovered. For example, the SAC alleges—and Duffus accepted—that one component of PJD's roll-up strategy was "the identity and personal contact information for several of the largest drywall industry targets in the United States." (Doc. 56 ¶ 60(a).) But as discussed in detail in earlier portions of this order, such information does not qualify as "Confidential Information" under the NDA for a host of reasons, including that Sterling and Callahan were independently responsible for identifying ConApp and Vatos as potential targets.[29]

81. As another example, one of the subcategories of "Proprietary Information" identified in the SAC, and which Duffus included in his valuation, is "PJD's ability to successfully structure its labor force with IRS Form W-2 employees (which DOL insists is necessary) to deal with the labor constrained market in the U.S. and legally hire more than 2,500 workers to address its customers increasing demands, instead of hiring 1099 independent contractors . . . ." (Doc. 56 ¶ 57(b).) However, as recognized in the March 2024 summary judgment order, "PJD's use of W-2 labor . . . models is not, alone, Confidential Information." (Doc. 206 at 35.) Additionally, as noted by Bayley, Duffus did not perform "any work to test whether this piece of information is protected by the NDA."

---

[29] Also, even assuming that some fraction of the information pertaining to those targets (such as contact information and EBITDA) might qualify as Confidential Information, Duffus made no attempt to calculate the value of those isolated pieces of information.

1  (Tr. 911.)

2      82.    As another example, some of the other subcategories of "Proprietary

3  Information" identified in the SAC include "PJD regulatory compliance" and "PJD's

4  ability to maintain national recognition for its regulatory compliance." (Doc. 56 ¶¶ 57(c),

5  57(d).)  However, PJD made no effort during trial to establish that it disclosed information

6  bearing on these topics to Sterling following execution of the NDA—perhaps there is some

7  document somewhere in the VDR index bearing on them, but the issue was not explored

8  or proved at trial—and it is unclear what these amorphous concepts even *mean*, let alone

9  how they could qualify as "Confidential Information" under the NDA.    At any rate, as

10  Bayley persuasively noted during his testimony at trial, Duffus made no effort to analyze

11  these components of the Proprietary Information.  (Tr. 912.)

12      83.    Although the Court could identify further examples of how Duffus's

13  conception of "Proprietary Information" is more expansive than the NDA's definition of

14  "Confidential Information," the bottom line, as Sterling correctly notes in its proposed

15  findings, is that Duffus "valued the wrong 'subject interest' and entirely failed to apportion

16  or assess value based on what specific information (if any) was actually protected by the

17  NDA." (Doc. 273 at 102.)  This error is critical because Sterling's liability theories under

18  §§ 2.1, 2.5, and 2.6 of the NDA turn on whether Sterling and/or its Representatives

19  wrongfully disseminated, misappropriated, or used "Confidential Information."  Because

20  Duffus made no attempt to calculate the value of the "Confidential Information"—instead,

21  he attempted to calculate the value of a more expansive collection of information known

22  as the "Proprietary Information"—his approach was flawed from inception.

23      84.    Duffus's approach also suffers from a second fundamental flaw.  Duffus only

24  sought to calculate the aggregate value of all of the information comprising the "Proprietary

25  Information" and made no attempt to value the individual components—or even the six

26  subcategories—separately.    (Tr. 548-49, 578, 582-83, 585.)    As a result, even if

27  "Proprietary Information" and "Confidential Information" were the same thing—and they

28  are not, for the reasons discussed above—Duffus's approach would only provide a useful

damages figure if PJD had established at trial that Sterling and/or Callahan had wrongfully disclosed, misappropriated, and/or misused each and every piece of Confidential Information that PJD had provided to Sterling.  After all, Sterling was entitled to receive Confidential Information under the NDA—it is only the subsequent misuse and improper disclosure of such material that is actionable under §§ 2.1, 2.5, and 2.6.

85.    Duffus's failure to calculate the individual value of particular categories of Confidential Information provides another reason why his approach fails to provide a permissible basis for assessing damages.  As noted in earlier portions of this order, PJD has only established (subject to the evaluation of Sterling's affirmative defenses) one breach of the NDA—Sterling violated § 2.1 of the NDA by disclosing the Customer Slide to Ratliff.  (*See* Conclusions of Law No. 24.)  However, Duffus made no attempt to individually value the Confidential Information that appeared in the Customer Slide.  (Tr. 578 [Duffus, agreeing that he "didn't do a valuation of any of those subcategories, if the Court wanted to know the value of a list of PJD's top customers"].)

86.    Indeed, even if PJD had prevailed on some of its other breach theories, the problem would remain.  Suppose, for example, the evidence at trial had established that the Target List qualified as "Confidential Information" (in which case Friese's emails to Ratliff on June 20, 2021 and July 1, 2021 would have been impermissible under §§ 2.1 and 2.5 of the NDA) or that Sterling had provided the Cost Stack Slide and Procurement Slide to Ratliff during the April 13, 2021 meeting or the May 7, 2021 meeting (in which case, assuming the information in those slides qualifies as "Confidential Information," the disclosures would have been impermissible under § 2.1 of the NDA).  Even if those additional breaches had been established, Duffus's testimony would still fail to provide any basis for determining the value of the specific pieces of Confidential Information that were improperly used or disclosed.  (Tr. 901 [Bayley, answering "He has not" to the question: "[I]f the Court concludes that only specific pieces of information give rise to liability in this case, has Mr. Duffus provided any information about the value of that subset of

1    information?"].)[30]

2        87.    The Ninth Circuit's decision in *Management & Engineering Technologies*

3    *Int'l, Inc. v. Information Systems Support, Inc.*, 490 F. App'x 30 (9th Cir. 2012),

4    underscores why Duffus's failure to individually value the subset of Confidential

5    Information that was actually misused or wrongfully disseminated was a critical error.

6    There, the plaintiff's expert in a trade secrets case "did not apportion value among the

7    legally valid and the legally invalid alleged trade secrets.  Rather, he testified about the

8    hypothetical negotiated price that ISS would have paid for *all* of the information alleged to

9    be trade secrets."  *Id.* at 34.  Because the Ninth Circuit determined that some of the

10   information the expert included in the valuation did not qualify as a trade secret, it

11   concluded that "the evidence was insufficient to support the amount of the jury's damages

12   award" and was "therefore compelled to vacate the damages award."  *Id.*

13       88.    In a related vein, the Court rejects PJD's argument that it was impermissible

14   for Sterling to limit the scope of Bayley's testimony to poking holes in Duffus's analysis

15   and that Sterling was required to have Bayley opine to a competing valuation figure.  (Doc.

16   268 at 71-72 ¶ 69 ["Sterling argues that some of the information valued by Mr. Duffus . . .

17   fell within the permissible bounds of the NDA.  But Sterling made the tactical decision not

18   to offer any evidence or testimony on the amount of any proposed reduction to the value

19   as calculated by Mr. Duffus.  [Because] PJD presented a reasonable approximation of the

20   unjust enrichment to Sterling and its Representatives, the burden was on Sterling to present

21   evidence to show that the true extent of the unjust enrichment was something less, which

22   it failed to do."].)  As Sterling correctly notes in its proposed findings, any such requirement

23   only arises in dissimilar contexts and only when, unlike here, the plaintiff has established

24   a reasonable approximation of loss or unjust enrichment.  (Doc. 273 at 112-14.)  For

25   

26   ───────────────

[30]    Likewise, although PJD has waived any "technical[]" argument that Callahan

27   violated § 2.1 of the NDA by disclosing to Ratliff certain "information about the Transaction" that was not "Confidential Information" (*see* footnote 26, *supra*), Duffus made no effort to quantify the value of the "information about the Transaction" that

28   Callahan disclosed (*i.e.*, the bare fact that PJD was considering pursuing a roll-up) and the Court easily concludes that information had no independent value.

example, although PJD emphasizes that, under comment a to § 352 of the Restatement (Second) of Contracts, "[d]oubts are generally resolved against the party in breach" (Doc. 268 at 69 ¶ 63), PJD ignores that the same comment also recognizes that "[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty" and that a breaching party "should not be allowed to profit from his breach where it is established that a significant loss has occurred." *Id.* Here, the overarching problem is that PJD has not come close to establishing that it suffered a significant loss or establishing, with reasonable certainty, the size of any loss (or the size of any unjust enrichment to Sterling).

89. Although the analysis could end there, Duffus's testimony was also insufficient to satisfy PJD's burden of proof for a third reason—the Court was wholly unpersuaded by his methodology.

90. Duffus began by conducting four different analyses purporting to test whether the "integrated suite" of information had any value. The first analysis involved comparing PJD's financial performance as measured by its diligence-adjusted EBITDA against an industry average for anonymous drywall and insulation contractors, which Duffus obtained from a publication called IBISWorld. (Tr. 550-52.) According to Duffus, this comparison showed that PJD's EBITDA performance "was in excess of industry by about 6 percent annually." (*Id.* at 552.) The second analysis involved evaluating Vatos's EBITDA margin before and after it was acquired by PJD. (*Id.* at 552-53.) According to Duffus, this analysis showed that, "with the exception of 2020," Vatos showed "an increase of 7.1 percent in that EBITDA margin following the acquisition." (*Id.* at 553.) The third analysis involved reviewing Sterling's anticipated post-acquisition EBITDA margin for PJD. (*Id.* at 553-54.) According to Duffus, this analysis showed that Sterling believed PJD's post-acquisition EBIDTA margin would be about "5.4 percent" higher than ConApp's post-acquisition EBIDTA margin. (*Id.* at 554.) The fourth analysis involved reviewing Sterling's anticipated EBITDA margins for the other companies that would be acquired as part of the roll-up. (*Id.* at 555.) According to Duffus, that analysis showed

"plus or minus about a 4 percent improvement in the EBITDA margin for those add-on acquisitions through the application of PJD's proprietary information in their businesses." (*Id.*)

91.    The Court agrees with Bayley that these methodologies do not confirm whether the "integrated suite" of Proprietary Information has value.  (Tr. 916-23.)  As Bayley persuasively explained, a range of factors can influence financial performance, such as a company's size, history, geography, management capabilities, name recognition, trade name, customer base, and technology.  (*Id.*)  Duffus's failure to account for those considerations was particularly significant here because, among other things, PJD was larger than most of its competitors and Johnson's leadership and management significantly contributed to PJD's success.  (Tr. 373 ["PJD is larger than your average competitor, and they have a buying advantage."]; *id.* 453 [Elliott: "Cole built a good business."].) Additionally, Duffus sometimes simply ignored contrary data that might undermine his conclusions—such as his decision to ignore Vatos's 2020 performance when performing his before-and-after calculations—and based other conclusions on Sterling's hypothetical projections about what would occur post-acquisition.

92.    In the next portion of his analysis, Duffus presented a pair of "with and without" models in an attempt to quantify the value of PJD's alleged superior financial performance over industry average.  In the first model, Duffus calculated the difference between PJD's diligence-adjusted EBITDA for the trailing 12-month period ending March 2021 (the "with" model) and the IBIS World industry average for a different period, 2020 (the "without" model), postulating that the resulting figure represented PJD's "margin differential . . . attributed to the proprietary information."  (Tr. 561.)  Duffus then multiplied that figure by PJD's diligence-adjusted revenue to find the "annual incremental EBITDA impact," and multiplied that figure by the EBITDA multiple that Sterling contemplated paying for PJD in the acquisition, resulting in a figure of $46.4 million.  (*Id.*) In the second model, Duffus took the difference between the EBITDA multiple that Sterling contemplated paying for PJD in the acquisition (the "with" model) and an

EBITDA multiple drawn from what a Sterling presentation proposed for certain hypothetical add-on acquisitions (as well as multiples contemplated for certain PJD acquisitions) (the "without" model) and multiplied that figure by PJD's diligence-adjusted EBITDA for the trailing 12-month period ending March 2021, to reach a result of slightly more than $45 million. (Tr. 562-63.) Duffus used these two models to reach his valuation calculation of $45.7 million. (Tr. 565.)

93. These methodologies are once again unpersuasive, most notably because they assume without analysis that any alleged superior performance (reflected in the higher EBITDA or EBITDA multiple) is entirely attributable to PJD's Proprietary Information, without accounting for possible alternative explanations and without attempting to analyze how the Proprietary Information results in any excess performance. The Court agrees with Bayley that assigning 100% of the difference in those metrics to PJD's Proprietary Information—without conducting any analysis to support that conclusion—is unpersuasive. (Tr. 893, 930-32.) As Bayley persuasively explained, Duffus "conducted no analysis of the comparability" of the IBIS World industry average and thus failed to account for other factors aside from the Proprietary Information that may drive the performance differential. (Tr. 930.) Likewise, when Duffus compared the EBITDA multiple contemplated for the purchase of PJD to the lower benchmark multiple for add-on acquisitions, he improperly "assume[d] that the sole reason for that difference . . . is due to PJD's proprietary information," even though there are other differences between PJD and the add-on acquisitions that would likely drive the differential. (Tr. 930-32.)

94. As Sterling correctly argues in its proposed findings, "an example illustrative of the flaws in this approach" is that "although Mr. Duffus's analysis assumes that the difference between the EBITDA multiple offered to PJD and that contemplated for add-on acquisitions was solely due to PJD's 'Proprietary Information,' Sterling offered the same deal multiple to both PJD and ConApp. Mr. Duffus was not able to describe any work that he did to discern the reason for that—instead, he relied on PJD's representation that the reason was that ConApp wanted 'parity.' As Mr. Bayley explained, the fact that ConApp

was offered the same multiple would—applying Mr. Duffus's logic—mean that ConApp had its own valuable proprietary information (or if it didn't, that PJD's multiple is not due to its proprietary information)." (Doc. 273 at 119.)

95.     As the final step in his methodology, Duffus attempted to "corroborate" the reasonableness of his damages calculation in several ways. First, Duffus compared his calculation against a total "intangible asset value" that he calculated to be included in Sterling's contemplated purchase of PJD. (Tr. 565.) Duffus calculated that "intangible asset value" by subtracting from Sterling's contemplated purchase price for PJD what he calculated to be the book value of PJD's tangible assets included in the contemplated transaction. (Tr. 558-59.) Duffus testified that, because his damages calculation was approximately 52% of the resulting calculation for the "intangible asset value" in the transaction, his damages calculation left room for other "elements of intangible value" in the transaction, thus purportedly supporting its reasonableness. (Tr. 565-66.)

96.     Even assuming Duffus conducted this subtraction exercise correctly, his assessment provides little useful information because he made no effort to assign a specific value to any of PJD's other intangible assets contemplated in the sale, such as Cole Johnson's management and PJD's brand name in its region. (Tr. 935.) Without such a calculation, the fact that Duffus's valuation of the Proprietary Information does not subsume his entire calculated value for intangible assets fails to provide any meaningful check on the primary valuation.

97.     As another purported corroboration exercise, Duffus utilized a "franchise framework" that considered Con App as "a licensee" and applied a royalty rate against the entirety of Con App's 2021 net sales. (Tr. 567.) Duffus then applied a capitalization rate to translate that purported income stream into value, reaching a result of $49.5 million. (Tr. 567-68.)

98.     The Court agrees with Sterling that the "franchise framework" utilized by Duffus "does not corroborate the reasonableness of Mr. Duffus's damages valuation, nor would it serve as a reliable and relevant damages model in any event." (Doc. 273 at 122.)

Most important, and as Bayley persuasively explained, Duffus's approach assumes that "all of Con App's net sales are driven by the use of PJD's proprietary information." (Tr. 938.) This approach is unpersuasive because ConApp has been in business for decades and made sales and income before it ever became engaged with Sterling or met PJD. As Sterling correctly argues in its proposed findings, "Duffus provided no explanation of why a company with an established track record would be interested in licensing the entire business model of a competitor. To imply that every single cent of ConApp's 2021 earnings was due to the use of PJD's proprietary information is facially unreasonable." (Doc. 273 at 124.) Notably, Duffus did no analysis to determine how, for example, ConApp's and PJD's customer models differed; he did not study ConApp's labor model or operations model; and he could not identify the difference between the two companies' distributor and manufacturer models. (Tr. 599-601.)

99. As a last purported corroboration exercise, Duffus testified that his damages calculation was "corroborated by the additional $5 million that PJD had to pay to acquire" Vatos. (Tr. 547.) The Court has little trouble concluding that the details of the Vatos acquisition have no bearing on the reasonableness of Duffus's $45.7 million valuation opinion. Putting aside the fact, as discussed in more detail below, that PJD has not presented sufficient evidence to prevail on its $5 million damages theory related to the Vatos acquisition, that theory is predicated on the notion that Callahan's improper inquiry created negotiating leverage that enabled Vatos to squeeze PJD for another $5 million. Duffus made no attempt to explain how the existence of this negotiating leverage, or Callahan's decision to reach out to Vatos, has any bearing on the process of assigning a discrete value to PJD's Proprietary Information.

100. Duffus's approach was also unpersuasive because he failed to account for other factors that would affect (and likely diminish) the value of the Proprietary Information. Most notably, Duffus did not assess the impact of PJD's non-disclosure agreements with other private equity firms and potential buyers, even though the protections that PJD utilized for that information—some of which were relatively short in

duration—would affect the value of the Proprietary Information.  (Tr. 914.)  In a related vein, Duffus did no work to determine if any of the specific pieces of information become stale and thus lose value over time —instead, he incorrectly assumed that the information had an "indefinite life."  (Tr. 909.)

101.    For all of these reasons, the Court concludes that Duffus's valuation opinions are unpersuasive and that PJD has accordingly failed to meet its burden of substantiating its claim for $45.7 million in damages arising from Sterling's alleged misuse and/or wrongful disclosure of Confidential Information in violation of the NDA.  In reaching this conclusion, the Court acknowledges—as PJD emphasizes in its proposed findings (Doc. 268 at 68-69 ¶¶ 62-63)—that the value of confidential information is often difficult to ascertain with certainty and that a lack of certainty will not preclude recovery.  *Cf. Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 720 (Tex. 2016) ("In trade-secret cases, a measure of uncertainty is tolerated, and to an extent, unavoidable.").  Additionally, as discussed in more detail above (*see* Conclusions of Law No. 88), "[d]oubts are generally resolved against the party in breach" when calculating contract damages.  Nevertheless, even assuming Arizona would follow the rule that "the plaintiff need only demonstrate the extent of damages as a matter of just and reasonable inference, even if the extent is only an approximation," *Sw. Energy Prod. Co.*, 491 S.W.3d at 712 (cleaned up), PJD has not come close to providing a just and reasonable approximation of the value of the Confidential Information that Sterling is alleged to have wrongfully disclosed and/or misused (let alone the Confidential Information that Sterling was actually shown to have wrongfully disclosed and/or misused).  PJD chose to present one and only one valuation figure, $45.7 million, and that figure is not in the ballpark of a just and reasonable approximation.  It follows that PJD cannot prevail on Count Five.  *See, e.g.*, *Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004) (reversing the trial court for "reliev[ing] plaintiffs of their burden of establishing damages as an essential element of their breach-of-contract claim"); *Aspen Biotech Corp. v. Wakefield*, 2021 WL 3503399, *21 (Ariz. Ct. App. 2021) (if "an essential element of the Contract Claims—damages—would be missing . . . the court would be

1    required to dismiss the claims based on [the] inability to make a *prima facie* case for either

2    claim"); *Aubuchon v. Maricopa County*, 2020 WL 7024677, *4 (Ariz. Ct. App. 2020) ("In

3    summary, [Plaintiffs] presented no evidence that would create a genuine issue of fact on

4    two essential elements—breach and damages—of their contract claim.  The superior court,

5    therefore, correctly granted summary judgment for the County on this claim.") (cleaned

6    up).

7        102.    Sterling asks the Court to go beyond merely rejecting the persuasiveness of

8    Duffus's opinions and to take the additional step of excluding Duffus's opinions pursuant

9    to Rule 702.  (Doc. 247; Doc. 273 at 99-102.)  The Court declines to take this additional

10   step.  "[W]here the factfinder and the gatekeeper are the same, the court does not err in

11   admitting the evidence subject to the ability later to exclude it *or disregard it* if it turns out

12   not to meet the standard of reliability established by Rule 702."  *In re Salem*, 465 F.3d 767,

13   777 (7th Cir. 2006) (emphasis added).  In its capacity as factfinder, the Court has now

14   chosen to disregard Duffus's damages opinions.  In doing so, the Court has effectively

15   ruled in Sterling's favor on the issue of damages.  This makes it unnecessary for the Court

16   to go further, reprise its role of gatekeeper, and determine whether the flaws that rendered

17   Duffus's testimony unpersuasive were so grave as to warrant exclusion under Rule 702.

18                ii.    $5 Million Based On The Vatos Transaction

19       103.    PJD's second damages theory relates to the Vatos transaction.  In a nutshell,

20   PJD argues that because Callahan violated the NDA through his inquiries to Vatos, which

21   had the effect of causing PJD to pay $40 million for Vatos rather than $35 million, and

22   because Sterling is responsible for Callahan's breaches pursuant to § 2.6 of the NDA,

23   Sterling must pay $5 million in damages based on the increased purchase price.  (Doc. 268

24   at 45-47 ¶¶ 154-64.)

25       104.    This theory requires little additional discussion in light of the findings and

26   conclusions reached in earlier portions of this order.  As an initial matter, PJD has not

27   established any breach of the NDA that would support this theory—Sterling and Callahan

28   were responsible for identifying Vatos as a potential target; Vatos's status as a potential

acquisition target does not qualify as Confidential Information; and Callahan's decision to reach out to Vatos was based on beliefs and information that were independent from any of PJD's Confidential Information.  (*See* Conclusions of Law No. 69.)

105.    At any rate, PJD has also failed to establish causation in relation to this theory.  As noted, "Callahan's inquiry did not have any causal effect on the $5 million increase in the purchase price" because "the Vatos owners would not have agreed to sell their company to PJD (or anybody else) for anything less than $40 million."  (*See* Findings of Fact No. 123.)

D.    **Other Remedies**

106.    In its proposed findings, PJD seeks several other remedies as an alternative to, or in addition to, its request for an award of $50.7 million in contract damages.

i.    Nominal Damages And Court Costs

107.    First, PJD requests an award of nominal damages and court costs.  (Doc. 268 at 73 ¶ 74.)  PJD contends it is entitled to these remedies because "Sterling clearly breached the contract and PJD brought this case in good faith to protect its Confidential Information, stop a competing roll up, and prove damages."  (*Id.*)  Sterling opposes this request.  (Doc. 273 at 73 n.30, 134.)

108.    Although their briefing on the topic is not entirely clear, the parties seem to agree that, under Arizona law, nominal damages are only available in a contract action where the plaintiff has established both breach and the *fact* of damages/injury and has simply failed to establish the *amount* of damages with reasonable certainty.  (Doc. 268 at 73 ¶ 74 [PJD's argument that "[e]ven if the Court had found the precise amount of such damages is not reasonably ascertainable, PJD is still entitled to a 'judgment for nominal damages.'"]; Doc. 273 at 134 [Sterling's argument that "[n]ominal damages are awarded where actual damages are slight or difficult to calculate . . . [b]ut the availability of nominal damages does not eliminate the requirement that Plaintiffs show they have suffered (or will suffer) an injury some kind"].)  The Court's independent research suggests that Arizona does, indeed, follow this approach.  *See, e.g.*, *Edwards v. Anaconda Co.*, 565 P.2d 190, 194

(Ariz. Ct. App. 1977) ("Edwards' damages due to his loss of use of the data from the time of breach to the present were indefinite and cannot be estimated accurately. The award of nominal damages was thus correct on this point."); *Premier Consulting and Mgmt. Solutions, LLC v. Peace Releaf Center I*, 544 P.3d 658, 669 (Ariz. Ct. App. 2024) (noting that, under Arizona's model jury instructions for breach-of-contract actions, "[i]f you find that [defendant] breached the [contract] but that [plaintiff] did not prove damages with reasonable certainty, then you may award nominal damages to [plaintiff] (such as $1.00)"). Thus, the Court will apply the parties' agreed-to legal standard. *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (discussing the principle of party presentation).[31]

109.    As discussed, PJD has established one breach of the NDA—Sterling breached § 2.1 of the NDA by disclosing the Customer List to Ratliff—but was unable to prove the resulting damages. In the Court's view, this was not simply a failure to prove the damages associated with that breach with reasonable certainty—rather, the Court is unpersuaded that PJD sustained any injury whatsoever from this isolated disclosure. For that reason alone, PJD is not entitled to nominal damages based on that incident.[32]

110.    Nominal damages are also unavailable for a different reason. Sterling has raised a variety of affirmative defenses to liability. (Doc. 273 at 143-52.) If Sterling prevailed on those defenses, nominal damages would be unavailable. *Cf. Henderson v. Franklin*, 782 F. App'x 866, 874 (11th Cir. 2019) ("There is no question that a party in

---

[31]    The Court notes that although some jurisdictions appear to "permit nominal damages awards based on a showing of breach alone," others "require[] a showing of actual damages." *CarmelCrisp, LLC v. Putnam*, 2023 WL 422892, *5 (N.D. Ill. 2023). As discussed above, the parties agree (and the Court's research indicates) that Arizona follows the latter approach.

[32]    For the same reason, the Court would have declined to award nominal damages with respect to some of PJD's other unsuccessful breach theories. For example, although the Court has now found that the disclosure of versions 11 and 12 of the Target List did not violate the NDA (because those documents do not qualify as "Confidential Information"), the Court is also unpersuaded that PJD suffered any injury from those disclosures. Likewise, even if Friese had presented the Cost Stack Slide and the Procurement Slide to Ratliff during the meeting on April 13, 2021, the Court is unpersuaded that PJD would have suffered any injury from those disclosures. And again, as for PJD's now-waived theory regarding Callahan's "technical[]" violation of the portion of § 2.1 barring the disclosure of any "information about the Transaction" (*see* footnote 26, *supra*), the Court is unpersuaded that PJD suffered any injury from that disclosure.

whose favor the district court granted summary judgment is a prevailing party for purposes of Rule 54(d)(1).  And that rule applies even if the party prevailed on an affirmative defense.") (cleaned up).  As relevant here, Sterling contends that "[i]n response to PJD's claim that Sterling breached the NDA by . . . sharing the Customer Slide, Sterling contends that PJD's claim is barred by estoppel, waiver, and ratification."  (Doc. 273 at 143.)[33]  In support, Sterling relies on Johnson's admission that he "reluctantly acquiesced" in Sterling's proposed plan to share the Customer Slide with Ratliff.  (*Id.*)  PJD disagrees, arguing that (1) under § 12 of the NDA, the parties could only amend or waive the protections created by the NDA "by a written agreement signed by both parties," and Johnson's oral acquiescence does not qualify as a written agreement; and alternatively (2) "the evidence shows that Sterling repeatedly represented to PJD that it was acting in accordance with the NDA to protect the PJD Confidential Information and PJD relied upon those assurances," so "Sterling's argument that PJD waived some right under the NDA or acquiesced to some breach of the agreement from having relied upon the representations of Sterling is without legal or factual basis."  (Doc. 268 at 64-65 ¶¶ 51-52.)

111.    PJD's first argument turns on the applicability of § 12 of the NDA, under which the parties agreed that the NDA "may not be modified or amended and no provision hereof may be waived, in whole or in part, except by a written agreement signed by the parties hereto.  No waiver of any breach or default hereunder shall be considered valid unless in writing, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature."  (*See* Findings of Fact No. 18.)  Although the parties have not briefed the issue in any depth and Arizona law is not entirely clear on the subject, Arizona appears to follow the rule that even when, as here, a contract "contains an antiwaiver clause[] which provides that any waiver of a contractual right . . . is invalid unless done in a signed writing," "[a] breach of contract can be waived through conduct notwithstanding the presence of [that] antiwaiver clause."  *Reliance Hospitality LLC v.*

---

[33]    Sterling raises a variety of affirmative defenses to PJD's other breach theories, but it is unnecessary to resolve the parties' arguments regarding those affirmative defenses because they address breach theories that have now been rejected on the merits.

*5251 S. Julian Drive LLC*, 2024 WL 989827, *2 (D. Ariz. 2024).   *See also Haz-Mat Response Techs., Inc. v. Oxnard Commerceplex, LLC*, 2023 WL 4198068, *5 (Ariz. Ct. App. 2023) ("[D]espite a non-waiver provision requiring all waivers be in writing and signed by the waiving party, a party may waive its expectation of strict performance through conduct.").   This also appears to the "general rule" followed in some other jurisdictions.  13 Williston on Contracts § 39:36 (4th ed. May 2024 update) ("The general view is that a party to a written contract can waive a provision of that contract by conduct despite the existence of a so-called antiwaiver or failure to enforce clause in the contract. . . .   This general rule, that a party to a written contract may waive a provision despite the existence of an antiwaiver or failure to enforce clause, is based on the view that the nonwaiver provision itself, like any other term in the contract, is subject to waiver by agreement or conduct during performance."); *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198, 202 (7th Cir. 1985) ("Article XXXIV of the Subcontract expressly provides that 'provisions of this contract [cannot] be waived except by an express waiver in writing.'  Since there is no writing waiving this 'Waiver Only in Writing' provision, or any other Subcontract provision, Article XXXIV would seem to preclude a finding of waiver.  However, the weight of the authority in Illinois holds that Waiver Only in Writing provisions can be waived by words and deeds of the parties, so long as the waiver is proved by clear and convincing evidence.").[34]  Given these principles, Sterling is not foreclosed, under § 12 of the NDA, from relying on Johnson's oral statement

---

[34]       The Court acknowledges that not all jurisdictions seem to follow this rule.  *Rybovich Boat Works, Inc. v. Atkins*, 587 So. 2d 519, 521-22 (Fla. Ct. App. 1991) ("Seller was entitled to a summary judgment, unless there was an issue of material fact as to the affirmative defenses raised by buyer.  The buyer claimed that through the course of dealings between the parties and the numerous extensions seller waived or was estopped to enforce the time of the essence clause.  Although such time of the essence provisions [generally] may be waived by the conduct of the parties, . . . this contract contained an anti-waiver provision which provided . . . [that] no waiver of any rights or obligations hereunder shall be deemed to have occurred unless in writing signed by the party against whom such waiver is asserted . . . .   Thus under the anti-waiver provision of this agreement the time of the essence provision could not have been waived unless there was a writing signed by the party against whom the waiver was asserted.") (citations omitted).  Nevertheless, as noted above, there is significant evidence that Arizona follows this rule and PJD has not cited any Arizona authority suggesting otherwise.

as the basis for raising affirmative defenses to PJD's breach-of-contract claim premised on the disclosure of the Customer Slide to Ratliff.

112.    The next question is whether Sterling should prevail on those affirmative defenses on the merits.  The Court will begin with the affirmative defense of waiver because it is dispositive.  Under Arizona law, "[w]aiver is either the express, voluntary [or] intentional relinquishment of a known right or such conduct as warrants an inference of such an intentional relinquishment." *Am. Cont. Life Ins. v. Ranier Const. Co., Inc.*, 607 P.2d 372, 374 (Ariz. 1980).  *See also State, ex rel. Horne v. Campos*, 250 P.3d 201, 206 (Ariz. Ct. App. 2011) ("As a general matter, any litigant . . . can waive by conduct its right to object to an adverse party's failure to comply with . . . contractual . . . requirements."); *Concannon v. Yewell*, 493 P.2d 122, 123 (Ariz. Ct. App. 1972) ("It is, of course, true that one party may waive any provision of a contract made for his benefit.  The courts of this state have repeatedly held that the essential element in the defense of waiver is the voluntary and intentional relinquishment of a known right.  Waiver need not be expressed but may be inferred from conduct and is therefore a question of fact to be determined by the trial court.") (citations omitted).  Here, the elements of waiver are satisfied because PJD, through Johnson, voluntarily and intentionally relinquished its right to maintain the confidentiality of the Customer Slide in relation to ConApp (as otherwise created by § 2.1) by expressly acquiescing in Sterling's proposal to share the Customer Slide with Ratliff during the May 7, 2021 meeting.  (*See* Findings of Fact No. 71.)  Although Johnson's acquiescence may have been "reluctant[]," it was still express and unqualified.[35]  Nor was this the only instance of PJD's acquiescence.  Following the meeting with Ratliff, PJD never asked ConApp to enter into an agreement to protect the information shared during that meeting.  (Doc. 267-4 at 32 [Ratliff deposition at 292-93].)  PJD also continued to

---

[35]    PJD seems to suggest (Doc. 268 at 64-65 ¶ 51) that this outcome is inconsistent with the observation in the March 2024 summary judgment order that "nothing in the NDA suggests that PJD somehow forfeits its contractual rights by failing to make contemporaneous objections to improper disclosures" (Doc. 206 at 34-35).  The Court disagrees—Johnson did not merely fail to object, but affirmatively consented to the disclosure to Ratliff.

correspond with ConApp after that meeting, including sharing information about PJD's customers.  (*Id.* at 37-38 [Ratliff deposition at 303-06]; Ex. 299 at PJD034474 [Blevins's notes from call with ConApp's Tom Healy on May 14, 2021].)  Taken together, these episodes qualify as clear and convincing evidence of waiver.  Thus, for this additional reason, PJD is not entitled to nominal damages.

113.    Because PJD is not entitled to nominal damages, PJD is also not entitled to court costs, which may be awarded as a matter of discretion only where nominal damages are also awarded.  *See* Restatement (Second) of Contracts § 346, cmt. b ("[In] instances in which loss is caused but recovery for that loss is precluded because it cannot be proved with reasonable certainty . . . the injured party will nevertheless get judgment for nominal damages, a small sum usually fixed by judicial practice in the jurisdiction in which the action is brought.  Such a judgment may, in the discretion of the court, carry with it an award of court costs.").  Furthermore, even if court costs were potentially available, the Court would decline in its discretion to award them.  Under the above-quoted comment to § 346 of the Restatement, "[c]osts are generally awarded if a significant right was involved or the claimant made a good faith effort to prove damages, but not if the maintenance of the action was frivolous or in bad faith."  It would be one thing if PJD had prevailed on many or even a substantial subset of its breach theories in this action.  Instead, PJD established only one breach of the NDA related to one discrete category of Confidential Information—the identities of PJD's top 10 customers and the revenues associated with those customers set forth in the Customer Slide—and that breach theory is barred by the affirmative defense of waiver.  Additionally, even if that affirmative defense weren't applicable, the information in the Customer Slide is not worth anything close to $45.7 million.  Nor would a dispute over such a relatively minor breach justify the massive resources that went into trying this case, in which both sides were represented by excellent teams of experienced attorneys (many from out of state) over the course of two trial weeks.  PJD was largely responsible for the massive scope of the trial (and resulting expense) because it chose to pursue unsupported and overly expansive liability and damage theories.

Similarly, although PJD contends it was forced to file this lawsuit "to stop a competing roll up," the Court rejects that premise because, as discussed at length in earlier portions of this order, Sterling and Callahan were not violating the NDA through their pursuit of competing roll-up strategies.

ii.    Consequential Damages

114.    Next, PJD asserts that "Sterling's and its Representatives' failures to comply with the NDA resulted in other consequential damages and harm to PJD as well, including PJD's having to pursue this litigation and PJD having to deal with an industry competitor that otherwise would not have existed."  (Doc. 268 at 51 ¶ 174.)  PJD seems to suggest it is only seeking these consequential damages in relation to its tort claim in Count Nine.  (*Id.* at 73 ¶ 73.)

115.    Regardless, PJD is not entitled to an award of consequential damages—it did not prevail on its breach of contract claim and has made no effort to quantify the unspecified consequential damages it is seeking (let alone present evidence in support of them).  *See generally Seekings v. Jimmy GMC of Tucson, Inc.*, 638 P.2d 210, 216 (Ariz. 1981) (explaining that "consequential" damages are "those damages *caused by a breach of contract* or warranty that can reasonably be supposed to be within the contemplation of the parties at the time of the contracting.") (emphasis added); *Walter v. F.J. Simmons & Others*, 818 P.2d 214, 221 (Ariz. Ct. App. 1991) ("[A]lthough Walter may have presented evidence of the fact that he suffered damage that could be deemed consequential, he presented absolutely no evidence from which a jury could reasonably compute the amount of this damage.  Consequently, we believe the trial court reasonably concluded that the award of consequential damages was not supported by the evidence.").

iii.    Declaratory Relief

116.    Next, PJD contends that because "[t]he evidence shows that Sterling breached Section 2.1 and 2.5 of the NDA and that it is responsible under Section 2.6 of the NDA for its Representatives' breaches of the NDA," PJD "is entitled to a declaratory judgment that Sterling and its Representatives breached their obligations under the NDA."

1    (Doc. 268 at 65-66 ¶¶ 53-54.)  This is effectively the same relief sought in Count One of

2    the SAC.  (Doc. 56 ¶ 98 ["Plaintiffs respectfully request that the Court declare . . . that

3    Sterling has materially breached the NDA . . . ."].)

4          117.    Sterling opposes PJD's request for declaratory relief on three grounds: (1) to

5    the extent Count One is intended to function as a standalone claim, it fails because a

6    declaratory judgment is a "remed[y], not separate cause[] of action"; (2) any "request for a

7    declaratory judgment is redundant of PJD's other claims, including for breach of contract";

8    and (3) on the merits, "PJD is not entitled to a declaratory judgment that the NDA was

9    breached."  (Doc. 273 at 73 & n.30.)

10          118.    PJD is not entitled to declaratory relief for the reasons identified by Sterling.

11    First, Count One is not a proper cause of action, at least where, as here, it simply seeks a

12    declaration concerning some of the merits issues being raised in other causes of action.

13    *See, e.g.*, *Staren v. Clarivate Analytics (US), LLC*, 2025 WL 40767, *5 (D. Ariz. 2025)

14    ("[T]he validity of [certain contractual provisions] is intertwined with the merits of

15    Plaintiff's [contract-based claims] in Counts One and Two of the complaint.  Those

16    considerations counsel against issuing independent declaratory relief as to the narrow

17    issues raised in Count Three."); *Schultz v. BAC Home Loans Servicing, LP*, 2011 WL

18    3684481, *4 (D. Ariz. 2011) ("To the extent that the Plaintiff's complaint seeks to raise an

19    independent cause of action for declaratory relief [to resolve the construction or validity of

20    a written contract], that claim also fails.  Declaratory relief is a remedy for underlying

21    causes of action . . . not a separate cause of action.").  Second, and more broadly, a federal

22    court need not entertain a request for declaratory relief where, as here, the requested

23    declaration "would not resolve the entire case or controversy as to any [plaintiff] but would

24    merely determine a collateral legal issue governing certain aspects of their pending or

25    future suits."  *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998).  *See also Gov't Emps. Ins.

26    Co. v. Dizol*, 133 F.3d 1220, 1223 (9th Cir. 1998) ("This determination is discretionary, for

27    the Declaratory Judgment Act is deliberately cast in terms of permissive, rather than

28    mandatory, authority.  The Act gave the federal courts competence to make a declaration

of rights; it did not impose a duty to do so.") (cleaned up); *Goodrich & Pennington Mortgage Fund, Inc. v. Chase Home Fin., LLC*, 2008 WL 11338041, *3 (S.D. Cal. 2008) (holding that requested declarations on the same issues presented by other claims were "redundant and unwarranted").  Third, at any rate, at least the first part of PJD's request for declaratory relief—that is, for a declaration that Sterling "breached Section 2.1 and 2.5 of the NDA"—fails on the merits because PJD has not established that such breaches occurred.

### iv.    Injunctive Relief And Specific Performance

119.    Last, PJD seeks an order "requiring Sterling to perform its obligations under the NDA, including the obligation to direct its Representatives to comply with the terms of the NDA, and to remain liable for any failure of its Representatives to do so."  (Doc. 268 at 66 ¶ 58.)  "Further, to the extent that any PJD Confidential Information remains in the possession of Sterling or its Representatives and has not been properly returned (or destroyed at the conclusion of this litigation) as required by the NDA, such information was subject to the terms of the NDA pursuant to Section 4, and Sterling is directed to return to PJD or destroy at the conclusion of this litigation all PJD Confidential Information and documents containing PJD Confidential Information and to ensure that its Representatives Callahan and Con App have returned to PJD or destroyed at the end of this litigation all PJD Confidential Information and documents containing PJD Confidential Information."  (*Id.* at 66-67 ¶ 59.)  These are effectively the same forms of relief sought in Counts Two and Three of the SAC—*i.e.*, injunctive relief and specific performance.  (Doc. 56 ¶¶ 109, 116.)

120.    Sterling opposes these requests.  As an initial matter, Sterling argues that to the extent Counts Two and Three are intended to function as standalone claims, they fail because "specific performance[] and injunctive relief are remedies, not separate causes of action."  (Doc. 273 at 73 & n.30.)  Next, and more broadly, Sterling argues that PJD is not entitled to any form of equitable relief because it did not prevail on its breach-of-contract claim (or any of its other claims).  (*Id.* at 134.)  Next, Sterling argues that PJD would not,

at any rate, be entitled to specific performance regarding the obligation to "direct" Representatives to comply with the NDA because (1) that obligation expired after two years, pursuant to § 13 of the NDA, and more than two years have elapsed since the NDA was executed; (2) Sterling is not pursuing any acquisitions in the drywall industry; and (3) Sterling has effectively directed Callahan to comply with the NDA.  (*Id.* at 134-36.) Finally, as for PJD's request for an order requiring Sterling to return or destroy all outstanding Confidential Information, Sterling argues that under § 4 of the NDA it was only required to return or destroy Confidential Information upon receipt of a written request by PJD, that PJD did not provide such a written request until March 2, 2022 (by which point this litigation was already pending), and that Sterling was precluded from complying with that request "due to its ongoing obligation to preserve all relevant information, including Confidential Information, for the purpose of defending itself in this legal proceeding."  (*Id.* at 66 ¶ 210.  *See also id.* at 94, 151.)

121.    PJD is not entitled to the requested forms of specific performance and injunctive relief.  As an initial matter, Counts Two and Three are not proper standalone claims and PJD fails to explain how it could be entitled to the requested equitable remedies where it has lost on its underlying claims.  *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1167 (9th Cir. 2015) (noting that "[s]pecific performance is a remedy associated with breach of contract" and quoting, with approval, a treatise's observation that "specific performance ordinarily cannot lie until there has been a breach of contract") (citations omitted); Restatement (Second) of Contracts § 357, cmt. a ("An order of specific performance . . . is seldom granted unless there has been a breach of contract . . . .").  At any rate, as for the request to require Sterling to "direct" Callahan to comply with the NDA, the Court has already found that Sterling satisfied that requirement.  (*See* Conclusions of Law ¶ 15.)  Additionally, PJD has conspicuously failed to respond to Sterling's argument that any "direction" requirement has now expired.  Finally, PJD has failed to establish any violation of Sterling's duty to return or destroy Confidential Information given that the only written request came in

1  March 2022, after PJD initiated this lawsuit, and PJD simultaneously demanded in the same

2  document that Sterling preserve evidence for use in litigation.  (Ex. 273.)

3  III.    Breach Of Implied Covenant (Count Six)

4      122.    PJD's second remaining claim is that Sterling should be liable for breach of

5  implied covenant of good faith and fair dealing, as alleged in Count Six of the SAC.

6      123.    The covenant of good faith and fair dealing, which is a term implied in all

7  contracts, "prohibits a party from doing anything to prevent other parties . . . from receiving

8  the benefits and entitlements of the agreement." *Wells Fargo Bank v. Ariz. Laborers,*

9  *Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 28 (Ariz. 2002).

10  A party breaches the implied covenant by denying the other party the "reasonable

11  expectation[s]" of the contract.  *Great W. Bank v. LJC Dev., LLC*, 362 P.3d 1037, 1046

12  (Ariz. Ct. App. 2015).  "A party can breach the implied covenant of good faith and fair

13  dealing without breaching an express provision of the underlying contract."  *United*

14  *Dairymen of Ariz. v. Schugg*, 128 P.3d 756, 760-61 (Ariz. Ct. App. 2006).

15      124.    PJD's theory of liability concerning Count Six is that "[t]he purpose of the

16  NDA was to protect and preserve the confidentiality of PJD's Confidential Information

17  that PJD was agreeing to share with Sterling and its Representatives for the sole purpose

18  of allowing Sterling to evaluate, negotiate and consummate an acquisition of PJD.  PJD

19  had a reasonable expectation that its Confidential Information would be protected by

20  Sterling and its Representatives and would be used solely for purposes of Sterling's

21  acquisition of PJD.  Sterling's actions in failing to protect PJD's Confidential Information

22  and failing to direct persons with whom it shared PJD's Confidential Information to protect

23  the confidentiality of such information deprived PJD from receiving the benefits and

24  entitlements it was owed under the NDA."  (Doc. 268 at 63 ¶¶ 46-47.)

25      125.    Sterling denies liability in relation to Count Six, arguing:

26  Sterling acted fairly and in good faith based on the circumstances it faced
27  during its consideration of a transaction with PJD.  Sterling did not engage
    in conduct to prevent PJD from receiving the reasonably expected benefits
28  of the NDA—under which Sterling genuinely considered a transaction with

PJD and engaged Representatives to assist it in its evaluation. The Court has seen no evidence that Sterling did not actually evaluate and consider acquiring PJD—the benefit of Sterling receiving information under the NDA—and the record shows that Sterling genuinely evaluated PJD for the transaction. While PJD may now have complaints about Sterling's conduct regarding Callahan and ConApp as it related to the national drywall roll-up thesis, the sharing of the thesis had no bearing on whether Confidential Information remained confidential and free from disclosure. This is not a case where PJD alerted Sterling to the confidential nature of certain information and then Sterling ignored PJD's comments or concerns—as Johnson testified, he willingly participated in the joint meeting and sharing of information with Callahan and ConApp. And for at least the joint meeting in Houston on May 7, 2021, PJD's conduct appeared welcoming and permissive as to the information that was shared that day. In fact, the evidence shows that Sterling sought PJD's input on what to share, how to share, and whether PJD was comfortable sharing information. . . . Sterling was genuinely considering the transaction with PJD and its sharing of information during that time frame with Callahan and ConApp (whether Confidential Information or not) was not intended to prevent PJD from the benefits of its bargain, particularly when all the parties had hoped to be joined into one company by end of it all.

(Doc. 273 at 137-38.) Additionally, Sterling argues that some of PJD's criticisms are foreclosed by the express terms of the NDA and that PJD has not established damages in relation to Count Six. (*Id.* at 138-39.)

126. For all of the reasons stated by Sterling, PJD has failed to establish an entitlement to relief on Count Six. The Court is not persuaded that Sterling did anything to prevent PJD from receiving the benefits and entitlements of the NDA. Additionally, for all of the reasons stated in relation to Count Five, PJD has not established damages or an entitlement to nominal damages, court costs, consequential damages, declaratory relief, specific performance, or injunctive relief. These analyses apply equally to PJD's claim for breach of the implied covenant.

## IV. Unfair Competition (Count Nine)

127. PJD's final remaining claim is that Sterling should be liable for unfair competition, as alleged in Count Nine of the SAC.

128. "In Arizona, the common law doctrine of unfair competition encompasses

several tort theories, such as trademark infringement, false advertising, palming off, and misappropriation." *ACT Grp. Inc. v. Hamlin*, 2012 WL 2976724, *6 (D. Ariz. 2012) (cleaned up). As relevant here, the "[i]nformation misappropriation" theory of unfair competition "consists of . . . disclosures or use of information of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the information . . . was acquired under circumstances giving rise to a duty to maintain its secrecy or limit it use or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." *Id.* at *7 (cleaned up). "[A]n unfair competition claim must either show that the plaintiff was engaged in competitive business with the defendant or that the defendant's actions were likely to produce public confusion." *Joshua David Mellberg LLC v. Will*, 96 F. Supp. 3d 953, 984 (D. Ariz. 2015).

129.    PJD's theory of liability concerning Count Nine is that "Sterling engaged in unfair competition" because "Sterling had a duty to maintain the secrecy and limit its use of PJD's Confidential information consistent with the NDA. Yet, Sterling improperly disclosed and used PJD's Confidential Information to pursue a national drywall roll-up with Callahan and Con App and in competition with PJD." (Doc. 268 at 64 ¶ 50.)

130.    Sterling argues that, as an initial matter, Count Nine is displaced by the Arizona Uniform Trade Secrets Act ("AUTSA") because PJD has never "distinguish[ed] between information that may qualify as trade secrets and may not qualify as trade secret." (Doc. 273 at 140.) Alternatively, Sterling argues that Count Nine fails on the merits because (1) "[t]he record does not support that Sterling competed with PJD, let alone competed by using Confidential Information" and "PJD's unfair competition claim amounts to no more than a grievance that Sterling *considered* competing against it"; (2) "Sterling's conduct was neither dishonest nor deceptive"; (3) "PJD's unfair competition claim fails because the NDA specifically permits competition without the use of Confidential Information and Arizona law prevents the use of NDAs to chill competition"; and (4) "PJD has also failed to establish damages for its unfair competition claim." (*Id.* at

140-42.)

131.    PJD has failed to establish an entitlement to relief on Count Nine.  Even assuming that Count Nine is not displaced by the AUTSA, Count Nine fails on the merits because, at a minimum, PJD failed to substantiate its argument that Sterling acted improperly or unfairly or made improper uses and disclosures of Confidential Information. Additionally, for all of the reasons stated in relation to Counts Five and Six, PJD has not established damages or an entitlement to nominal damages, court costs, consequential damages, declaratory relief, specific performance, or injunctive relief.

132.    PJD also seeks punitive damages in relation to Count Nine.  (Doc. 268 at 74 ¶ 75.)  That request fails because PJD did not prevail on Count Nine.  At any rate, punitive damages are also unwarranted because PJD failed to prove (let alone prove clearly and convincingly) that Sterling acted with an evil mind.  *Rawlings v. Apodaca*, 726 P.2d 565, 578 (Ariz. 1986) ("[T]o obtain punitive damages, plaintiff must prove that defendant's evil hand was guided by an evil mind."); *Hilgeman v. Am. Mortgage Sec., Inc.*, 994 P.2d 1030, 1036-38 (Ariz. Ct. App. 2000) ("To recover punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant engaged in aggravated and outrageous conduct with an evil mind, that is, with intent to injure or defraud, or deliberately interfere with the rights of others, consciously disregarding the unjustifiably substantial risk of significant harm to them.") (cleaned up).

…

…

…

…

…

…

…

…

…

Accordingly,

**IT IS ORDERED** that:

1.      Sterling's renewed motion to exclude Duffus (Doc. 247) is **denied**.

2.      The Court rules in Sterling's favor as to Counts One, Two, Three, Five, Six, and Nine of the SAC, which are all of the remaining claims in this action.

3.      The Clerk shall enter judgment in Sterling's favor and terminate this action.

Dated this 18th day of February, 2025.

Dominic W. Lanza
United States District Judge